1  MICHAEL J. HARTLEY (State Bar No. 189375)
   JOANN M. WAKANA (State Bar No. 232714)
2  **ALSTON & BIRD LLP**
   333 South Hope Street, Sixteenth Floor
3  Los Angeles, California 90071
   Telephone: (213) 576-1000
4  Facsimile: (213) 576-1100
   michael.hartley@alston.com
5  joann.wakana@alston.com

6

7  Richard J. Oparil
   PATTON BOGGS LLP
8  2550 M Street, NW
   Washington, DC 20037
9  Telephone: (202) 457-6000
   Facsimile: (202) 457-6315
10 roparil@pattonboggs.com

11 Attorneys for Plaintiffs
   SIMON DAVIES and DAVID WARNOCK

12

13               **UNITED STATES DISTRICT COURT**

14               **CENTRAL DISTRICT OF CALIFORNIA**

15                      **CENTRAL DIVISION**

16 SIMON DAVIES, an individual; and       Case No. **CV09-8724 RGK (RCx)**
   DAVID WARNOCK, an individual,
17
                                          **COMPLAINT FOR:**
18              Plaintiffs,
                                          **(1) RICO (Against All**
19      v.                                    **Defendants);**
                                          **(2) CAL. BUS. & PROF. C. §**
20 GETFUGU, INC., a Nevada corporation;       **17200, *et seq.* (Against All**
   CARL FREER, an individual; ALAN J.        **Defendants);**
21 BAILEY, an individual; BEGBIES         **(3) BREACH OF FIDUCIARY**
   TRAYNOR GROUP, a United Kingdom          **DUTIES – DERIVATIVE**
22 corporation; MICHAEL CARRENDER, an       **CLAIM (Against Defendants**
   individual; MARK CHAMPION, an            **Freer, Bailey, Champion, Irwin,**
23 individual; CORPORATE VALUATION          **Kozhuharov, Kurz, LaPresle,**
   ADVISORS, INC., a Wisconsin              **Norton, O'Connor, Peters,**
24 corporation; DRAGON PHOENIX              **Solomon, Steran, Stolar,**
   (CHINA) LTD., a Chinese corporation;     **Stoppenhagen and Timpe);**
25 DAVID RUBIN & PARTNERS, a United      **(4) NEGLIGENCE –**
   Kingdom corporation; PAUL DAVIS, an       **DERIVATIVE CLAIM**
26 individual; TIMOTHY DOLDER, an           **(Against CVA);**
   individual; STEFAN ERIKSSON, an       **(5) BREACH OF CONTRACT**
27 individual; ANNELI FREER, an individual;  **(Against Freer and Eriksson);**
   ERICKA FREER, an individual; DAVID    **(6) ACCOUNT STATED (Against**
28 HUDSON, an individual; JASON IRWIN,      **Freer and Eriksson);**
   an individual; JUANITA GROUP LTD., a  **(7) UNJUST ENRICHMENT**

                                   1

| | | |
|---|---|---|
| 1 | United Kingdom corporation; IVAN D. KOZHUHAROV, an individual; DONALD A. KURZ, an individual; MARK LAPRESLE, an individual; MIKAEL LJUNGMAN, an individual; HAZINA LJUNGMAN, an individual; ASHER D. MILLER, an individual; DEREK NORTON, an individual; MICHAEL O'CONNOR, an individual; CHRISTINE PETERS, an individual; DAVID ANTONY RUBIN, an individual; MICHAEL JAY SOLOMON, an individual; LEATHEM STERAN, an individual; BERNARD STOLAR, an individual; ERIC STOPPENHAGEN, an individual; TIGER TELEMATICS, INC., a Florida corporation; CHUCK TIMPE, an individual; MEDIA POWER USA LLC, a California corporation; and DOE 1 through DOE 100, inclusive, | **(Against Freer and Eriksson); and** |

**(8) CIVIL CONSPIRACY (Against All Defendants)**

**DEMAND FOR JURY TRIAL**

Filing Date: November 25, 2009

Defendants.

2

COMPLAINT

LEGAL.02/31640952v2

1    Plaintiffs SIMON DAVIES and DAVID WARNOCK (collectively
2  "Plaintiffs") hereby allege against Defendants GETFUGU, INC., CARL FREER,
3  ALAN J. BAILEY, BEGBIES TRAYNOR GROUP, MICHAEL CARRENDER,
4  MARK CHAMPION, CORPORATE VALUATION ADVISORS, INC., DRAGON
5  PHOENIX (CHINA) LTD., DAVID RUBIN & PARTNERS, PAUL DAVIS,
6  TIMOTHY DOLDER, STEFAN ERIKSSON, ANNELI FREER, ERICKA FREER,
7  DAVID HUDSON, JASON IRWIN, JUANITA GROUP LTD.,   IVAN D.
8  KOZHUHAROV,   DONALD   A.   KURZ,   MARK   LAPRESLE,   MIKAEL
9  LJUNGMAN, HAZINA LJUNGMAN, ASHER D. MILLER, DEREK NORTON,
10 MICHAEL O'CONNOR, CHRISTINE PETERS, DAVID ANTONY RUBIN,
11 MICHAEL JAY SOLOMON, LEATHEM STERAN, BERNARD STOLAR, ERIC
12 STOPPENHAGEN, TIGER TELEMATICS, INC., CHUCK TIMPE, MEDIA
13 POWER USA LLC DOE 1 through DOE 100, and Nominal Defendant GETFUGU,
14 INC. (collectively "Defendants"), inclusive, on personal knowledge as to itself, and
15 otherwise on information and belief, as follows:

## JURISDICTION AND VENUE

17    1.    This Court has subject matter jurisdiction over these claims
18 pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1961, and 18 U.S.C. § 1964(a), (c).  This
19 Court also has supplemental jurisdiction over the state law claims asserted herein
20 pursuant to 28 U.S.C. § 1367(a).

21    2.    Venue is proper in this forum pursuant to 28 U.S.C. §§ 1391(a)-
22 (d), 18 U.S.C. § 1965, and the applicable law of this Court.  Venue is proper because,
23 *inter alia*, events that form the basis for Plaintiffs' claims have occurred here, and
24 Defendants have engaged in commerce within this forum, have sought the benefits of
25 this forum in this litigation, and continue to have substantial contact with this forum.
26 ///
27 ///
28

3

COMPLAINT

**INTRODUCTION**

3.      This is an action brought by Plaintiffs pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961, *et seq.*  This action also includes claims for breach of fiduciary duty and for repayment of a loan against some of the Defendants.  Defendant Freer is a felon and corrupt individual who has repeatedly schemed and conspired with others to take over companies, many of them publicly traded, and then exploit them for his own greedy and improper purposes.  Freer and those of his corrupt associates often benefit from classic "pump and dump" schemes to talk up the value of penny stocks, sell their shares at the inflated prices, and then abandon the companies and its exploited shareholders, before moving on to their next business.  Further, Freer and his associates have used their management and control positions with these corporations to strip corporate assets and to raid the corporate piggybank for their personal benefit, deprive the shareholders of their honest services, commit fraud, breach their fiduciary duties and stiff creditors (including Plaintiffs) – all in an effort to improperly and unlawfully enrich themselves and for their own financial benefit.  GetFugu, Inc. is nothing more than Freer's latest corporate swindle.

**PARTIES**

4.      Plaintiff Simon Davies ("Davies") is a citizen of the United Kingdom.

5.      Plaintiff David Warnock ("Warnock") is a citizen of the United Kingdom.

6.      Defendant GetFugu, Inc. ("GetFugu") is a Delaware corporation with its principal place of business in Los Angeles, California.  Prior to October 16, 2009, GetFugu was a Nevada corporation.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

4

LEGAL02/31640952v2

1    7.    Defendant Carl Freer ("Freer") is a citizen of Sweden who is a
2    resident of California.  Freer is the founder, largest shareholder, and an officer and
3    director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and
4    its shareholders and breached such duties, and he acted, aided and abetted, conspired,
5    facilitated and participated in the unlawful and illegal acts and omissions alleged
6    below.  Also, Freer personally guaranteed loans made by Davies and Warnock.

7    8.    Defendant Alan J. Bailey ("Bailey") is a citizen of the State of
8    California.  On or about November 2, 2009, he became a Director of GetFugu.  At all
9    material times, he owed fiduciary duties to GetFugu and its shareholders and breached
10   such duties, and he acted, aided and abetted, conspired, facilitated and participated in
11   the unlawful and illegal acts and omissions alleged below.

12   9.    Defendant Begbies Traynor Group ("Begbies Traynor") is a United
13   Kingdom corporation with its principal place of business in the United Kingdom.  The
14   company provides services related to business rescue, recovery and restructuring.
15   Begbies employed two of the Joint Liquidators for Gizmondo Europe Limited (in
16   Liquidation) ("Gizmondo-Liquidation").  At all material times, it acted, aided and
17   abetted, conspired, facilitated and participated in the unlawful and illegal acts and
18   omissions alleged below.

19   10.   Defendant Michael Carrender ("Carrender") is a citizen of the
20   State of Florida and served as President of Tiger.  At all material times, he acted,
21   aided and abetted, conspired, facilitated and participated in the unlawful and illegal
22   acts and omissions alleged below.

23   11.   Defendant Mark Champion ("Champion") is a citizen of the State
24   of California.  He was and is the Chief Financial Officer of GetFugu.  At all material
25   times, he owed fiduciary duties to GetFugu and its shareholders and breached such
26   duties, and acted, aided and abetted, conspired, facilitated and participated in the
27   unlawful and illegal acts and omissions alleged below.

28

COMPLAINT

1         12.    Defendant Corporate Valuation Advisors, Inc. ("CVA") is a

2    Wisconsin corporation with its principal place of business in Wisconsin.   At all

3    material times, it acted, aided and abetted, conspired, facilitated and participated in the

4    unlawful and illegal acts and omissions alleged below.

5         13.    Defendant Dragon Phoenix (China) Ltd. ("Dragon Phoenix") is a

6    Chinese corporation with its principal place of business in Hong Kong.   At all material

7    times, it acted, aided and abetted, conspired, facilitated and participated in the

8    unlawful and illegal acts and omissions alleged below.

9         14.    Defendant David Rubin & Partners ("DRP") is a United Kingdom

10   corporation with its principal place of business in the United Kingdom.   The company

11   provides services related to business rescue, recovery and restructuring.   DRP

12   employed two of the Joint Liquidators for Gizmondo-Liquidation.   At all material

13   times, it acted, aided and abetted, conspired, facilitated and participated in the

14   unlawful and illegal acts and omissions alleged below.

15        15.    Defendant Paul Davis ("Davis") is a citizen of the United

16   Kingdom.   During relevant time periods, he was employed by Begbies Traynor and

17   was one of the Joint Liquidators of Gizmondo-Liquidation.   At all material times, he

18   acted, aided and abetted, conspired, facilitated and participated in the unlawful and

19   illegal acts and omissions alleged below.

20        16.    Defendant Timothy Dolder ("Dolder") is a citizen of the United

21   Kingdom.   During relevant time periods, he was employed by Begbies Traynor and

22   was one of the Joint Liquidators of Gizmondo-Liquidation.   At all material times, he

23   acted, aided and abetted, conspired, facilitated and participated in the unlawful and

24   illegal acts and omissions alleged below.

25        17.    Defendant Stefan Eriksson ("Eriksson") is a citizen of Sweden. He

26   has held various positions with numerous entities, including without limitation,

27   Gizmondo, Tiger and Xero.   At all material times, he acted, aided and abetted,

28   conspired, facilitated and participated in the unlawful and illegal acts and omissions

COMPLAINT

1 alleged below. Also, Eriksson personally guaranteed loans made by Davies and
2 Warnock.

3          18.    Defendant Anneli Freer is a citizen of the State of California and is
4 Freer's ex-wife.  At all material times, she acted, aided and abetted, conspired,
5 facilitated and participated in the unlawful and illegal acts and omissions alleged
6 below.

7          19.    Defendant Ericka Freer is a citizen of the State of Colorado.  She is
8 Freer's wife and has participated in and/or personally benefited from the wrongful acts
9 and omissions described herein.  At all material times, she acted, aided and abetted,
10 conspired, facilitated and participated in the unlawful and illegal acts and omissions
11 alleged below.

12          20.    Defendant David Hudson is a citizen of the United Kingdom.
13 During relevant time periods, he was employed by Begbies Traynor and was one of
14 the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided
15 and abetted, conspired, facilitated and participated in the unlawful and illegal acts and
16 omissions alleged below.

17          21.    Defendant Jason Irwin ("Irwin") is a citizen of the State of New
18 York.   Irwin was President, Chief Executive Officer, Chief Financial Officer,
19 Secretary, and a Director of GetFugu from January 30, 2009 to April 2, 2009.  At all
20 material times, he owed fiduciary duties to GetFugu and its shareholders and breached
21 such duties, and acted, aided and abetted, conspired, facilitated and participated in the
22 unlawful and illegal acts and omissions alleged below.

23          22.    Defendant Juanita Group Ltd. ("Juanita Group") is a United
24 Kingdom corporation with its principal place of business in California. At all material
25 times, it acted, aided and abetted, conspired, facilitated and participated in the
26 unlawful and illegal acts and omissions alleged below.  At all material times, he acted,
27 aided and abetted, conspired, facilitated and participated in the unlawful and illegal
28 acts and omissions alleged below.

7

COMPLAINT

23. Defendant Ivan D. Kozhuharov ("Kozhuharov") is a citizen of the State of Connecticut. Kozhuharov was Chief Technology Officer of Media Power, Madero and GetFugu. His current position at GetFugu is called Chief Software Architect. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

24. Defendant Donald A. Kurz ("Kurz") is a citizen of the State of California. On or about November 13, 2009, Kurz was appointed to GetFugu's Board of Directors. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

25. Defendant Mark LaPresle ("LaPresle") is a citizen of the State of California. LaPresle has been a member of the Board of Directors of GetFugu since January 2009. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

26. Defendant Mikael Ljungman ("Ljungman") is a citizen of Sweden and he is current incarcerated in Sweden. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

27. Defendant Hazina Ljungman is a citizen of Sweden. She is Ljungman's wife and has participated in and/or personally benefited from the wrongful acts and omissions described herein. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

8

COMPLAINT

1    28.    Defendant Asher D. Miller ("Miller") is a citizen of the United

2  Kingdom.  During relevant time periods, he was a partner in DRP and was one of the

3  Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and

4  abetted, conspired, facilitated and participated in the unlawful and illegal acts and

5  omissions alleged below.

6    29.    Defendant Derek Norton ("Norton") is a citizen of the State of

7  California.  On or about October 19, 2009, he became Chief Operating Officer of

8  GetFugu.   At all material times, he owed fiduciary duties to GetFugu and its

9  shareholders and breached such duties, and he acted, aided and abetted, conspired,

10  facilitated and participated in the unlawful and illegal acts and omissions alleged

11  below.

12    30.    Defendant Michael O'Connor ("O'Connor") on information and

13  belief, is a citizen of Canada.  On or about July 26, 2009, he became a Director of

14  GetFugu.   At all material times, he owed fiduciary duties to GetFugu and its

15  shareholders and breached such duties, and he acted, aided and abetted, conspired,

16  facilitated and participated in the unlawful and illegal acts and omissions alleged

17  below.

18    31.    Defendant Christine Peters ("Peters") is a citizen of the State of

19  California.  Peters has been a Director of GetFugu since on or about May 5, 2009.  At

20  all material times, she owed fiduciary duties to GetFugu and its shareholders and

21  breached such duties, and she acted, aided and abetted, conspired, facilitated and

22  participated in the unlawful and illegal acts and omissions alleged below.

23    32.    Defendant David Antony Rubin ("Rubin") is a citizen of the

24  United Kingdom.  During relevant time periods, he was a partner in DRP and was one

25  of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted,

26  aided and abetted, conspired, facilitated and participated in the unlawful and illegal

27  acts and omissions alleged below.

28

9

COMPLAINT

33.   Defendant Michael Jay Solomon ("Solomon") is a citizen of the State of California. Solomon became Chairman of the Board of Directors of GetFugu on or about July 22, 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

34.   Defendant Leathem Steran ("Steran") is a citizen of the State of Connecticut.  Leathem was the Chairman of the Board of Directors of GetFugu from approximately January 2009 to approximately July 22, 2009; he continues to be a director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

35.   Defendant Bernard Stolar ("Stolar") is a citizen of the State of California.   Stolar was Chief Executive Officer and President and a director of GetFugu since approximately January 2009.  On or about November 2, 2009, Stolar resigned as President (but remained CEO).  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

36.   Defendant Eric Stoppenhagen ("Stoppenhagen") is a citizen of the State of California.   Stoppenhagen, a Certified Public Accountant, was the interim Chief Financial Officer and Secretary and a director of GetFugu from on or about April 4, 2009 to May 4, 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

COMPLAINT

LEGAL02/31640952v2

37.     Defendant Tiger Telematics, Inc. ("Tiger") is incorporated under Delaware law and its principal place of business is in Jacksonville, Florida.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

38.     Defendant Chuck Timpe ("Timpe") is a citizen of the State of California. On or about November 2, 2009, he became a Director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

39.     Defendant Media Power USA LLC ("Media Power") is a California corporation with its principal place of business in Los Angeles, California. Media Power's predecessor was Media Power USA, Inc., which was originally established on December 31, 2006 as a California Limited Liability Company.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

40.     Plaintiffs currently do not know the true names and capacities of the Defendants sued as Does 1 through 100, inclusive, and therefore sue these Defendants by fictitious names.  Plaintiffs will amend their Complaint to allege the true names and capacities of these Defendants when they are ascertained.  Each of the fictitiously named Doe Defendants are responsible in some manner for the events and happenings alleged in this Complaint.

41.     At all relevant times, each Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c), because each Plaintiff was "capable of holding a legal or beneficial interest in property" and "were injured in their business or property by a violation of 18 U.S.C. § 1962."

42.     At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

11

LEGAL02/31640952v2

## SHAREHOLDER DERIVATIVE ACTION

43.  At all relevant times, Warnock was and is a shareholder of GetFugu.  He owns 500,004 shares of the company.  The derivative claims set forth herein all pertain to the time period during which Warnock was a GetFugu shareholder.

44.  This action is not a collusive action to confer jurisdiction on a court of the United States which it would not otherwise have.

45.  On October 8, 2009, Warnock sent a letter to the members of the Board of Directors as well as the Chief Executive Officer of GetFugu demanding that they immediately investigate and enforce the rights that GetFugu may properly assert relating to the claims alleged below but has failed to enforce.  Warnock demanded an immediate response to his letter, no later than October 13.

46.  On October 21, 2009, counsel for GetFugu and Freer personally sent a letter to Warnock stating, *inter alia*, that GetFugu's Board allegedly formed a special committee of independent directors to review and investigate the matters set forth in Warnock's letter.

47.  On October 23, Warnock replied to the letter, which, *inter alia*, (a) asked that the names of the members of the special committee be disclosed, (b) stated that Kirkland should not serve as counsel to the special committee because he was not independent, and (c) provided additional information regarding the claims described in Warnock's October 8 letter.  Warnock asked for a reply by October 28.  To date, no response has been received.

48.  In any event, an attempt to obtain the relief requested herein from the Defendants would be futile.  The Defendant directors, officers and shareholders are and have been antagonistic to Warnock.  The Defendants would not agree to the payment of damages or the equitable relief sought herein.

49.  Moreover, a day after Warnock sent his demand letter, on October 9, GetFugu filed a Preliminary Information Statement with the Securities and

12

COMPLAINT

LEGAL02/31640952v2

1   Exchange Commission to reincorporate as a Delaware corporation, in an apparent

2   attempt to limit the liability of GetFugu's directors and officers.  On or about October

3   16, 2009, GetFugu became a Delaware corporation.

4                                              **FACTS**

5   **I.      Tiger / Gizmondo / Smart Adds**

6             50.    In 2000, Freer was director of a UK-based company, Eagle Eye

7   Scandinavian Distribution Ltd. ("Eagle Eye").

8             51.    Freer became interested in Floor Décor, Inc. ("FDI"), not because

9   of its flooring business, but because in 2001, it became a public company by way of a

10  reverse merger with Media Communications Group Inc. ("MCGI"), a publicly-traded

11  marketing and distribution company.  Freer came to believe that a publicly-traded

12  company can create money by selling stock, borrowing money from shareholders,

13  creating more shares of stock, and even using them in lieu of cash.  The latter was

14  what FDI accomplished with its reverse takeover of MCGI.  By the end of 2001, FDI

15  had an accumulated deficit of almost two million dollars, the annual report noted

16  "strained" liquidity and the possibility of having to start cost-saving measures to

17  increase available cash.

18            52.    On or about February 4, 2002, FDI purchased Freer's company,

19  Eagle Eye, with 7,000,000 shares of its stock and changed its name to Tiger

20  Telematics Ltd.  It also relieved itself of indebtedness to various shareholders by

21  converting the debts into stock. FDI had managed to acquire a new subsidiary, and

22  reduce its liabilities by over $4 million, without actually spending any money.

23            53.    By July 2002, FDI had changed its name to Tiger Telematics Inc.,

24  announced plans to dispose of its unprofitable flooring business and leased a London

25  office for Tiger Telematics Ltd. (paying for the first year with 500,000 shares).

26            54.    Tiger bought Comworxx Inc., a U.S.-based telematics provider.

27  The deal was for $4.2 million worth of Tiger stock, the assumption of some of

28  Comworxx's liabilities, and the provision of $500,000 of funding. A subsequent

1  review of Comworxx's operations concluded, rather surprisingly, that Comworxx was
2  not a viable business. Tiger then wrote off the value of the purchase completely,
3  adding almost five million dollars to its losses for that year.

4          55.    In 2002, Tiger formed a new subsidiary, Tiger Telematics Europe
5  Ltd., subsequently named Gizmondo Europe, Ltd. ("Gizmondo"), to provide
6  telematics products and services to customers in England and Western Europe.  Freer
7  was made Managing Director of this new subsidiary, and Steve Carroll ("Carroll"),
8  originally employed by Freer's company Eagle Eye, became Technical Director.
9  Freer subsequently became Chairman of the Board.

10          56.    A short time later, Christian & Timbers ("C&T") sued Tiger
11  because Tiger Ltd. had defaulted on its lease payments and Tiger guaranteed the lease.
12  Although the UK Court entered a $300,000 judgment, Tiger issued C&T with "shares
13  of common stock to satisfy the amount of the outstanding judgment."

14          57.    The 2002 annual report of Tiger first mentioned Freer and
15  described his alleged background and listed a number of previous appointments,
16  including as a trustee on the Kings Medical Research Trust and a founder of a
17  company called Vxtreme.  *The Times of London* later reported neither of those
18  statements were true. In fact, Freer promised Kings Medical Research Trust millions
19  of dollars, but in the end offered the Trust nothing more than stock at the time, and
20  that was not good enough – a pattern which has followed Freer to this day. Freer is
21  notorious for offering stock to charities, universities, debt collectors and colleagues,
22  for yacht, art, and self-serving needs.

23          58.    Meanwhile, under Freer's direction, Tiger was only able to
24  continue operating by borrowing money (usually from shareholders) or by using
25  shares in lieu of cash to pay suppliers and even employees. As a result, Tiger's losses
26  for 2003 were diminished from those in 2002.

27          59.    Tiger and its subsidiaries, including a company named Smart
28  Adds, Inc. ("Smart Adds"), were allegedly engaged in the business of developing and

14

1   marketing a wireless handheld multi-entertainment gaming device called the
2   Gizmondo and related games and accessories associated with the device.  In an article
3   published by Business Week on or about June 21, 2004, Carrender said that "It's clear
4   the growth is going to be astronomical . . . ."

5          60.   In August 2004, a press release announced that Gizmondo had
6   purchased a purported Stockholm game developer called Indie Studios AB ("Indie"),
7   for $850,000 and shares valued at $2,740,000 – in total over three million dollars *in*
8   *excess* of its stated value. The excess of purchase price over the value of the tangible
9   assets acquired ($3,651,713), was assigned to "goodwill."

10          61.   The Indie acquisition marked both the entry into the company of
11   Freer's Swedish associates and the first seriously questionable business deal.   Indie
12   was bought from a company called Golden Sands Investment Holdings. Its directors
13   were Eriksson, Peter Uf, and Joe Marten.  Eriksson had been convicted of robbery,
14   drug trafficking, assault and counterfeiting, released from prison in 2000 after serving
15   six years of a ten-year sentence for fraud.  He was alleged to be a member of a
16   Swedish organized crime group known as the "Uppsala Mafia."  On November 7,
17   2006, Eriksson pleaded no contest to embezzling the two sport cars and illegally
18   possessing a gun and was sentenced to three years in prison.  In or about January
19   2008, Eriksson was released from prison in the US and extradited to serve a prison
20   term in Europe. Peter Uf had also been imprisoned for fraud.

21          62.   A number of personnel changes followed the acquisition: Freer
22   was made a Director of Tiger and Board Chairman as well as Managing Director of
23   Gizmondo, Eriksson and Uf were brought on as Directors of Gizmondo and Carroll
24   was made Tiger's Chief Technology Officer. Johan Enander, an associate of Eriksson,
25   was made Head of Security for Gizmondo.  Enander, another alleged member of the
26   Uppsala Mafia, had been convicted of extortion and grand theft.  Further, when he
27   was hired by Gizmondo as Head of Security he had only just finished an 18-month
28   sentence for assaulting a woman and was still wanted by the Swedish police.

COMPLAINT

63. Tiger's 2004 SEC Form 10-K revealed not only a massive, $99.2 million loss but very generous executive compensation packages, provided in the form of cash, loans, automobile allowances and stock.

64. Freer and Eriksson used Tiger and Gizmondo and Tiger's other affiliates to enrich themselves and their associates at the expense of the companies and their creditors and stockholders. Examples of such conduct include, without limitation:

(a) In or about September 2004, Gizmondo entered into a License Agreement with Northern Lights Software Limited ("Northern Lights"), under which Gizmondo paid Northern Lights approximately $3.5 million. At the time of the agreement Freer and Eriksson were the only directors of both Northern Lights and Gizmondo. Freer and Eriksson each was the beneficial owner of 23.5% of the outstanding shares of Northern Lights. The 52% owner of Northern Lights was said to be "Asiatic Commerce Bank." Freer and/or Eriksson owned and controlled, directly or indirectly, Asiatic.

(b) Tiger disclosed that in 2004, Freer and Eriksson caused "Asiatic Bank and Finance", a company allegedly registered in Panama with its head office in Hong Kong, to pay $7.6 million that was said to have been owed by Asiatic to Freer and Eriksson, directly to 3P PreForm Marketing and Research AB, a systems developer based in Stockholm, and others supposedly in repayment of research and development expenditures owed to these parties by Gizmondo. Gizmondo then credited this amount in payment of amounts previously owed by Freer and Eriksson to Gizmondo. Asiatic was also a Tiger shareholder. What Tiger did not disclose was that Freer and/or Eriksson, directly or indirectly, owned most

16

1    if not all of Asiatic.

2    (c)    Gizmondo paid Freer's wife for "consultancy services."

3    (d)    Freer had a dual role selling Tiger stock to the Palestinian
4           Investment Fund ("PIF"). According to Tiger's April 28, 2005
5           SEC Form 8-K, on or about April 28, 2005, Tiger completed a
6           sale of approximately 1,640,724 shares of its common stock for an
7           aggregate purchase price of approximately $21,437,537 million.
8           Approximately 1,220,588 of the shares were sold to PIF, for $17 a
9           share. The Form 8-K goes on to say that PIF was involved in a
10          stock swap with an unnamed shareholder who sold Tiger shares to
11          an investment fund. Later, they remitted the funds to Tiger in
12          exchange for newly issued shares at a discounted price to reflect
13          the restrictions. Tiger paid approximately $1,640,000 to Earlsdon
14          Investments Ltd. in part as a placement fee. Among other things,
15          Tiger did not disclose that:

16          (1)    Tiger had transferred 1,295,588 of its shares to Juanita
17                 Group, a company that is owned by Freer and his
18                 wife, Anneli Freer.

19          (2)    On or about April 11, 2005, Tiger's President,
20                 Carrender, wrote four letters to PIF transmitting
21                 shares (one for 200,000 shares, 20,588 shares,
22                 600,000 shares, and 400,000 shares) and
23                 certifying "that the above certificate for shares was
24                 purchased from a *non-affiliated shareholder*"
25                 (emphasis added). In fact, the certificates came from
26                 Juanita Group. In addition to his ownership interest in
27                 Juanita Group, Freer was Chairman of the Board of
28                 Tiger at the time. Thus, these letters were false and

                                    17

                                                    COMPLAINT

1                  misleading.

2                (3)      The actual amount paid by PIF was $20,750,000 (for

3                       1,220,588 shares) not $21,437,537. Moreover, PIF

4                       paid this amount to Juanita Group, not Tiger. Tiger

5                       only received $14,119,880.

6  Thus, Freer and Anneli Freer were able to fraudulently and improperly obtain money,

7  to the detriment of Tiger.

8         65.    By spring 2005, Gizmondo was issuing frequent news releases and

9  Tiger's share prices rose to $32.50, valuing the company in excess of $1 billion. In

10  April 2005, Tiger raised $21.4 million in a stock sale.   However, in May 2005, less

11  than one month after that sale, Tiger reported that in the second quarter of 2005, it had

12  borrowed approximately $21.2 million from two shareholders, Plaintiffs Warnock and

13  Davies. (SEC Form 10-Q filed Nov. 30, 2005).

14         66.    On or about May 9, 2005, Warnock loaned Gizmondo £4,000,000,

15  documented in a promissory note.  The note was due June 2, 2005.  Gizmondo, Tiger,

16  Freer, and Eriksson signed and personally guaranteed the note.  A copy of the

17  document is incorporated by reference.

18         67.    On or about May 31, 2005, Gizmondo signed a note in the amount

19  of £4,000,000 in favor of Warnock, which, *inter alia*, extended the due date of the

20  May 9, 2005 note to June 30, 2005.  Gizmondo, Tiger, Freer and Eriksson signed and

21  personally guaranteed the note.  A copy of the document is incorporated by reference.

22         68.    On or about June 13, 2005, Warnock and Davies loaned Gizmondo

23  £6,000,000, documented in a promissory note.  The note was due July 31, 2005.

24  Gizmondo, Tiger, Freer and Eriksson signed and personally guaranteed the note.  A

25  copy of the document is incorporated by reference.

26         69.    On or about June 13, 2005, Warnock and Davies loaned Gizmondo

27  £1,000,000, documented in a promissory note.  The note was due July 31, 2005.

28  Gizmondo Tiger, Freer and Eriksson signed and personally guaranteed the note.  A

COMPLAINT

1    copy of the document is incorporated by reference.

2          70.    On or about July 5, 2005, Warnock and Davies agreed to extend

3    the maturity of the June 13, 2005 note in the amount of £1,000,000 to September 30,

4    2005.  The guarantee of Tiger was extended to October 1, 2005 and the guarantee of

5    Eriksson and Freer were extended to October 2, 2005.  A copy of the document is

6    incorporated by reference.

7          71.    On or about July 5, 2005, the maturity of the note with the original

8    due date of June 2, 2005 was extended to December 31, 2005, with the addition of a

9    1,027,069 stock option.

10         72.    On or about August 11, 2005, two patent applications were filed

11   with the U.S. Patent and Trademark Office ("USPTO"):  No. 2006/0064350, titled

12   "Method for advertising" ("Smart Adds I") and No. 2006/0074550, titled "System &

13   method for distributing multimedia content via mobile wireless platforms" ("Smart

14   Adds II").   Freer was listed as the inventor on both patent applications.   Both

15   applications are now assigned to Warnock and Davies and such assignments are

16   properly recorded with the USPTO.

17         73.    Incredibly, for the first three quarters of September 2005, when

18   financial reporting ended, Tiger disclosed that it had spent over $218 million on

19   "general and administrative expenses."  Tiger also disclosed that:

20                      The Company has sustained net losses aggregating
21                      over $382.5 million for the three years and nine
22                      months ended September 30, 2005.  In addition, the
                         Company had a net working capital deficiency of
23                      $76.4 million at September 30, 2005.  During those
24                      periods,  the  Company  sold  $121.3  million  of
                         restricted  common  stock  shares  and,  in  order  to
25                      conserve cash, the Company funded $178.3 million of
                         the losses by issuing restricted common stock in
26                      exchange     for     services     and     other     expenses.
27                      Management  anticipates  proceeds  from  sales  of
                         Gizmondo     units     and     accessories     to     increase
28

19

COMPLAINT

significantly after the U.S. launch of the product on October 22, 2005. Management also anticipates the ability to continue issuing equity securities to meet working capital requirements and to fund development costs incurred in connection with developing products that the Company believes will enhance its operations. No assurances can be given that these funds will be available. Additionally, the Company borrowed approximately $21.2 million from shareholders on a short-term basis during the second quarter of 2005 (See Note J).

(SEC Form 10-Q filed Nov. 30, 2005).

74.    On or about August 19, 2005, Ogilvy Group Sweden Limited, the company's public relations agency, sued Gizmondo to collect $4.1 million for its services and the court later ruled in favor of the plaintiff. In the United States, Ogilvy Public Relations Worldwide, Inc. commenced an arbitration against Gizmondo for $305,000 it claimed was also outstanding. On or about September 2, 2005, MTV Networks Europe demanded payment of $1.5 million in sponsorship fees it claimed Gizmondo had not paid.

75.    On or about September 30, 2005, Tiger announced that three new "independent" directors joined the Board. (See SEC Form 8-K dated Sept. 30, 2005). They formed a special committee to investigate Tiger's related party transactions, including those involving Freer and Erickson. Tiger disclosed that the committee was conducting an active review of the matters. "Should any transactions be deemed inappropriate or unfair to the Company by this committee, they will be fully investigated and remedial action taken accordingly." No such action was ever taken by the committee.

76.    For the first quarter of 2005, the quarter in which it launched Gizmondo in the United Kingdom, Tiger lost $163.8 million. Reflecting Freer's pattern and practice of looting companies, $151.1 million of that loss arose from general and administrative operating expenses. By contrast, the company spent just

20

LEGAL02/31640952v2

1  $455,092 on goods sold.  (SEC Form 10-Q, filed Oct. 20, 2005).

2          77.    On or about October 19, 2005, Davies provided Freer with

3  instructions on how to repay the two loans of £4 million and £7 million.  Freer did not

4  contest the debt that he personally guaranteed.

5          78.    In October 2005, Freer was sentenced to probation and fined by a

6  court in Germany for buying four luxury cars with a bad check.  He had previously

7  forged his own parents' signature for a loan and was convicted of fraud.  Further,

8  between November 2007 and September 2008, Freer contributed at least $18,450 to

9  Hilary Clinton or her political action committee.  In doing so, he provided a California

10  address with the contribution but failed to disclose that he was a not a U.S. citizen.

11  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign national to make political

12  contributions.

13          79.    In October 2005, Freer and Eriksson traveled to California for the

14  purported U.S. launch of the Gizmondo product.  However, they resigned their

15  positions with Tiger, Gizmondo and other Tiger affiliates on or about October 20,

16  2005.  Uf also resigned.  Tiger then disclosed that:

17              Since their resignations, Messrs. Freer, Eriksson and
18              Uf have been the subject of several articles published
19              in Sweden reporting alleged questionable activities
                and association with a Swedish crime family and, in
20              the case of Messrs. Eriksson and Uf, prior convictions
                for fraud and other economic crimes.  Mr. Freer has
21              advised the Company that the allegations and
22              implications of illegal activities or improprieties
                attributed to him are not true and that he intends to file
23              suit against the newspapers.  Prior to these reports, the
                Company had no prior knowledge of the past history
24              described in these reports.  The Company conducts
25              background checks of all of its senior executives.  The
                background checks did not reveal these convictions or
26              other illegal activities.

27

28

COMPLAINT

1    (SEC Form 10-Q filed Nov. 30, 2005).

2        80.    On or about December 14, 2005, Smart Adds entered into a

3    Security Agreement with Davies and Warnock.  Smart Adds granted Davies and

4    Warnock a security in its intellectual property as security for the loans to Gizmondo.

5        81.    On or about January 20, 2006, Gizmondo filed a High Court

6    application for administration in the United Kingdom.

7        82.    On or about February 2, 2006, liquidators were appointed for

8    Gizmondo, for the purpose of winding up the company's affairs and distributing its

9    assets.  The joint liquidators appointed for Gizmondo-Liquidation were Davis and

10   Dolder of Begbies Traynor, and Rubin and Miller of DRP (collectively, "the Joint

11   Liquidators").  The Joint Liquidators disclosed that they had conducted a "detailed

12   investigation" of Gizmondo pursuant to the UK Insolvency Act 1986.  The Joint

13   Liquidators contended that they had claims against Freer, his then-wife, other entities

14   affiliated with Freer, Eriksson, Tiger and others.  As set forth below, the Joint

15   Liquidators subsequently became part of the illegal enterprise alleged herein.

16       83.    In March 2006, Warnock and Davies demanded payment of their

17   loan from Tiger as guarantor.  However, Tiger had no funds to honor its guarantee.

18   Tiger's subsidiary, Smart Adds, did own intellectual property, including without

19   limitation Smart Adds I and Smart Adds II.

20       84.    On or about March 1, 2006, Smart Adds, Tiger, Davies and

21   Warnock entered into an Assignment of Intellectual Property and Release of Security

22   Agreement ("Assignment and Release").  Pursuant to the Assignment and Release,

23   Smart Adds assigned its intellectual property assets to Davies and Warnock, including

24   without limitation Smart Adds I and Smart Adds II.

25       85.    On or about November 15, 2007, the Joint Liquidators, Gizmondo-

26   Liquidation, and Freer entered into a Deed of Settlement to settle their claims against

27   Freer.  In pertinent part, the Deed of Settlement provided that:

28

(a)    Freer would pay the Joint Liquidators $6,010,000, with an initial payment of $10,000 and eight installments of $750,000 each;

(b)    If any of the installments were not timely paid, the entire amount of $6 million would immediately be due and payable;

(c)    Gizmondo-Liquidation would assign and transfer any intellectual property rights to trade names to Freer; and

(d)    On February 29, 2008, on the condition that Freer was then current with the payment schedule, the Liquidators would send Freer a letter confirming, *inter alia*, the cooperation and assistance given by Freer to the Liquidators.

## II.   <u>Xero</u>

86.    In February 2006, Freer engineered the formation of Xero Mobile, Inc. ("Xero"), a "Mobile Virtual Network Operator" in Los Angeles. It planned to offer a free cell phone service for college students, subsidized by advertisements delivered to their handsets.

87.    Xero was projecting incomes of $1.8 billion after three years, and was soon rumored to have raised $300 million in European investment.

88.    On or about June 26, 2006, Roger Davis, the President of Xero Mobile, wrote a letter "to whom it may concern" representing that Freer was the company's majority shareholder.  Other former Tiger and Gizmondo personnel were involved in management of Xero.

89.    On or about June 29, 2006, Thomas S. Loo, a shareholder in the law firm Greenberg Traurig LLLP, sent a letter to Wayne Levy of Equity Funding Group representing that:

> We serve as outside legal counsel to Xero Mobile, a Nevada corporation ("Xero Mobile" or the "Company").  As requested by the Company, we wish to confirm to you that Carl Freer was the founder of, and presently is a significant shareholder and investor

COMPLAINT

1  in Xero Mobile.  Our confirmation is based upon a
2  certificate by the President of the Company (attached)
   and certain records which have been provided to us.
3  We have not otherwise conducted a separate
4  investigation of the facts represented to us.

5  Attached to the letter was a June 30, 2006 "Certificate" signed by Roger Davis as

6  President of Xero, representing that:

7      (a)    Carl Freer is the beneficial owner of 4,254,743 of the outstanding

8          shares of Xero Mobile, which shares he holds in his name.

9          Blowfishworks LLC is beneficial owner of 8,642,311 of the

10          outstanding shares of Xero Mobile.  Additionally, Mr. Freer is the

11          beneficial owner of 1,000,000 shares held of record by

12          Blowfishworks LLC;

13      (b)    The above listed shareholdings represent approximately 31.2% of

14          the outstanding shares of Xero Mobile exclusive of outstanding

15          options and warrants to acquire equity interests in Xero Mobile;

16          and

17      (c)    Carl Freer was the initial shareholder of Xero Mobile or its

18          predecessor.

19  Freer owns and controls Blowfish.

20          90.    On or about March 6, 2006, Davies and Warnock entered into an

21  Assignment of Intellectual Property agreement with Xero, Freer and Eriksson

22  ("IP Assignment").  Pursuant to the IP Assignment, on the Closing Date (the date on

23  which Xero paid $26,000,000 to Davies and Warnock), Davies and Warnock would

24  assign the intellectual property they owned to Xero.  The IP Assignment is

25  incorporated herein by reference.

26          91.    In June 2006, Xero performed a reverse merger with a public shell

27  company.

28

COMPLAINT

1        92.    Freer and Eriksson personally guaranteed, jointly and severally, the

2   obligations of Xero under the IP Assignment.  If the transactions contemplated by the

3   IP Assignment were not consummated on or before May 31, 2006, Freer and Eriksson

4   would remain liable as guarantors under the 2005 notes.

5        93.    Freer and Eriksson have breached the IP Assignment by failing to

6   meet their obligations as guarantors to, *inter alia*, pay $26,000,000 (plus interest) to

7   Davies and Warnock.

8        94.    Thus, Davies and Warnock continue to own the intellectual

9   property set forth in the IP Assignment and are owed $26,000,000 plus interest by

10   Freer and Eriksson.

11  **III.**   **Media Power/Madero**

12        95.    Media Power was founded by Freer and his partner Ljungman.

13        96.    Ljungman recently was sentenced in Sweden to prison for tax

14   fraud.  On or about September 30, 2008, Ljungman donated $5,000 to Hilary

15   Clinton's political action committee, Hillpac.  In doing so, he provided a New York

16   address and stated that he was employed by Media Power, but he failed to disclose

17   that he was a not a U.S. citizen.  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign

18   national to make political contributions.1.   Media Power USA, Inc. was originally

19   established on December 31, 2006 as a California Limited Liability Company.  Media

20   Power USA LLC was founded by Freer and Ljungman, with Richard Jenkins

21   ("Jenkins") as Chief Executive Officer.  On October 27, 2007, the company converted

22   to a California Corporation.

23        97.    In or about late 2007, Freer (along with his minor son, Simon)

24   became involved with Alien King Inc. ("Alien King"), a company financed in whole

25   or in part with the proceeds of the criminal activities by Freer and others as alleged

26   herein.  Alien King provides pornography in the form of "mobile adult entertainment"

27   and operates websites to facilitate its business, including without limitation,

28   http://www.alienking.com  and  http://mobile.alienking.com.   Freer,  directly  or

COMPLAINT

1   indirectly, continues to have an interest in Alien King.  Further, Freer caused a Media

2   Power entity to make a payment to mBlox Inc., which, *inter alia*, facilitates payment

3   to adult content providers.

4           98.    On or about June 8, 2008, Media Power USA Inc, a California

5   corporation, merged with Media Power, a Delaware corporation.

6           99.    On or about February 14, 2008, Media Power purchased a 100%

7   membership interest in eCommerce, LLC ("eCommerce") for $1.00 and assumption

8   of debt. eCommerce's sole member was Ljungman, a Media Power shareholder.

9           100.   On or about April 7, 2008, Paul M. Davis, one of Gizmondo-

10  Liquidation's Joint Liquidators, wrote a letter to "whom it may concern," writing that:

> The Joint Liquidators are pleased to advise that following extensive enquiries and negotiations they have entered into an agreement with one of the Ex Director's [sic] of the Company, Mr. Carl Freer.
>
> Much time and effort has been spent on finding a resolution in relation to Mr. Carl Freer and the IPR Assets of Gizmondo Europe Limited — in liquidation.
>
> The continued co-operation afforded us by Mr. Freer will enabled [sic] the Liquidators to recover a substantial sum for the general body of creditors, furthermore, Mr. Freer's continued assistance will reduce the overall indebtedness of the company.
>
> We have considered the commerciality and viability of selling the IPR Assets to Mr. Carl Freer and feel that in all the circumstances we have achieved the best possible outcome on behalf of the creditors.
>
> Much work has been done by Mr. Freer and the Liquidators in finding ways to uncover value and repair the defunct operations of the

26

company.  According to Mr. Freer "the shareholders of Tiger Telematics will now be able to prosper on the re-introduction of the Gizmondo into the market".

The terms of the agreement remain confidential; however, we can advise that a substantial payment has already been made for the purchase by Mr. Carl Freer of the company's IPR Assets.

We wish Mr. Carl Freer every success with his plans to re-establish the Gizmondo in the Augmented Reality environment which will bring the power of Television, the accuracy and accountability of Direct Mail and the interactivity of the Gizmondo to a global audience.

101.  On May 20, 2008, Media Power executed a guarantee and indemnity agreement ("GI Agreement") with Gizmondo-Liquidation, whereby Media Power agreed to provide payment security to Gizmondo-Liquidation for the major shareholder of Media Power, *i.e.*, Freer.  On March 31, 2008, Media Power made an advance payment of $750,000 and as of November 3, 2008, Media Power paid a total of $2,379,596 under the GI Agreement.

102.  Media Power entered into the GI Agreement even though it had not yet been incorporated when Gizmondo filed for bankruptcy.  Media Power entered into the GI Agreement for the purpose of personally benefiting Freer, and shows Freer's self-serving purpose for which he uses his corporate entities and the use of such companies as his personal piggybank.

103.  Media Power's owners included not only Freer and Ljungman individually, but also related persons and entities under their ownership and control, including without limitation, Dragon Phoenix and 16 companies incorporated in United Arab Emirates or the Isle of Man on or about August 28, 2008. Ljungman,

27

LEGAL02/31640952v2

1    through eCommerce, incorporated 16 companies by using the services of Sovereign

2    Corporate Services.  Dragon Phoenix's website continues to list eCommerce as one of

3    its "partners."  http://www.dragonphoenix.hk/partners.php

4        104.  On or about August 29, 2008, Media Power entered into a Stock

5    Purchase Agreement with Madero, Inc. ("Madero"), a publicly traded Nevada

6    corporation on the over-the-counter bulletin board under the symbol MDRQ.  The

7    purchase price was disclosed as $264,000, and Media Power received four million

8    shares of common stock.  Madero was a shell corporation, with its sole Director being

9    a manager/waiter of a restaurant located in Los Mochis, Sinola, Mexico.  After

10   closing, Jenkins, Media Power's CEO, was named President, Chief Executive Officer,

11   Chief Financial Officer and Secretary of Madero.

12       105.  In 2007 and 2008, Media Power had no clients, no income and no

13   product or services.  On or about October 2, 2008, Media Power announced that it was

14   partnering with IT Factory, a Danish company, through its eCommerce subsidiary.

15   Media Power's CEO, Jenkins, stated that "[o]ur new relationship with IT Factory

16   represents a great opportunity for us to find new and expanded markets for our mobile

17   technology."  eCommerce's relationship with IT Factory was the only source of

18   revenue for Media Power.

19       106.  IT Factory is a central figure in one of the largest frauds in

20   Denmark's history.  It perpetuated a four-year long fraud that involved more than

21   $170 million in fraudulent revenues from nonexistent leasing contracts.  IT Factory

22   filed for bankruptcy in Denmark in December 2008.  Some or all of the funds Media

23   Power and eCommerce received from IT Factory are the proceeds of criminal

24   conduct.

25       107.  IT Factory was run by Stein Bagger ("Bagger"), who turned

26   himself into the Los Angeles Police Department on or about December 6, 2008, was

27   extradicted to Denmark and later pled guilty to fraud in Denmark.  On or about June

28   11, 2009, Bagger was sentenced to seven years in a Danish prison for fraud.  Bagger

COMPLAINT

1  was also a close business associate of Ljungman, who is in prison facing fraud charges

2  related to the IT Factory case.

3       108.  After IT Factory filed for bankruptcy, liquidators were appointed

4  ("Danish Liquidators").  The Danish Liquidators conducted an investigation and

5  concluded that the funds paid by IT Factory to eCommerce and Media Power were the

6  proceeds of criminal acts.

7       109.  On or about November 27, 2008, the solicitors for the Joint

8  Liquidators notified Irwin, then Media Power's Chief Financial Officer, that Freer was

9  in default under their November 15, 2007 Deed of Settlement and that they had

10  demanded that Freer pay the Joint Liquidators $6 million.  The Joint Liquidators

11  demanded payment by December 4, 2008 of $6 million by Media Power pursuant to

12  the May 20, 2008 GI Agreement.

13       110.  In a press release issued on or about December 2, 2008, Media

14  Power, through its CEO, Jenkins, admitted the association and business relationship

15  with IT Factory.

16       111.  Also in December 2008, the Joint Liquidators and their counsel

17  were notified that, as a result of the IT Factory fraud, Media Power was no longer a

18  viable entity.

19       112.  Freer, Irwin and others acting in concert with them conspired and

20  schemed to close Media Power and strip it of its assets for their own personal benefit,

21  at the same time making misrepresentations to third-parties as to the future of Media

22  Power.  By way of example, on or about December 10, 2008, Media Power sent a

23  letter addressed to its customers.  The letter stated that Media Power was "updating

24  and remodeling" its business strategy and projecting total income of almost $1 billion.

25       113.  Both Media Power and eCommerce had offices in New York,

26  where Freer, Jenkins, Ljungman and others worked. They also had an office in

27  Atlanta, Georgia, where they hired employees to work on augmented reality projects

28  and local Atlanta police officers to provide security.  Employees received not only late

payments, but checks which bounced, and to receive their last checks were told that they had to sign a document whereby they agreed not to criticize Freer, Jenkins or Media Power. The head employee refused, passed out the checks and told the employees to run to the bank to cash them. To this day, the leasing company, which spent approximately $40,000 in construction costs specifically for Media Power has not been paid in full. Nor have the approximately 10 to 12 Atlanta police officials.

114. Media Power and its subsidiaries and affiliates, Freer, Irwin, Ljungman, Dragon Phoenix, Corlito Software Limited, and others acting in concert with them conspired to unlawfully launder money that was the proceeds of criminal conduct. Such conduct violates 18 U.S.C. § 1956.

115. Income received from the IT Factory fraud was used by Media Power to develop Augmented Reality technology ("AR"). The results of the technology development allegedly resulted in the filing of patent applications.

116. On or about January 23, 2009, Douglas Holtz of Frishauf Holtz Goodman & Chick P.C. represented that the following alleged patent applications (collectively referred to as "the Eight Patent Applications") were filed by his firm:

| NON-PROVISIONAL U.S. SERIAL NO. | FILING DATE | TITLE | NAMED INVENTORS |
|---|---|---|---|
| 12/172,803 | 07/14/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LOGO RECOGNITION | Carl Freer Mikael Ljungman Rich Jenkins Jeff Chastine |
| 12/172,827 | 07/14/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LETTERS, NUMBERS, AND/OR MATH SYMBOLS RECOGNITION | Carl Freer Mikael Ljungman Rich Jenkins Jeff Chastine |

30

COMPLAINT

| | | | |
|---|---|---|---|
| 12/172,843 | 07/14/08 | AUGMENTED REALITY METHOD AND SYSTEM USING LOGO RECOGNITION, WIRELESS APPLICATION PROTOCOL BROWSING AND VOICE OVER INTERNET PROTOCOL TECHNOLOGY | Carl Freer<br>Mikael Ljungman |
| 12/172,857 | 07/14/08 | LOGO RECOGNITION FOR MOBILE AUGMENTED REALITY ENVIRONMENT | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/175,519 | 07/18/08 | AUGMENTED REALITY COLLABORATIVE MESSAGING SYSTEM | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/184,793 | 08/01/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LOGO RECOGNITION | Carl Freer<br>Hong Wu<br>Jeremy Brooks<br>Jason Zhang<br>Panagiotis Oikonomopoulos<br>Maribeth Gandy<br>Jeff Chastine<br>Ivan Kozhuharov<br>Atanas Georgiev |

| Provisional U.S. Serial No. | Filing Date | Title | |
|---|---|---|---|
| 61/094,367 | 09/04/08 | METHOD AND PLATFORM FOR GESTURAL TRANSFER OF DIGITAL CONTENT FOR MOBILE DEVICES | |
| 61/104,530 | 10/10/08 | METHOD AND PLATFORM FOR VOICE AND LOCATION BASED SERVICES FOR MOBILE ADVERTISING | |

31

COMPLAINT

117.  Freer is a co-inventor on all of the non-provisional applications. According to the January 23 letter, Ljungman is a co-inventor on four non-provisional applications.  The felon Ljungman used his credit card to pay legal fees purported incurred in filing the applications with the USPTO.

118.  None of these alleged Eight Patent Applications have been published by the USPTO.  On information and belief, some or all of the Eight Patent Applications have been abandoned.  Further, an applicant has one year to timely convert provisional applications into non-provisional applications.  37 C.F.R. § 1.53 ("A request to convert a provisional application to a nonprovisional application must also be filed prior to the earliest of: (i) Abandonment of the provisional application filed under paragraph (c) of this section; or (ii) Expiration of twelve months after the filing date of the provisional application filed under paragraph (c) of this section."); Manual of Patent Examination Procedure § 601.01(c)(II).

119.  On information and belief, the applicant did not file the provisional applications by September 4, 2009 or October 10, 2009.

120.  Even though the Eight Patent Applications were described in Media Power's brochures, they somehow became the property of MARA Group Limited ("MARA"), an alleged company wholly owned by Freer.  Thus, Freer managed to become the personal beneficiary of Media Power's alleged intellectual property assets that were financed by the IT Factory $100 million fraud.

121.  Effective January 30, 2009, three individuals were appointed to serve as members of the Board of Directors of Madero:  Stern, Irwin, and Lapresle; Stern was named Chairman of the Board of Directors.  The same day, Jenkins resigned as the CEO, President, Chief Financial Officer, and Secretary of Madero and was replaced in those positions by Irwin (Media Power's Finance Director).  Jenkins remained a member of the Board.

122.  On or about February 1, 2009, a unanimous written consent of the Directors of Media Power gave Media Power's 4,000,000 shares of Madero to certain

32

COMPLAINT

persons, including without limitation, Jenkins (416,667 shares), Irwin (240,000 shares), Freer (1,700,000 shares), and Stearn (416,667 shares). Many, if not all, of the persons receiving shares were asked to sign a "Donation Agreement" that required the shareholders to not disparage Freer. The document was drafted or reviewed by an attorney, Alan Sussman.

123. On or about February 5, 2009, Odin Thorpe of CVA issued a valuation report addressed to Mr. Jason Irwin, CEO of Madero, "with the understanding that Madero, Inc. has proposed to acquire these eight patent applications from Mr. Freer." Placing the value of "The eight patent applications relate to a technology called augmented reality... filed with the United States Patent and Trademark office during the period from July 14, 2008 and October 10, 2008 . . . ."

124. In preparing and submitting its valuation reports, CVA was negligent and/or grossly negligent for several reasons, including without limitation, the following:

    (a)    The specific patent applications were never specifically identified;

    (b)    There is no suggestion that CVA reviewed the applications, confirmed that they had been filed with the USPTO, or ascertained the status of the applications before the USPTO or the assignee of such applications;

    (c)    CVA has no expertise in the complex mobile content, emerging technology fields required to make such assessments;

    (d)    CVA boldly (but unrealistically) assumed that the USPTO would issue patents on the applications;

    (e)    CVA's entire valuation is entirely based on management's revenue predictions and CVA made no attempt to confirm, test or validate the wildly inflated revenue predictions; and

33

COMPLAINT

(f)    The valuation did not take into account the fact that GetFugu's alleged technology is based on open source, non-proprietary software.

125.   CVA's valuation reports are thus negligent, grossly negligent and/or make misrepresentations of material facts or omit to state material facts that render their reports misleading.  CVA knew that Madero, GetFugu and third parties would be relying on its valuation reports.

126.   Media Power shut down most of its activities earlier this year, and its website disappeared.

127.   On or about February 25, 2009, Freer personally entered into a "Head of Terms" with Gizmondo-Liquidation's U.K. Joint Liquidators.  The Joint Liquidators entered into this agreement knowing that Freer and Media Power was involved with  the IT Factory fraud, that Media Power had unpaid creditors and employees and was insolvent.

128.   The terms and conditions of the Head of Agreement included, *inter alia*, the following:

(a)    Payment of $500,000 to the Joint Liquidators;

(b)    Upon payment of the $500,000, the Joint Liquidators would issue a press release that they were "supportive" of Freer and "his new venture" and that creditors of Gizmondo and "certain shareholders" of Tiger "would share in the success of the new venture."

(c)    A presumption that all intellectual property rights in Freer's name had been transferred to GetFugu;

(d)    Shares in GetFugu would be transferred to the Joint Liquidators; and

(e)    If Freer breached the agreement, the balance outstanding under the November 2007 Deed of Settlement would become due and

34

COMPLAINT

LEGAL02/31640952v2

1    payable by Freer and by Media Power.

2    The agreement was negotiated and executed in Los Angeles, California.  By entering

3    into this Head of Agreement and acting in compliance with it, the Joint Liquidators

4    were and are complicit with the illegal actions of Freer and other Defendants to violate

5    U.S. law and breach their fiduciary duties.

6    **IV.    GetFugu**

7         129.  Effective March 25, 2009, Madero amended its Articles of

8    Incorporation to change its name to GetFugu, Inc.

9         130.  Media Power had owned 48% of GetFugu until February 1, 2009,

10   when it transferred its interest to certain persons, including Freer, Irwin and Stearn.

11   Freer received approximately 1,200,000 of Media Power's 4,000,000 shares.  The

12   balance of GetFugu's shares are owned by Freer and Ljungman, directly or indirectly,

13   the 16 U.A.E. and Isle of Man shell companies, as alleged above.

14        131.  Effective as of April 2, 2009, Irwin resigned as a member of the

15   Board of Directors and as President, CEO, Chief Financial Officer and Secretary of

16   GetFugu, **and** Stolar, was elected to serve as the President and CEO.  Effective as of

17   April 4, Stoppenhagen was elected to serve as the Interim Chief Financial Officer and

18   Secretary of GetFugu.

19        132.  In April 2009, Madero raised $502,500 in a private placement of

20   the company's securities.

21        133.  On or about April 6, 2009, CVA issued a valuation report

22   addressed to Stolar "with the understanding that GetFugu, Inc. has proposed to acquire

23   these eight patent applications from Mr. Freer."  Placing the value of "The eight patent

24   applications relate to a technology called augmented reality... filed with the United

25   States Patent and Trademark office during the period from July 14, 2008 and October

26   10, 2008 . . ."  Except for the different addressee, this second report is virtually

27   identical to the first.  The second report suffers from the same flaws that the first had.

28

COMPLAINT

LEGAL02/31640952v2

134. On or about April 9, 2009, GetFugu allegedly entered into an Agreement for the Assignment of Patent Rights with MARA to acquire the Eight Patent Applications for 25 million shares of GetFugu, which were purportedly valued at the time of the transaction at $60 million. The agreement was signed by Freer for MARA and by Stolar for GetFugu. While the agreement recites that GetFugu is a Nevada corporation, there is no indication that MARA had or has a separate corporate existence.

135. The same press release continued to inform the public that GetFugu purchased the IP Portfolio from a company named MARA. The press release contains untrue material misrepresents and omits information needed to render the statements therein to be true. The alleged assignment from MARA (owned by Freer) to Madero/GetFugu (in which Freer is the largest shareholder) was not an arms-length transaction.

136. While the assignment agreement with MARA was filed with the SEC, no list of the alleged Eight Patent Applications was filed.

137. A search of the electronic records of the USPTO assignment database reveals that MARA, Madero or GetFugu are not the assignees of any U.S. patent or patent application.

138. The Eight Patent Applications either do not exist or have been abandoned, there is no evidence that provisional applications were converted into non-provisional applications. As such, the Eight Patent Applications have no value. The ownership and existence of intellectual property assets is material information. GetFugu and the Defendant who are its owners, directors, agents, employees and majority shareholders have made misrepresentations and failed to disclose the material issue of ownership and existence of GetFugu's alleged intellectual property assets.

139. GetFugu's April 9, 2009, press release, disseminated using the mail or wire, stating that "GetFugu strengthened its core technology base" as a result of the alleged assignment by MARA is false and misleading.

36

COMPLAINT

140. On April 16, 2009 GetFugu Inc. released a press statement, disseminated using the mail or wire, in which its then Chairman of the Board, Stearn, was quoted as saying that "GetFugu has built the next generation mobile search tool." It continued with the company's CEO, Stolar, stating that "GetFugu has developed the most unique mobile technology that I have seen to date." Both statements are wholly misleading. Notwithstanding this fact, GetFugu's share price rose.

141. In addition, while GetFugu's public statements, disseminated by mail or wire, hype its "revolutionary new mobile technology" (*see, e.g.*, September 11, 2009 press release), GetFugu in fact uses open source technology that is available to anyone, including without limitation, Boost and OpenCV libraries, standard C++ STL (standard templates) and public domain algorithms published by Dr. Lowe in British Columbia. As such, GetFugu's purported technology **cannot be protected** by either patents or as trade secrets. Thus, GetFugu's purported technology has little, in any, real value. CVA's valuation certainly did not reveal the use of this open source software or take that fact into consideration in grossly inflating the alleged value of the Eight Patent Applications.

142. Further, the company's officers and directors knew or should have known that GetFugu's public statements as to proprietary technology, disseminated by mail or wire, were false and misleading, but either caused or permitted such statements to be made.

143. Effective April 20, 2009, Jenkins resigned as a director of Madero, and on May 5, Peters was appointed a director.

144. Solomon was appointed to GetFugu's Board of Directors on May 18, 2009, and has served as its Chairman since July.

145. GetFugu provided shares in the company to Freer, members of his family and associated persons without any disclosure of the reason that the officers and directors did so.

COMPLAINT

146. On October 16, 2009, Freer created a limited liability company controlled by three individuals including his daughter, Ericka Freer. All shares of GetFugu common stock owned by Freer were transferred to this limited liability company. (SEC Form 10-Q, filed Nov. 23, 2009).

147. GetFugu operates a website, *www.getfugu.com*. The website was registered by Kozhuharov.

148. GetFugu's website includes a graphic with trademarked names and/or logos of third-party companies, including without limitation, American Express, Cisco, Coca-Cola, Dallas Cowboys, Disney, eBay, ESPN, Ford Motor, Goldman Sachs, Google, HBO, Los Angeles Lakers, McDonald's, Microsoft, NBC, Nike, Paramount, Pepsi, Pfizer, and many others. On information and belief, GetFugu has not obtained authorization or a license to use the names and trademarks of some or all of these companies. Thus, GetFugu, its officers, directors and/or majority shareholders are subjecting GetFugu to numerous potential claims of trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and the common law. Upon a finding of trademark infringement, the Court may award the trademark registrant either actual damages, or statutory damages of up to $200,000 or, in the case of willful infringement, up to $2,000,000. 15 U.S.C. § 1117(c).

149. In addition, GetFugu's website also renders the company potentially liable to third-parties for violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In connection with its goods or services, GetFugu may be using one or more words, terms, names, symbols, or devices, alone or in combination, as well as false designations of origin, false or misleading descriptions or representations of fact (disseminated by mail or wire), which are (a) likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of GetFugu with the third-parties shown on GetFugu's website, or as to the origin, sponsorship, or approval of its goods, services, or commercial activities by another person, and/or (b) in commercial advertising or promotion (including without

38

LEGAL02/31640952v2

1    limitation its website), GetFugu misrepresents the nature, characteristics, qualities, or
2    geographic origin of its goods, services, or commercial activities.    GetFugu's
3    violations of the Lanham Act could be found to be willful.

4         150.   In September 2009, GetFugu entered into a financial agreement
5    with Spongetech. After receipt of $1,750,000 on September 24, GetFugu allegedly
6    terminated the agreement, told Spongetech that it would not accept any further funds
7    and that it would return the amounts received to date, plus accrued interest, "as soon
8    as it is able." GetFugu announced that it terminated the agreement "due to allegations
9    of wrongdoing against SpongeTech." GetFugu's September 24 letter stated that:

> We have reason to believe that you
> [Spongetech] have been engaging in short
> selling of Company stock in anticipation of
> your proposed investment in the Company in
> violation of federal securities laws.
>
> SpongeTech has been publicly accused of
> forgery and identity theft in connection with
> attorney opinion letters allegedly forged by
> SpongeTech.

17        151.   GetFugu's SEC Form 8-K disclosed that it:

> concluded that GetFugu can no longer be
> associated with SpongeTech or Vanity, and our
> continued public association with SpongeTech
> and its potentially illegal activities is
> jeopardizing GetFugu and its continued
> viability. We therefore have no choice but to
> immediately terminate any further negotiations
> regarding an investment in the Company or any
> other business transaction.

25        152.   On September 30, 2009, Spongetech sued GetFugu in U.S. District
26   Court for the Southern District of New York, alleging fraud, conversion, breach of
27   contract, breach of fiduciary duty and obligation to deal in good faith, and seeking
28   damages and other relief. GetFugu and its officers, directors and employees failed to

LEGAL02/31640952v2

1    conduct adequate due diligence before entering into the agreement with Spongetech,

2    resulting in wasteful litigation expenses.  On November 6, 2009, GetFugu entered into

3    a   Settlement   Agreement   with   SpongeTech,   including   a   continuing   business

4    relationship with SpongeTech.  GetFugu, however, did not give any indication that

5    GetFugu had investigated and concluded that SpongeTech had not engaged in any

6    illegal activities.

7            153.   On   or   about   September   25,   2009,   Stolar,   GetFugu's   CEO,

8    disclosed a letter addressed to GetFugu's shareholders that included the statement,

9    *inter alia*, that: "It has been an exciting month for GetFugu. We have met or exceeded

10   all targets to date, have **more than adequate funding to continue operations into**

11   **the foreseeable future**" (emphasis added).  However, the day before, on September

12   24, Stolar sent a letter to Spongetech representing that GetFugu did **not** have adequate

13   funds to return the $1,750,000.  Moreover, since the September 25 letter, GetFugu has

14   closed the doors of its San Francisco headquarters and left employees unpaid. Stolar's

15   letter, disseminated by mail or wire, was false and misleading.

16           154.   On or about September 4, 2009, Jenkins represented that Freer was

17   not an officer or director of GetFugu.

18           155.   On September 14, 2009, GetFugu and Freer filed a lawsuit against

19   Davies and Warnock in the Superior Court of California, Los Angeles County,

20   captioned *GetFugu, Inc., et al. v. Simon Davies, et al.*, Case No. BC421759. GetFugu

21   and Freer filed three amended complaints to identify Doe defendants.  The complaint

22   asserts a variety of claims and seeks compensatory and punitive damages in excess of

23   $600,000,000.  The allegations of the complaint lack any legal or factual basis and are

24   frivolous.  The filing and continuation of this action is nothing more than the waste of

25   corporate assets.  Further, GetFugu and Freer filed the lawsuit without disclosing it to

26   the Board of Directors, let alone getting Board approval.  GetFugu has not disclosed

27   the filing of the lawsuit to the investing public in a Form 8-K filing with the SEC.

28

COMPLAINT

1    156.    Effective October 20, 2009, Lapresle and Peters resigned from the
2    Board of Directors.   Lapresle continued to serve as an employee, and Peters as a
3    consultant.

4    157.    On or about November 2, 2009, Stolar resigned as President (but
5    remained CEO) and Freer was appointed as GetFugu's President and as a member of
6    the Board of Directors.  GetFugu's SEC Form 8-K disclosed that:

> Mr. Freer has more than 15 years experience as a marketing and technology entrepreneur, successfully raising over $350 million in investment capital, and amassing $2.5 billion in market capitalization for his companies. Prior to co-founding GetFugu in April 2009, he served as SVP Business Development of Media Power Inc. in 2008. Mr. Freer founded mobile gaming platform Gizmondo in 2002, and was chairman of the board of directors at its parent company, Tiger Telematics Inc. until October 2005. He has been recognized as a pioneer in mobile technology and innovative approaches to advertising.

17   GetFugu also disclosed Freer's criminal history:

> In October 2005, Mr. Freer was sentenced to probation and fined by a court in Germany, for buying four luxury cars with a bad check, though Mr. Freer contended he had canceled the check after believing the cars did not have proper title and immediately informed the authorities. Upon being informed that only one of the four cars had a title issue, Mr. Freer resubmitted the check.

25    158.    Also on or about November 2, 2009, Bailey was appointed a
26   member of the Board of Directors.

27    159.    On or about November 2, 2009, each of GetFugu's Directors
28   entered into a standard form of Board of Directors Service and Indemnification

COMPLAINT

1    Agreement, which provides, inter alia, that: "The Company shall at all times during

2    the Term of this Agreement maintain a standard occurrence based policy of D&O

3    insurance covering the actions of the Board, including those of Director, on behalf of

4    the Company, in an amount to be determined by the Board."

5            160.   The gross mismanagement of GetFugu by its officers and directors

6    is reflected in its most request SEC Form 10-Q, filed November 23, 2009, which

7    disclosed that:

8                            The Company needs to raise additional
9                    capital from external sources in order to
                     sustain its operations while continuing the
10                   longer term efforts contemplated under its
                     business plan. The Company expects to
11                   continue incurring losses for the foreseeable
12                   future and must raise additional capital to
                     pursue its product development initiatives,
13                   to penetrate markets for the sale of its
14                   products and to continue as a going concern.
                     The Company cannot provide any assurance
15                   that it will raise additional capital. If the
16                   Company is unable to secure additional
                     capital, it may be required to curtail its
17                   research and development initiatives and
18                   take additional measures to reduce costs in
                     order to conserve its cash in amounts
19                   sufficient to sustain operations and meet it
20                   obligations. These measures could cause
                     significant delays in the Company's efforts
21                   to commercialize its products, which is
22                   critical to the realization of its business plan
                     and the future operations of the Company.
23                   These matters raise substantial doubt about
24                   the Company's ability to continue as a going
25                   concern.

26           161.   The November 23 SEC disclosure, signed by Stolar, is expressly

27   contrary to Stolar's September 25, 2009 letter publicly representing to GetFugu's

28   shareholders that the company has "more than adequate funding to continue

LEGAL02/31640952v2

1 | operations into the foreseeable future."

2 | 162. Despite the doubts about Getfugu's ability to survive, the officers

3 | and directors have not taken any action to reduce costs. To the contrary, GetFugu's

4 | general and administrative expenses totaled more than $21 million for the three

5 | months ended September 30, 2009. (SEC Form 10-Q, filed Nov. 23, 2009).

6 | 163. Moreover, the officers and directors continue to operate the

7 | company for their own personal benefit, rather than the benefit of its shareholders.

8 | The November 23 SEC Form 10-Q disclosed that:

> A meeting of the Board of the Company was
> held on November 2, 2009. At this meeting,
> the Board approved (i) the appointment of
> five new directors (ii) board compensation
> of $15,000 per month for the chairman and
> $10,000 a month for board members, and
> (iii) granted 2,000,000 options to each of the
> new directors at the fair value on the grant
> date of $.37 per share and of which 333,333
> options vest in six months and the remainder
> vests over a period of 3 years.

17 | 164. On or about November 13, 2009, GetFugu allegedly created a new

18 | wholly-owned subsidiary, GetFugu Research, Inc., a Delaware corporation, and

19 | entered into a merger agreement with IKDATA DE, Inc. ("IKDATA") and its sole

20 | stockholder, Ivan Kozhuharov, GetFugu's Chief Software Architect. (SEC Form 10-

21 | Q filed Nov. 23, 2009). Under the allegedly agreement, GetFufu acquired IKDATA

22 | and its intellectual property in exchange for an agreement to issue Kozhuharov five

23 | million shares of GetFugu's common stock immediately and an additional five million

24 | shares in March 2010. Kozhuharov also entered in to an employee agreement and a

25 | six month non-competition agreement. (*Id.*). However, as an officer of GetFugu, any

26 | intellectual property conceived or created is a corporate opportunity of GetFugu and

27 | not Kozhuharov or IKDATA. Further, the SEC filing does not disclose what

28 | intellectual property GetFugu acquired or whether the officers and directors obtained

LEGAL02/31640952v2

1  any independent due diligence and review of the validity and valuation of the

2  purported intellectual property.

3      165.  GetFugu's officers and directors have failed to publicly disclose

4  that, in a recent presentation to a Fortune 500 company, GetFugu's technology simply

5  did not work.  Particularly given the April 16, 2009 statements by Stolar and Steran

6  touting GetFugu's technology, its failure to work is material information that should

7  be disclosed to the investing public.

8      166.  The enforcement staff of the SEC is conducting an inquiry to

9  determine whether there have been violations of the federal securities laws pertaining

10  to GetFugu.

11      167.  The documents referred to in this complaint are incorporated

12  herein by reference.

13  ## COUNT I

14  **(RICO – Against All Defendants)**

15      168.  The foregoing allegations of the complaint are incorporated by

16  reference.

17      169.  RICO prohibits entities and individuals from engaging in

18  racketeering or criminal activities.  18 U.S.C. § 1961, *et seq*.  RICO provides that it is

19  unlawful for any person employed by, or associated with, any enterprise to conduct or

20  participate, directly or indirectly, in an enterprise through a pattern of racketeering

21  activity or the collection of an unlawful debt. 18 U.S.C. § 1962(c).

22      170.  At times pertinent to this complaint, Defendants, individually and

23  through their agents, directors, officers, employees, alter egos, affiliates, parents, or

24  subsidiaries ("the RICO Defendants"), materially participated in the enterprise, and

25  materially participated, conspired, assisted, encouraged, and otherwise aided and

26  abetted one or more of the other Defendants in the unlawful, misleading, and

27  fraudulent conduct alleged herein, and has affected foreign and interstate commerce in

28  the United States, including in the State of California. The RICO Defendants acted in

COMPLAINT

LEGAL02/31640952v2

1  concert with each other in order to further their illegal schemes.

2       171.  Beginning not later than 2001, the RICO Defendants formed an
3  enterprise as that term is defined in 18 U.S.C. § 1961(4) "(Enterprise"). The
4  Enterprise has functioned as an organized association-in-fact to achieve, through
5  illegal means, their shared goals and to avoid the consequences of their actions. Each
6  RICO Defendant has participated in the operation and management of the Enterprise
7  and has committed numerous acts to maintain and expand the Enterprise.

8       172.  The individual and corporate Defendants formed an Enterprise by
9  associating in fact to commit unlawful acts.  The corporations that are part of the
10 RICO Enterprise (including without limitation, GetFugu, Gizmondo, Gizmondo-
11 Liquidation, Tiger, Media Power, MARA, and Madero) were or are involved in the
12 RICO activity and had legal existences separate from their participation in the
13 racketeering. The corporations made the RICO activities possible and profitable by
14 providing a legal shield for the illegal activity.  While the RICO Defendants
15 participated in the common Enterprise, they also have an existence separate and
16 distinct from the Enterprise.

17      173.  Through their association, the RICO Defendants participated in a
18 pattern of racketeering activity as defined in 18 U.S.C. § 1961(5) and as alleged
19 above.  The RICO Defendants have engaged in at least two predicate acts in violation
20 of 18 U.S.C. §§ 1341, 1343 and 1956 within the last ten years.

21      174.  In furtherance of their scheme, the RICO Defendants sent
22 documents through the mail with the intent to defraud in violation of 18 U.S.C. §
23 1341.

24      175.  In furtherance of their scheme, the RICO Defendants sent wire
25 communication with the intent to defraud in violation of 18 U.S.C. § 1343.

26      176.  In furtherance of their scheme, the RICO Defendants engaged in
27 money laundering in violation of 18 U.S.C. § 1956.

28

LEGAL02/31640952v2

COMPLAINT

177. In order to avoid discovery of their illegal and fraudulent acts, the RICO Defendants have made false and deceptive statements and have concealed material information from the public, shareholders, government entities, and others.

178. The RICO Defendants acts formed a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). They have committed at least two acts of racketeering. These acts represent a common course of conduct to engage in unlawful activity for their own gain at the expense of the Plaintiffs and others.

179. As a direct and proximate cause of the RICO Defendants' acts, Plaintiffs have been injured in their business or property by reason of a violation of 18 U.S.C. § 1962.

180. The Plaintiffs seek a judgment for compensatory damages of $60 million, treble damages, and payment of reasonable attorneys' fees and costs.

## COUNT II

### (Cal. Bus. & Prof. C. § 17200, *et seq.* – Against All Defendants)

181. The foregoing allegations of the complaint are incorporated by reference.

182. At times pertinent to this complaint, Defendants, individually and through their agents, directors, officers, employees, alter egos, affiliates, parents, or subsidiaries (collectively, "the UCL Defendants") have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

183. The UCL Defendants have violated other laws, including without limitation, 18 U.S.C. §§ 1341 (mail fraud), 1342 (wire fraud), 1346 (scheme or artifice to deprive another of the intangible right of honest services) and 1956 (money laundering).

184. The UCL Defendants violations of such other laws were committed while they were engaged in business activity.

185. Davies and Warnock have suffered injury in fact and have lost money or property as a result of the violation, in an amount to be determined at trial,

46

1  in excess of $35 million.

2  ## COUNT III

3  **(Breach Of Fiduciary Duties – Derivative Claim – Against Defendants Freer,**

4  **Bailey, Champion, Irwin, Kozhuharov, Kurz, LaPresle, Norton, O'Connor,**

5  **Peters, Solomon, Steran, Stolar, Stoppenhagen, Timpe)**

6  186.  The foregoing allegations of the complaint are incorporated by

7  reference.

8  187.  Defendants Freer, Bailey, Champion, Irwin, Kozhuharov, Kurz,

9  LaPresle, Norton, O'Connor, Peters, Solomon, Steran, Stolar, Stoppenhagen, Timpe

10  are officers, directors, managers, and/or majority shareholders of GetFugu ("Fiduciary

11  Defendants").

12  188.  By reason of their positions as officers, directors, managers and/or

13  majority shareholders of GetFugu and because of their ability to control the business

14  and corporate affairs of GetFugu, the Fiduciary Defendants owed GetFugu and its

15  shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and

16  were and are required to use their utmost ability to control and manage GetFugu in a

17  fair, just, honest, and equitable manner, and conduct themselves with absolute loyalty

18  to GetFugu.  The Fiduciary Defendants were and are required to act in furtherance of

19  the best interests of GetFugu and its shareholders so as to benefit all shareholders

20  equally and not in furtherance of their personal interest or benefit.  They were required

21  to exercise reasonable and prudent supervision over the management, policies,

22  practices and controls of GetFugu.  Further, they were required to have and implement

23  appropriate corporate governance policies.  They were also precluded from usurping

24  corporate opportunities of GetFugu.

25  189.  The Fiduciary Defendants were able to and did, directly and/or

26  indirectly, exercise control over the wrongful acts complained of herein.

27  190.  The Fiduciary Defendants breached their fiduciary obligations to

28  GetFugu by, among other things, the following acts and omissions:

LEGAL02/31640952v2

(a) Failed exercise good faith in ensuring that the affairs of GetFugu were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b) Failed to exercise good faith in ensuring that GetFugu was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

(c) Failed to exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of GetFugu;

(d) Failed to exercise reasonable and prudent supervision over the management, policies, practices and controls of GetFugu;

(e) Failed to enact and implement appropriate corporate governance policies; (e) unduly benefiting themselves and other GetFugu insiders at the expense of GetFugu; and

(f) Usurped corporate opportunities belonging to GetFugu.

191. In further breach of their fiduciary duties of due care, loyalty and good faith, the Fiduciary Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action to breach said duties.

192. The acts and omissions of the Fiduciary Defendants' was alleged herein were not, and could not have been, an exercise of good faith business judgment.

193. As a direct and proximate result of the Fiduciary Defendants' breaches of fiduciary duties, GetFugu has sustained damages, in an amount to be

48

LEGAL02/31640952v2

1    proven at trial, in excess of $75,000.

2                  **COUNT IV**

3        **(Negligence – Derivative Claim - Against CVA)**

4         194.  The foregoing allegations of the complaint are incorporated by

5    reference.

6         195.  CVA was engaged by GetFugu to provide valuation services and

7    CVA undertook a duty to provide such services to GetFugu.

8         196.  As described above, CVA's valuation services were negligent and

9    grossly negligent and failed in all material respects to adequately discharge its duty.

10    As a direct and proximate result of said negligence and gross negligence, GetFugu

11    suffered damages, in an amount to be proven at trial, in excess of $60 million.

12         197.  Madero/GetFugu relied on CVA's valuations in negotiating the

13    consideration to be paid for the alleged Eight Patent Applications.

14                  **COUNT V**

15       **(Breach Of Contract – Against Freer and Eriksson)**

16         198.  The foregoing allegations of the complaint are incorporated by

17    reference.

18         199.  Plaintiffs entered into valid and binding promissory notes and

19    contracts with Freer and Eriksson, and completely fulfilled all of their contractual

20    obligations.

21         200.  Freer and Eriksson failed to repay the promissory notes or comply

22    with their contractual obligations.  They are therefore in material breach of the

23    contracts.

24         201.  Defendants' breach has directly and proximately harmed Plaintiffs

25    in the amount of no less than $26,000,000 plus pre-judgment interest.

26    ///

27    ///

28    ///

LEGAL02/31640952v2

COMPLAINT

1

## COUNT VI

2

### (Account Stated – Against Freer and Eriksson)

3        202.   The foregoing allegations of the complaint are incorporated by

4  reference.

5        203.   On or about October 8, 2009, Plaintiffs notified Freer in writing

6  that their repayment obligations were overdue.  Freer did not deny that they were in

7  default on their payment obligations or the amount of the payment due.

8        204.   The obligations by Freer and Eriksson constitutes an account

9  stated.  They failed to object to statements by or on behalf of Plaintiffs that money

10  was due or the amount that was due and owed, despite the reasonable passage of time.

11        205.   Plaintiffs have been injured in the amount of no less than

12  $26,000,000 plus pre-judgment interest.

13

## COUNT VII

14

### (Unjust Enrichment – Against Freer and Eriksson)

15        206.   The foregoing allegations of the complaint are incorporated by

16  reference.

17        207.   In the event that the Defendants assert that any of the

18  aforementioned contracts are not valid and binding agreements, Plaintiffs assert this

19  unjust enrichment claim in the alternative.

20        208.   Freer and Eriksson induced Plaintiffs into loaning them

21  $26,000,000 and Plaintiffs made such loans with the reasonable expectation and

22  understanding that the money loaned would be repaid.

23        209.   Despite the passage of several years, Freer and Eriksson have

24  failed to repay any part of the loans.

25        210.   Freer and Eriksson would be unjustly enriched at Plaintiffs'

26  expense if they were permitted to retain the benefits of the loan without repayment.

27  To prevent this unjust enrichment, Plaintiffs are entitled to a judgment of no less than

28  $26,000,000 plus pre-judgment interest.

COMPLAINT

LEGAL02/31640952v2

## COUNT VIII

### (Civil Conspiracy – Against All Defendants)

211.   The foregoing allegations of this complaint are incorporated by reference.

212.   All of the individual Defendants named herein have combined and conspired for an unlawful purpose, *i.e.*, conduct a RICO Enterprise, commit mail and fraud, failing to provide honest services, fraud, and breach of fiduciary duty for their own personal benefit.

213.   As a direct and proximate result of the civil conspiracy, Plaintiffs, individually and derivatively, have been injured by the individual Defendants in an amount to be proven at trial in excess of $75,000.

## PRAYER FOR RELIEF

Plaintiffs respectfully request:

1.   Judgment for compensatory damages, jointly and severally;

2.   An award of treble damages;

3.   An award of pre- and post-judgment interest;

4.   Reasonable attorneys' fees as allowed by law;

5.   Costs as allowed by law; and

6.   Such other relief as the Court deems just and appropriate under the circumstances.

DATED:  November 25, 2009     MICHAEL J. HARTLEY
                              JOANN M. WAKANA
                              **ALSTON & BIRD LLP**

_____ FOR
                              Michael J. Hartley
                              Attorneys for Plaintiffs
                              SIMON DAVIES AND DAVID WARNOCK

51

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2          Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury of all

3    issues in this action so triable by jury.

4

5    DATED:  November 25, 2009      MICHAEL J. HARTLEY
                                    JOANN M. WAKANA
6                                   **ALSTON & BIRD LLP**

7

8                                   _____
                                        Michael J. Hartley
9                                   Attorneys for Plaintiffs
                                    SIMON DAVIES AND DAVID WARNOCK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

LEGAL02/31640952v2

Michael J. Hartley (SBN 18937)
Joann M. Wakana (SBN 232714)
Alston & Bird LLP
333 S. Hope Street, Sixteenth Floor
Los Angeles, CA 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
michael.hartley@alston.com; joann.wakana@alston.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SIMON DAVIES, an individual; and DAVID WARNOCK, an individual PLAINTIFF(S) | CASE NUMBER CV09-8724 RGK (RCx) |
|---|---|
| v. GETFUGU, INC., a Nevada corporation; CARL FREER, an individual; ALAN J. BAILEY, an individual; BEGBIES TRAYNOR GROUP, a United Kingdom corporation; (SEE ATTACHMENT) DEFENDANT(S). | SUMMONS |

TO:DEFENDANT(S): (See Attachment)

A lawsuit has been filed against you.

Within 20 (twenty) days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Michael Hartley, whose address is 333 S. Hope Street, Sixteenth Floor, Los Angeles, CA 90071. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **25 NOV 2009**

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.
www.USCourtForms.com

## Attachment

**Continuation of Defendants**:

MICHAEL CARRENDER, an individual; MARK CHAMPION, an individual; CORPORATE VALUATION ADVISORS, INC., a Wisconsin corporation; DRAGON PHOENIX (CHINA) LTD., a Chinese corporation; DAVID RUBIN & PARTNERS, a United Kingdom corporation; PAUL DAVIS, an individual; TIMOTHY DOLDER, an individual; STEFAN ERIKSSON, an individual; ANNELI FREER, an individual; ERICKA FREER, an individual; DAVID HUDSON, an individual; JASON IRWIN, an individual; JUANITA GROUP LTD., a United Kingdom corporation; IVAN D. KOZHUHAROV, an individual; DONALD A. KURZ, an individual; MARK LAPRESLE, an individual; MIKAEL LJUNGMAN, an individual; HAZINA LJUNGMAN, an individual; ASHER D. MILLER, an individual; DEREK NORTON, an individual; MICHAEL O'CONNOR, an individual; CHRISTINE PETERS, an individual; DAVID ANTONY RUBIN, an individual; MICHAEL JAY SOLOMON, an individual; LEATHEM STERAN, an individual; BERNARD STOLAR, an individual; ERIC STOPPENHAGEN, an individual; TIGER TELEMATICS, INC., a Florida corporation; CHUCK TIMPE, an individual; MEDIA POWER USA LLC, a California corporation; and DOE 1 through DOE 100, inclusive

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
SIMON DAVIES and DAVID WARNOCK

**DEFENDANTS**
GETFUGU, Inc., et al.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Michael Hartley (SBN 189375); Joann Wakana (SBN 232714)
Alston & Bird LLP
333 S. Hope Street, Sixteenth Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT: $** 60,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
RICO, 18 U.S.C. 1961, 18 U.S.C. 1964(a), (c), breach of fiduciary duties, breach of contract, negligence, and civil conspiracy

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☒ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**TORTS PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 22 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities – Employment
☐ 446 American with Disabilities – Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 61 HIA(1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW 405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

CV09-8724
RGK (PLAx)

**FOR OFFICE USE ONLY:** Case Number:

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)    CIVIL COVER SHEET    Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☒ Yes

If yes, list case number(s): CV09-07388 GHK(FMOx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | United Kingdom, United Kingdom |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles | United Kingdom, Florida, Wisconsin, China, United Kingdom, United Kingdom, United Kingdom, Sweden, Colorado, United Kingdom, Sweden, Sweden, United Kingdom, Canada, United Kingdom, New York, United Kingdom, Florida |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles, Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

| X. SIGNATURE OF ATTORNEY (OR PRO PER): | Date November 25, 2009 |
|---|---|
| Joann M. Wakana | |

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

American LegalNet, Inc.
www.FormsWorkflow.com

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CIVIL COVER SHEET

American LegalNet, Inc.
www.FormsWorkflow.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV09- 8724 RGK (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

**[X] Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

**[ ] Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

**[ ] Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.