1   IMAN REZA (State Bar No. 245094)
    **CUMMINS & WHITE, LLP**
2   2424 S.E. Bristol Street, Suite 300
    Newport Beach, California 92660
3   Telephone: (949) 852-1800
    Facsimile: (949) 852-8510
4   IReza@cwlawyers.com

5   J. THOMAS GILBERT (State Bar No. 183362)
    **PATTON BOGGS LLP**
6   2001 Ross Avenue, Suite 3000
    Dallas, Texas 75201
7   Telephone: (214) 758-1500
    Facsimile: (214) 758-1550
8   tgilbert@pattonboggs.com

9   Richard J. Oparil (*pro hac vice* application submitted)
    **PATTON BOGGS LLP**
10  2550 M Street, NW
    Washington, DC 20037
11  Telephone: (202) 457-6000
    Facsimile: (202) 457-6315
12  roparil@pattonboggs.com

13  Attorneys for Plaintiffs
    SIMON DAVIES and DAVID WARNOCK

14
                **UNITED STATES DISTRICT COURT**
15
                **CENTRAL DISTRICT OF CALIFORNIA**
16
                    **(Western Division - Los Angeles)**
17

18  SIMON DAVIES, an individual and            Case No. 2:09-cv-08724-RGK (RCx)
    derivatively; and DAVID WARNOCK, an
19  individual and derivatively,               **FIRST AMENDED
                                               COMPLAINT FOR:**
20          Plaintiffs,
                                               **(1) RICO (Against Freer,
21      v.                                          Carrender, Dragon Phoenix,
                                                    Eriksson, Anneli Freer, Irwin,
22  GETFUGU, INC., a Nevada corporation;            Jenkins, Kozhuharov,
    CARL FREER, an individual; ALAN J.              Ljungman, Schloth, Tiger,
23  BAILEY, an individual; BEGBIES                  Media Power and Asiatic);
    TRAYNOR GROUP, a United Kingdom          (2) RICO CONSPIRACY (Against
24  corporation; MICHAEL CARRENDER, an           Freer, Begbies, Carrender,
    individual; MARK CHAMPION, an                 Dragon Phoenix, DRP, Davis,
25  individual; CORPORATE VALUATION              Dolder, Eriksson, Anneli Freer,
    ADVISORS, INC., a Wisconsin                  Hudson, Irwin, Jenkins,
26  corporation; DRAGON PHOENIX                  Kozhuharov, Ljungman,
    (CHINA) LTD., a Chinese corporation;         Hazina Ljungman, Miller,
27  DAVID RUBIN & PARTNERS, a United            Rubin, Schloth, Tiger, Media
    Kingdom corporation; PAUL DAVIS, an         Power and Asiatic);
28  individual; TIMOTHY DOLDER, an          **(3) RICO – DERIVATIVE CLAIM**

1  individual; STEFAN ERIKSSON, an
   individual; ANNELI FREER, an individual;
2  ERICKA FREER, an individual; DAVID
   HUDSON, an individual; JASON IRWIN,
3  an individual; RICHARD JENKINS, an
   individual; JUANITA GROUP LTD., a
4  United Kingdom corporation; IVAN D.
   KOZHUHAROV, an individual; DONALD
5  A. KURZ, an individual; MARK
   LAPRESLE, an individual; MIKAEL
6  LJUNGMAN, an individual; HAZINA
   LJUNGMAN, an individual; ASHER D.
7  MILLER, an individual; DEREK
   NORTON, an individual; MICHAEL
8  O'CONNOR, an individual; CHRISTINE
   PETERS, an individual; DAVID ANTONY
9  RUBIN, an individual; WILLIAM
   SCHLOTH, CPA, an individual; MICHAEL
10 JAY SOLOMON, an individual;
   LEATHEM STERAN, an individual;
11 BERNARD STOLAR, an individual; ERIC
   STOPPENHAGEN, an individual; TIGER
12 TELEMATICS, INC., a Florida corporation;
   CHUCK TIMPE, an individual; MEDIA
13 POWER USA LLC, a California
   corporation; ASIATIC COMMERCE BANK,
14 a United Kingdom bank; and DOE 1 through
   DOE 10 , inclusive,

15        Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

(Against Freer, Champion,
Irwin, Jenkins, Kozhuharov,
LaPresle, Norton, Schloth,
Solomon, Steran, and Stolar);
(4) **RICO CONSPIRACY –
DERIVATIVE CLAIM**
(Against Freer, Bailey, Begbies,
Champion, CVA, DRP, Davis,
Dolder, Ericka Freer, Hudson,
Irwin, Jenkins, Kozhuharov,
Kurz, LaPresle, Miller, Norton,
O'Connor, Peters, Rubin,
Schloth, Solomon, Steran,
Stolar, Stoppenhagen, and
Timpe)
(5) **CAL. BUS. & PROF. C. §
17200,** *et seq.* (Against All
Defendants);
(6) **BREACH OF FIDUCIARY
DUTIES – DERIVATIVE
CLAIM** (Against Defendants
Freer, Bailey, Champion, Irwin,
Kozhuharov, Kurz, LaPresle,
Norton, O'Connor, Peters,
Solomon, Steran, Stolar,
Stoppenhagen and Timpe);
(7) **FRAUD – DERIVATIVE
CLAIM** (Against CVA);
(8) **NEGLIGENCE –
DERIVATIVE CLAIM**
(Against CVA);
(9) **BREACH OF CONTRACT**
(Against Freer and Eriksson);
(10)**ACCOUNT STATED** (Against
Freer and Eriksson);
(11)**UNJUST ENRICHMENT**
(Against Freer and Eriksson);
(12)**CIVIL CONSPIRACY** (Against
All Defendants);
(13) **FRAUD** (Against Freer and
Eriksson); and
(14)**FRAUDULENT TRANSFER
ACT AND COMMON LAW
FRAUDULENT TRANSFER**
(Against Freer, Ericka Freer
and Doe LLC)
(15)**AIDING AND ABETTING
BREACH OF FIDUCIARY
DUTIES** (Against CVA)
(16)**AIDING AND ABETTING
BREACH OF FIDUCIARY
DUTIES** (Against Joint
Liquidators)

**DEMAND FOR JURY TRIAL**

- 2 -
FIRST AMENDED COMPLAINT

1

2   Filing Date: January 4, 2010

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

1  Plaintiffs SIMON DAVIES and DAVID WARNOCK (collectively

2  "Plaintiffs") hereby allege against Defendants GETFUGU, INC., CARL FREER,

3  ALAN J. BAILEY, BEGBIES TRAYNOR GROUP, MICHAEL CARRENDER,

4  MARK CHAMPION, CORPORATE VALUATION ADVISORS, INC., DRAGON

5  PHOENIX (CHINA) LTD., DAVID RUBIN & PARTNERS, PAUL DAVIS,

6  TIMOTHY DOLDER, STEFAN ERIKSSON, ANNELI FREER, ERICKA FREER,

7  DAVID HUDSON, JASON IRWIN, RICHARD JENKINS, JUANITA GROUP

8  LTD., IVAN D. KOZHUHAROV, DONALD A. KURZ, MARK LAPRESLE,

9  MIKAEL LJUNGMAN, HAZINA LJUNGMAN, ASHER D. MILLER, DEREK

10  NORTON, MICHAEL O'CONNOR, CHRISTINE PETERS, DAVID ANTONY

11  RUBIN, WILLIAM SCHLOTH, CPA, MICHAEL JAY SOLOMON, LEATHEM

12  STERAN, BERNARD STOLAR, ERIC STOPPENHAGEN, TIGER TELEMATICS,

13  INC., CHUCK TIMPE, MEDIA POWER USA LLC, ASIATIC COMMERCE BANK,

14  DOE 1 through DOE 100, and Nominal Defendant GETFUGU, INC. (collectively

15  "Defendants"), inclusive, on personal knowledge as to itself, and otherwise on

16  information and belief, as follows:

17  **INTRODUCTION**

18  1.  This is an action brought by Plaintiffs pursuant to the provisions of

19  the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C.

20  § 1961, *et seq.*  This action also includes claims for breach of fiduciary duty and for

21  repayment of a loan against some of the Defendants.  Defendant Freer is a felon and

22  corrupt individual who has repeatedly schemed and conspired with others to take over

23  companies, many of them publicly traded, and then exploit them for his own greedy

24  and improper purposes.  Freer and those of his corrupt associates often benefit from

25  classic "pump and dump" schemes to talk up the value of penny stocks, sell their

26  shares at the inflated prices, and then abandon the companies and its exploited

27  shareholders, before moving on to their next business.  Further, Freer and his

28  associates have used their management and control positions with these corporations

1   to strip corporate assets and to raid the corporate piggybank for their personal benefit,

2   deprive the shareholders of their honest services, commit fraud, breach their fiduciary

3   duties and stiff creditors (including Plaintiffs) – all in an effort to improperly and

4   unlawfully enrich themselves and for their own financial benefit.  GetFugu, Inc. is

5   nothing more than Freer's latest corporate swindle.

6        2.     This complaint hereby incorporates by reference Plaintiffs' RICO

7   Case Statement and any amendments or supplements thereto.

8                    **JURISDICTION AND VENUE**

9        3.     This Court has subject matter jurisdiction over these claims

10   pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1961, and 18 U.S.C. § 1964(a), (c).  This

11   Court also has supplemental jurisdiction over the state law claims asserted herein

12   pursuant to 28 U.S.C. § 1367(a).

13        4.     Personal jurisdiction over the defendants is proper in this District.

14   A substantial portion of the wrongdoing occurred in California.  Defendants are

15   located in, have been or are doing business here, or have other minimal contacts in

16   California more than sufficient to render the exercise of personal jurisdiction

17   permissible under traditional notions of fair play and substantial justice. Personal

18   jurisdiction also exists pursuant to 18 U.S.C. § 1965.

19        5.     Venue is proper in this forum pursuant to 28 U.S.C. §§ 1391(a)-

20   (d), 18 U.S.C. § 1965, and the applicable law of this Court.  Venue is proper because,

21   *inter alia*, events that form the basis for Plaintiffs' claims have occurred here, and

22   Defendants have engaged in commerce within this forum, have sought the benefits of

23   this forum in litigation, and continue to have substantial contact with this forum.

24                          **PARTIES**

25        6.     Plaintiff Simon Davies ("Davies") is a citizen of the United

26   Kingdom.

27        7.     Plaintiff David Warnock ("Warnock") is a citizen of the United

28   Kingdom.

1    8.    Defendant and nominal defendant GetFugu, Inc. ("GetFugu") is a
2  Delaware corporation with its principal place of business in Los Angeles, California.
3  Prior to October 16, 2009, GetFugu was a Nevada corporation.  At all material times,
4  it acted, aided and abetted, conspired, facilitated and participated in the unlawful and
5  illegal acts and omissions alleged below.

6    9.    Defendant Carl Freer, a/k/a Eric Jonsson, Johan Freer, and Brian
7  Littleton ("Freer") is a citizen of Sweden who is a resident of California.  Freer is the
8  founder, largest shareholder, and an officer and director of GetFugu.  At all material
9  times, he owed fiduciary duties to GetFugu and its shareholders and breached such
10 duties, and he acted, aided and abetted, conspired, facilitated and participated in the
11 unlawful and illegal acts and omissions alleged below.  Also, Freer personally
12 guaranteed loans made by Davies and Warnock.

13   10.    Defendant Alan J. Bailey ("Bailey") is a citizen of the State of
14 California.  On or about November 2, 2009, he became a Director of GetFugu.  At all
15 material times, he owed fiduciary duties to GetFugu and its shareholders and breached
16 such duties, and he acted, aided and abetted, conspired, facilitated and participated in
17 the unlawful and illegal acts and omissions alleged below.  The defendant ratified the
18 fraudulent and conspiratorial conduct of the Defendants.

19   11.    Defendant Begbies Traynor Group ("Begbies") is a United
20 Kingdom corporation with its principal place of business in the United Kingdom, but
21 with offices in the United States, including New York, New Jersey and Atlanta.  The
22 company provides services related to business rescue, recovery and restructuring.
23 Begbies employed two of the Joint Liquidators for Gizmondo Europe Limited (in
24 Liquidation) ("Gizmondo-Liquidation").  At all material times, it acted, aided and
25 abetted, conspired, facilitated and participated in the unlawful and illegal acts and
26 omissions alleged below.

27   12.    Defendant Michael Carrender ("Carrender") is a citizen of the
28 State of Florida and served as President of Tiger.  At all material times, he acted,

1   aided and abetted, conspired, facilitated and participated in the unlawful and illegal

2   acts and omissions alleged below.

3   13.   Defendant Mark Champion ("Champion") is a citizen of the State

4   of California.  He was and is the Chief Financial Officer of GetFugu.  At all material

5   times, he owed fiduciary duties to GetFugu and its shareholders and breached such

6   duties, and acted, aided and abetted, conspired, facilitated and participated in the

7   unlawful and illegal acts and omissions alleged below.  The defendant ratified the

8   fraudulent and conspiratorial conduct of the Defendants.

9   14.   Defendant Corporate Valuation Advisors, Inc. ("CVA") is a

10   Wisconsin corporation with its principal place of business in Wisconsin.  At all

11   material times, it acted, aided and abetted, conspired, facilitated and participated in the

12   unlawful and illegal acts and omissions alleged below.

13   15.   Defendant Dragon Phoenix (China) Ltd. ("Dragon Phoenix") is a

14   Chinese corporation with its principal place of business in Hong Kong.  At all material

15   times, it acted, aided and abetted, conspired, facilitated and participated in the

16   unlawful and illegal acts and omissions alleged below.

17   16.   Defendant David Rubin & Partners ("DRP") is a United Kingdom

18   corporation with its principal place of business in the United Kingdom.  The company

19   provides services related to business rescue, recovery and restructuring.   DRP

20   employed two of the Joint Liquidators for Gizmondo-Liquidation.  At all material

21   times, it acted, aided and abetted, conspired, facilitated and participated in the

22   unlawful and illegal acts and omissions alleged below.

23   17.   Defendant Paul Davis ("Davis") is a citizen of the United

24   Kingdom.  During relevant time periods, he was employed by Begbies Traynor and

25   was one of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he

26   acted, aided and abetted, conspired, facilitated and participated in the unlawful and

27   illegal acts and omissions alleged below.

28   18.   Defendant Timothy Dolder ("Dolder") is a citizen of the United

Kingdom.  During relevant time periods, he was employed by Begbies Traynor and was one of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

19.     Defendant Stefan Eriksson ("Eriksson") is a citizen of Sweden.  He has held various positions with numerous entities, including without limitation, Gizmondo, Tiger and Xero.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. Also, Eriksson personally guaranteed loans made by Davies and Warnock.

20.     Defendant Anneli Freer is a citizen of the State of California and is Freer's ex-wife.  At all material times, she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

21.     Defendant Ericka Freer is a citizen of the State of Colorado.  She is Freer's current wife and has participated in and/or personally benefited from the wrongful acts and omissions described herein.  At all material times, she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

22.     Defendant David Hudson is a citizen of the United Kingdom. During relevant time periods, he was employed by Begbies Traynor and was one of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

23.     Defendant Jason Irwin ("Irwin") is a citizen of the State of New York.  Irwin was President, Chief Executive Officer, Chief Financial Officer, Secretary, and a Director of GetFugu from January 30, 2009 to April 2, 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached

1  such duties, and acted, aided and abetted, conspired, facilitated and participated in the

2  unlawful and illegal acts and omissions alleged below.   The defendant ratified the

3  fraudulent and conspiratorial conduct of the Defendants.

4         24.   Defendant Richard Jenkins ("Jenkins") is a citizen of the State of

5  California.   Jenkins was the Chief Executive Officer, President, Chief Financial

6  Officer, and Secretary and Chairman of the Board of Directors of GetFugu from

7  August 29, 2008 to January 30, 2009. On or about April 20, 2009, he resigned as a

8  Director of the Company. Beginning in August 2008, Jenkins served as Chief

9  Executive Officer of Media Power Inc.  From January 2007 to August 2008, Jenkins

10  served as Chief Operating Officer of Media Power Inc.   The defendant ratified the

11  fraudulent and conspiratorial conduct of the Defendants.

12         25.   Defendant Juanita Group Ltd. ("Juanita Group") is a United

13  Kingdom corporation with its principal place of business in California. At all material

14  times, it acted, aided and abetted, conspired, facilitated and participated in the

15  unlawful and illegal acts and omissions alleged below.  At all material times, he acted,

16  aided and abetted, conspired, facilitated and participated in the unlawful and illegal

17  acts and omissions alleged below.

18         26.   Defendant Ivan D. Kozhuharov ("Kozhuharov") is a citizen of the

19  State of Connecticut.  Kozhuharov was Chief Technology Officer of Media Power,

20  Madero and GetFugu.   His current position at GetFugu is called Chief Software

21  Architect.   At all material times, he owed fiduciary duties to GetFugu and its

22  shareholders and breached such duties, and he acted, aided and abetted, conspired,

23  facilitated and participated in the unlawful and illegal acts and omissions alleged

24  below.   The defendant ratified the fraudulent and conspiratorial conduct of the

25  Defendants.

26         27.   Defendant Donald A. Kurz ("Kurz") is a citizen of the State of

27  California.  On or about November 13, 2009, Kurz was appointed to GetFugu's Board

28  of Directors.   At all material times, he owed fiduciary duties to GetFugu and its

shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

28.   Defendant Mark LaPresle ("LaPresle") is a citizen of the State of California. LaPresle has been a member of the Board of Directors of GetFugu since January 2009. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

29.   Defendant Mikael Ljungman ("Ljungman") is a citizen of Sweden and he is current incarcerated in Sweden. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

30.   Defendant Hazina Ljungman is a citizen of Sweden. She is Ljungman's wife and has participated in and/or personally benefited from the wrongful acts and omissions described herein. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

31.   Defendant Asher D. Miller ("Miller") is a citizen of the United Kingdom. During relevant time periods, he was a partner in DRP and was one of the Joint Liquidators of Gizmondo-Liquidation. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

32.   Defendant Derek Norton ("Norton") is a citizen of the State of California. On or about October 19, 2009, he became Chief Operating Officer of GetFugu. At all material times, he owed fiduciary duties to GetFugu and its

shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

33. Defendant Michael O'Connor ("O'Connor") on information and belief, is a citizen of Canada. On or about July 26, 2009, he became a Director of GetFugu. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

34. Defendant Christine Peters ("Peters") is a citizen of the State of California. Peters has been a Director of GetFugu since on or about May 5, 2009. At all material times, she owed fiduciary duties to GetFugu and its shareholders and breached such duties, and she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

35. Defendant David Antony Rubin ("Rubin") is a citizen of the United Kingdom. During relevant time periods, he was a partner in DRP and was one of the Joint Liquidators of Gizmondo-Liquidation. At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

36. Defendant William Schloth, CPA ("Schloth") is a citizen of the State of Connecticut. He was involved with Media Power and Madero. Schloth is currently employed by Southridge Investment Group LLC. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

37. Defendant Michael Jay Solomon ("Solomon") is a citizen of the State of California. Solomon became Chairman of the Board of Directors of GetFugu

on or about July 22, 2009. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

38.     Defendant Leathem Steran ("Steran") is a citizen of the State of Connecticut. Leathem was the Chairman of the Board of Directors of GetFugu from approximately January 2009 to approximately July 22, 2009; he continues to be a director of GetFugu. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

39.     Defendant Bernard Stolar ("Stolar") is a citizen of the State of California. Stolar was Chief Executive Officer and President and a director of GetFugu since approximately January 2009. On or about November 2, 2009, Stolar resigned as President (but remained CEO). At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

40.     Defendant Eric Stoppenhagen ("Stoppenhagen") is a citizen of the State of California. Stoppenhagen, a Certified Public Accountant, was the interim Chief Financial Officer and Secretary and a director of GetFugu from on or about April 4, 2009 to May 4, 2009. At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. The defendant ratified the fraudulent and conspiratorial

conduct of the Defendants.

41.   Defendant Tiger Telematics, Inc. ("Tiger") is incorporated under Delaware law and its principal place of business is in Jacksonville, Florida.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

42.   Defendant Chuck Timpe ("Timpe") is a citizen of the State of California. On or about November 2, 2009, he became a Director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.  The defendant ratified the fraudulent and conspiratorial conduct of the Defendants.

43.   Defendant Media Power USA LLC ("Media Power") is a California corporation with its principal place of business in Los Angeles, California. Media Power's predecessor was Media Power USA, Inc., which was originally established on December 31, 2006 as a California Limited Liability Company.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

44.   Defendant Asiatic Commerce Bank ("Asiatic") is a United Kingdom bank with its principal place of business at 6 Albemarle Street, London. At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

45.   Plaintiffs currently do not know the true names and capacities of the Defendants sued as Does 1 through 100, inclusive, and therefore sue these Defendants by fictitious names.  Plaintiffs will amend their Complaint to allege the true names and capacities of these Defendants when they are ascertained.  Each of the fictitiously named Doe Defendants are responsible in some manner for the events and happenings alleged in this Complaint.

46.   Each of the Defendants was or is the co-conspirator, partner, joint

venturer, director, officer, managing agent, employer, employee, principal, agent, representative and alter ego of each of the other Defendant and in connections with the conduct alleged here, was acting with the scope of such capacities and with the authorization, consent, control, direction, knowledge, and ratification of the other Defendants.  The Defendants are vicariously and jointly and severally liable for the damages claimed herein.

## SHAREHOLDER DERIVATIVE ACTION

47.   At all relevant times, Warnock was and is a shareholder of GetFugu.  He owns 500,004 shares of the company, which he obtained from Freer pursuant to an agreement.  The derivative claims set forth herein all pertain to the time period during which Warnock was a GetFugu shareholder.

48.   This action is not a collusive action to confer jurisdiction on a court of the United States which it would not otherwise have.

49.   On October 8, 2009, Warnock sent a letter to the members of the Board of Directors as well as the Chief Executive Officer of GetFugu demanding that they immediately investigate and enforce the rights that GetFugu may properly assert relating to the claims alleged below but has failed to enforce.  Warnock demanded an immediate response to his letter, no later than October 13.

50.   On October 21, 2009, counsel for GetFugu and Freer personally sent a letter to Warnock stating, *inter alia*, that GetFugu's Board allegedly formed a special committee of independent directors to review and investigate the matters set forth in Warnock's letter.

51.   On October 23, Warnock replied to the letter, which, *inter alia*, (a) asked that the names of the members of the special committee be disclosed, (b) stated that Kirkland should not serve as counsel to the special committee because he was not independent, and (c) provided additional information regarding the claims described in Warnock's October 8 letter.  Warnock asked for a reply by October 28.  To date, no response has been received.

52.     In any event, an attempt to obtain the relief requested herein from the Defendants would be futile.  The Defendant directors, officers and shareholders are and have been antagonistic to Warnock.  The Defendants would not agree to the payment of damages or the equitable relief sought herein.

53.     Moreover, a day after Warnock sent his demand letter, on October 9, GetFugu filed a Preliminary Information Statement with the Securities and Exchange Commission to reincorporate as a Delaware corporation, in an apparent attempt to limit the liability of GetFugu's directors and officers.  On or about October 16, 2009, GetFugu became a Delaware corporation.

## FACTS

### I.     Tiger/Gizmondo

54.     In 2000, Freer was director of a UK-based company, Eagle Eye Scandinavian Distribution Ltd. ("Eagle Eye").

55.     Freer became interested in Floor Décor, Inc. ("FDI"), not because of its flooring business, but because in 2001, it became a public company by way of a reverse merger with Media Communications Group Inc. ("MCGI"), a publicly-traded marketing and distribution company.  Freer came to believe that a publicly-traded company can create money by selling stock, borrowing money from shareholders, creating more shares of stock, and even using them in lieu of cash.  The latter was what FDI accomplished with its reverse takeover of MCGI.  By the end of 2001, FDI had an accumulated deficit of almost two million dollars, the annual report noted "strained" liquidity and the possibility of having to start cost-saving measures to increase available cash.

56.     On or about February 4, 2002, FDI purchased Freer's company, Eagle Eye, with 7,000,000 shares of its stock and changed its name to Tiger Telematics Ltd.  It also relieved itself of indebtedness to various shareholders by converting the debts into stock. FDI had managed to acquire a new subsidiary, and reduce its liabilities by over $4 million, without actually spending any money.

57.     By July 2002, FDI had changed its name to Tiger Telematics Inc., announced plans to dispose of its unprofitable flooring business and leased a London office for Tiger Telematics Ltd. (paying for the first year with 500,000 shares).

58.     Tiger bought Comworxx Inc., a U.S.-based telematics provider. The deal was for $4.2 million worth of Tiger stock, the assumption of some of Comworxx's liabilities, and the provision of $500,000 of funding. A subsequent review of Comworxx's operations concluded, rather surprisingly, that Comworxx was not a viable business. Tiger then wrote off the value of the purchase completely, adding almost five million dollars to its losses for that year.

59.     In 2002, Tiger formed a new subsidiary, Tiger Telematics Europe Ltd., subsequently named Gizmondo Europe, Ltd. ("Gizmondo"), to provide telematics products and services to customers in England and Western Europe. Freer was made Managing Director of this new subsidiary, and Steve Carroll ("Carroll"), originally employed by Freer's company Eagle Eye, became Technical Director. Freer subsequently became Chairman of the Board.

60.     A short time later, Christian & Timbers ("C&T") sued Tiger because Tiger Ltd. had defaulted on its lease payments and Tiger guaranteed the lease. Although the UK Court entered a $300,000 judgment, Tiger issued C&T with "shares of common stock to satisfy the amount of the outstanding judgment."

61.     The 2002 annual report of Tiger first mentioned Freer and described his alleged background and listed a number of previous appointments, including as a trustee on the Kings Medical Research Trust and a founder of a company called Vxtreme.   Neither of those statements was true. In fact, Freer promised Kings Medical Research Trust millions of dollars, but in the end offered the Trust nothing more than stock at the time, and that was not good enough – a pattern which has followed Freer to this day. Freer is notorious for offering stock to charities, universities, debt collectors and colleagues, for yacht, art, and self-serving needs.

62.     Meanwhile, under Freer's direction, Tiger was only able to

continue operating by borrowing money (usually from shareholders) or by using shares in lieu of cash to pay suppliers and even employees. As a result, Tiger's losses for 2003 misleadingly appeared to be less from those in 2002.

63.   Tiger and its subsidiaries, including a company named Smart Adds, Inc. ("Smart Adds"), were allegedly engaged in the business of developing and marketing a wireless handheld multi-entertainment gaming device called the Gizmondo and related games and accessories associated with the device.  In an article published by Business Week on or about June 21, 2004, Carrender said that "It's clear the growth is going to be astronomical . . . ."

64.   In August 2004, a press release announced that Gizmondo had purchased a purported Stockholm game developer called Indie Studios AB ("Indie"), for $850,000 and shares valued at $2,740,000 – in total over three million dollars *in excess* of its stated value. The excess of purchase price over the value of the tangible assets acquired ($3,651,713), was assigned to "goodwill."

65.   The Indie acquisition marked both the entry into the company of Freer's Swedish associates and the first seriously questionable business deal.   Indie was bought from a company called Golden Sands Investment Holdings. Its directors included Eriksson, Peter Uf and Joseph Marten.  Eriksson had been convicted of robbery, drug trafficking, assault and counterfeiting, released from prison in 2000 after serving six years of a ten-year sentence for fraud.  He was alleged to be a member of a Swedish organized crime group known as the "Uppsala Mafia."  On November 7, 2006, Eriksson pleaded no contest to embezzling the two sport cars and illegally possessing a gun and was sentenced to three years in prison.  In or about January 2008, Eriksson was released from prison in the US and extradited to serve a prison term in Europe.  Peter Uf had also been imprisoned for fraud.

66.   A number of personnel changes followed the acquisition: Freer was made a Director of Tiger and Board Chairman as well as Managing Director of Gizmondo, Eriksson and Uf were brought on as Directors of Gizmondo and Carroll

was made Tiger's Chief Technology Officer. Johan Enander, an associate of Eriksson, was made Head of Security for Gizmondo.  Enander, another alleged member of the Uppsala Mafia, had been convicted of extortion and grand theft.  Further, when he was hired by Gizmondo as Head of Security he had only just finished an 18-month sentence for assaulting a woman and was still wanted by the Swedish police.

67.     Tiger's 2004 SEC Form 10-K revealed not only a massive, $99.2 million loss but very generous executive compensation packages, provided in the form of cash, loans, automobile allowances and stock.  This Form 10-K was certified by Carrender.

68.     Freer and Eriksson used Tiger and Gizmondo and Tiger's other affiliates to enrich themselves and their associates at the expense of the companies and their creditors and stockholders.  They caused the corporate entities to pay their personal expenses.

69.     Freer, Eriksson and their corrupt associates developed elaborate schemes to divert corporate assets to their own personal use and benefit.  Examples of such conduct include, without limitation:

(a)     In or about September 2004, Gizmondo entered into a License Agreement with Northern Lights Software Limited ("Northern Lights"), under which Gizmondo paid Northern Lights approximately $3.5 million.  At the time of the agreement Freer and Eriksson were the only directors of both Northern Lights and Gizmondo.  Freer and Eriksson each was the beneficial owner of 23.5% of the outstanding shares of Northern Lights.  The 52% owner of Northern Lights was said to be Asiatic.  Freer and/or Eriksson owned and controlled, directly or indirectly, Asiatic.

(b)     Tiger disclosed that in 2004, Freer and Eriksson caused

"Asiatic Bank and Finance", a company allegedly registered in Panama with its head office in Hong Kong, to pay $7.6 million that was said to have been owed by Asiatic to Freer and Eriksson, directly to 3P PreForm Marketing and Research AB, a systems developer based in Stockholm, and others supposedly in repayment of research and development expenditures owed to these parties by Gizmondo. Gizmondo then credited this amount in payment of amounts previously owed by Freer and Eriksson to Gizmondo. Asiatic was also a Tiger shareholder. What Tiger did not disclose was that Freer and/or Eriksson, directly or indirectly, owned most if not all of Asiatic. Carrender certified this Form 10-K.

(c) Gizmondo paid Freer's wife for unearned "consultancy services."

(d) Freer had a dual role selling Tiger stock to the Palestinian Investment Fund ("PIF"). According to Tiger's April 28, 2005 SEC Form 8-K (signed by Carrender), on or about April 28, 2005, Tiger completed a sale of approximately 1,640,724 shares of its common stock for an aggregate purchase price of approximately $21,437,537 million. Approximately 1,220,588 of the shares were sold to PIF, for $17 a share. The Form 8-K goes on to say that PIF was involved in a stock swap with an unnamed shareholder who sold Tiger shares to an investment fund. Later, they remitted the funds to Tiger in exchange for newly issued shares at a discounted price to reflect the restrictions. Tiger paid approximately $1,640,000 to Earlsdon Investments Ltd.

in part as a placement fee. Among other things, Tiger did not disclose that:

(1)    Tiger had transferred 1,295,588 of its shares to Juanita Group, a company that is owned by Freer and his wife, Anneli Freer.

(2)    On or about April 11, 2005, Tiger's President, Carrender, wrote four letters to PIF transmitting shares (one for 200,000 shares, 20,588 shares, 600,000 shares, and 400,000 shares) and certifying "that the above certificate for shares was purchased from a *non-affiliated shareholder*" (emphasis added). In fact, the certificates came from Juanita Group. In addition to his ownership interest in Juanita Group, Freer was Chairman of the Board of Tiger at the time. Thus, these letters were false and misleading.

(3)    The actual amount paid by PIF was $20,750,000 (for 1,220,588 shares) not $21,437,537. Moreover, PIF paid this amount to Juanita Group, not Tiger. Tiger only received $14,119,880.

70.    Thus, Freer and Anneli Freer were able to fraudulently and improperly obtain money, to the detriment of Tiger.

71.    By spring 2005, Gizmondo disseminated several news releases and public statements touting the prospects of Tiger, Gizmondo and the Gizmondo product. Such statements were false and misleading and failed to disclose that the assets of Tiger, Gizmondo and its affiliates were being improperly used by Freer and Eriksson for their own personal benefit.

72.    Tiger's share prices rose to $32.50, valuing the company in excess

1    of $1 billion.  In April 2005, Tiger raised $21.4 million in a stock sale.

2          73.    In May 2005, Tiger reported that in the second quarter of 2005, it

3    had borrowed approximately $21.2 million from two shareholders, Plaintiffs Warnock

4    and Davies.  (SEC Form 10-Q filed Nov. 30, 2005).    The contracts between Tiger,

5    Gizmondo, Freer and Eriksson and Davies and Warnock included the following:

6          (a)    On or about May 9, 2005, Warnock loaned Gizmondo
7                 £4,000,000, documented in a promissory note.  The note was
8                 due June 2, 2005.  Gizmondo, Tiger, Freer, and Eriksson
9                 signed and personally guaranteed the note.  A copy of the
10                document is incorporated by reference.

11         (b)    On or about May 31, 2005, Gizmondo signed a note in the
12                amount of £4,000,000 in favor of Warnock, which, *inter*
13                *alia*, extended the due date of the May 9, 2005 note to June
14                30, 2005.  Gizmondo, Tiger, Freer and Eriksson signed and
15                personally guaranteed the note.  A copy of the document is
16                incorporated by reference.

17         (c)    On or about June 13, 2005, Warnock and Davies loaned
18                Gizmondo £6,000,000, documented in a promissory note.
19                The note was due July 31, 2005.  Gizmondo, Tiger, Freer
20                and Eriksson signed and personally guaranteed the note.  A
21                copy of the document is incorporated by reference.

22         (d)    On or about June 13, 2005, Warnock and Davies loaned
23                Gizmondo £1,000,000, documented in a promissory note.
24                The note was due July 31, 2005.  Gizmondo Tiger, Freer and
25                Eriksson signed and personally guaranteed the note.  A copy
26                of the document is incorporated by reference.

27         (e)    On or about July 5, 2005, Warnock and Davies agreed to
28                extend the maturity of the June 13, 2005 note in the amount

FIRST AMENDED COMPLAINT

of £1,000,000 to September 30, 2005. The guarantee of Tiger was extended to October 1, 2005 and the guarantee of Eriksson and Freer were extended to October 2, 2005. A copy of the document is incorporated by reference.

(f) On or about July 5, 2005, the maturity of the note with the original due date of June 2, 2005 was extended to December 31, 2005, with the addition of a 1,027,069 stock option.

74. Davies and Warnock entered into these agreements in justifiable reliance on statements and omissions of material fact made by Tiger, Gizmondo, Eriksson, Freer and Carrender.

75. Further, Tiger failed to disclose to Davies and Warnock before entering into the agreements that in the first quarter of 2005, the quarter in which it launched Gizmondo in the United Kingdom, Tiger lost $163.8 million. Reflecting Freer's pattern and practice of looting companies, $151.1 million of that loss arose from general and administrative operating expenses. By contrast, the company spent just $455,092 on goods sold. This information was not disclosed to the public, let alone Plaintiffs, until October 2005. (SEC Form 10-Q, filed Oct. 20, 2005, signed by Carrender).

76. At the time that Gizmondo, Tiger, Freer and Eriksson entered into the above-described agreements with Davies and Warnock, they had no intention to repay their loan obligations or comply with their guarantee obligations.

77. Plaintiffs thus were fraudulently induced to enter into such agreements.

78. The amount of the debt owed to Davies and Warnock was liquidated and could be readily calculated based on the amount of the principal plus interest.

79. On or about August 11, 2005, two patent applications were filed with the U.S. Patent and Trademark Office ("USPTO"): No. 2006/0064350, titled

"Method for advertising" ("Smart Adds I") and No. 2006/0074550, titled "System & method for distributing multimedia content via mobile wireless platforms" ("Smart Adds II"). Freer was listed as the inventor on both patent applications. Both applications are now assigned to Warnock and Davies and such assignments are properly recorded with the USPTO.

80. Incredibly, for the first three quarters of 2005, Tiger had spent over $218 million on "general and administrative expenses." Tiger later disclosed that:

> The Company has sustained net losses aggregating over $382.5 million for the three years and nine months ended September 30, 2005. In addition, the Company had a net working capital deficiency of $76.4 million at September 30, 2005. During those periods, the Company sold $121.3 million of restricted common stock shares and, in order to conserve cash, the Company funded $178.3 million of the losses by issuing restricted common stock in exchange for services and other expenses. Management anticipates proceeds from sales of Gizmondo units and accessories to increase significantly after the U.S. launch of the product on October 22, 2005. Management also anticipates the ability to continue issuing equity securities to meet working capital requirements and to fund development costs incurred in connection with developing products that the Company believes will enhance its operations. No assurances can be given that these funds will be available. Additionally, the Company borrowed approximately $21.2 million from shareholders on a short-term basis during the second quarter of 2005 (See Note J).

(SEC Form 10-Q filed Nov. 30, 2005, signed by Carrender).

81. On or about September 30, 2005, Tiger announced that three new "independent" directors joined the Board. (See SEC Form 8-K dated Sept. 30, 2005). They formed a special committee to investigate Tiger's related party transactions, including those involving Freer and Erickson. Tiger disclosed that the committee was conducting an active review of the matters. "Should any transactions be deemed inappropriate or unfair to the Company by this committee, they will be fully

- 23 -
FIRST AMENDED COMPLAINT

1   investigated and remedial action taken accordingly." No such action was ever taken

2   by the committee.

3          82.   On or about October 19, 2005, Davies provided Freer with

4   instructions on how to repay the two loans of £4 million and £7 million. Freer did not

5   contest the debt that he personally guaranteed.

6          83.   In October 2005, Freer was sentenced to probation and fined by a

7   court in Germany for buying four luxury cars with a bad check. He had previously

8   forged his own parents' signature for a loan and was convicted of fraud. Further,

9   between November 2007 and September 2008, Freer contributed at least $18,450 to

10  Hilary Clinton or her political action committee. In doing so, he provided a California

11  address with the contribution but failed to disclose that he was a not a U.S. citizen.

12  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign national to make political

13  contributions.

14         84.   In October 2005, Freer and Eriksson traveled to California for the

15  purported U.S. launch of the Gizmondo product. However, they resigned their

16  positions with Tiger, Gizmondo and other Tiger affiliates on or about October 20,

17  2005. Uf also resigned. Tiger then disclosed that:

18         Since their resignations, Messrs. Freer, Eriksson and Uf
           have been the subject of several articles published in
19         Sweden reporting alleged questionable activities and
           association with a Swedish crime family and, in the case of
20         Messrs. Eriksson and Uf, prior convictions for fraud and
           other economic crimes. Mr. Freer has advised the Company
21         that the allegations and implications of illegal activities or
           improprieties attributed to him are not true and that he
22         intends to file suit against the newspapers. Prior to these
           reports, the Company had no prior knowledge of the past
23         history described in these reports. The Company conducts
24         background checks of all of its senior executives. The
           background checks did not reveal these convictions or other
25         illegal activities.

26

27

28  (SEC Form 10-Q filed Nov. 30, 2005).

85.    Thus, by no later than November or December 2005, Tiger had knowledge of the fraud and racketeering activity of, *inter alia*, Freer and Eriksson that directly and proximately injured the business and property of Tiger, its Gizmondo subsidiary, and its creditors, including Davies and Warnock.    As such, Tiger also knew that it was liable on the guarantees it provided for the loans made by Davies and Warnock but did not have sufficient funds or assets to repay the debt to them.

86.    As a direct and proximate result of the fraud and racketeering activity of, *inter alia*, Freer and Eriksson with respect to Tiger and Gizmondo, Davies and Warnock were injured in their business and property.    The debt owed to them by Tiger, Gizmondo, Freer and Eriksson has never been paid.

87.    On or about December 14, 2005, Smart Adds entered into a Security Agreement with Davies and Warnock.    Smart Adds granted Davies and Warnock a security in its intellectual property as security for the loans to Gizmondo.

88.    On or about January 20, 2006, Gizmondo filed a High Court application for administration in the United Kingdom.

89.    On or about February 2, 2006, liquidators were appointed for Gizmondo, for the purpose of winding up the company's affairs and distributing its assets.    The joint liquidators appointed for Gizmondo-Liquidation were Davis and Dolder of Begbies Traynor, and Rubin and Miller of DRP (collectively, "the Joint Liquidators").    The Joint Liquidators disclosed that they had conducted a "detailed investigation" of Gizmondo pursuant to the UK Insolvency Act 1986.    The Joint Liquidators contended that they had claims against Freer, his then-wife, other entities affiliated with Freer, Eriksson, Tiger and others.    As set forth below, the Joint Liquidators subsequently became part of the illegal activities and conspiracy alleged herein.

90.    In March 2006, Warnock and Davies demanded payment of their loan from Tiger as guarantor.    However, Tiger had no funds to honor its guarantee. Tiger's subsidiary, Smart Adds, did own intellectual property, including without

FIRST AMENDED COMPLAINT

limitation Smart Adds I and Smart Adds II.

91.     On or about March 1, 2006, Smart Adds, Tiger, Davies and Warnock entered into an Assignment of Intellectual Property and Release of Security Agreement ("Assignment and Release").  Pursuant to the Assignment and Release, Smart Adds assigned its intellectual property assets to Davies and Warnock, including without limitation Smart Adds I and Smart Adds II.

92.     On or about November 15, 2007, the Joint Liquidators, Gizmondo-Liquidation, and Freer entered into a Deed of Settlement to settle their claims against Freer.  In pertinent part, the Deed of Settlement provided that:

    (a)     Freer would pay the Joint Liquidators $6,010,000, with an initial payment of $10,000 and eight installments of $750,000 each;

    (b)     If any of the installments were not timely paid, the entire amount of $6 million would immediately be due and payable;

    (c)     Gizmondo-Liquidation would assign and transfer any intellectual property rights to trade names to Freer; and

    (d)     On February 29, 2008, on the condition that Freer was then current with the payment schedule, the Liquidators would send Freer a letter confirming, *inter alia*, the cooperation and assistance given by Freer to the Liquidators.

## II.     Xero

93.     In February 2006, Freer engineered the formation of Xero Mobile, Inc. ("Xero"), a "Mobile Virtual Network Operator" in Los Angeles. It planned to offer a free cell phone service for college students, subsidized by advertisements delivered to their handsets.

94.     Xero was projecting incomes of $1.8 billion after three years, and was soon rumored to have raised $300 million in European investment.

95.    On or about June 26, 2006, Roger Davis, the President of Xero Mobile, wrote a letter "to whom it may concern" representing that Freer was the company's majority shareholder.  Other former Tiger and Gizmondo personnel were involved in management of Xero.

96.    On or about June 29, 2006, Thomas S. Loo, a shareholder in the law firm Greenberg Traurig LLLP, sent a letter to Wayne Levy of Equity Funding Group representing that:

> We serve as outside legal counsel to Xero Mobile, a Nevada corporation ("Xero Mobile" or the "Company").  As requested by the Company, we wish to confirm to you that Carl Freer was the founder of, and presently is a significant shareholder and investor in Xero Mobile.  Our confirmation is based upon a certificate by the President of the Company (attached) and certain records which have been provided to us.    We have not otherwise conducted a separate investigation of the facts represented to us.

Attached to the letter was a June 30, 2006 "Certificate" signed by Roger Davis as President of Xero, representing that:

(a)    Carl Freer is the beneficial owner of 4,254,743 of the outstanding shares of Xero Mobile, which shares he holds in his name.    Blowfishworks LLC is beneficial owner of 8,642,311 of the outstanding shares of Xero Mobile.  Additionally, Mr. Freer is the beneficial owner of 1,000,000 shares held of record by Blowfishworks LLC;

(b)    The above listed shareholdings represent approximately 31.2% of the outstanding shares of Xero Mobile exclusive of outstanding options and warrants to acquire equity interests in Xero Mobile; and

(c)    Carl Freer was the initial shareholder of Xero Mobile or its predecessor.

FIRST AMENDED COMPLAINT

97.    Freer owns and controls Blowfish.

98.    In June 2006, Xero performed a reverse merger with a public shell company.

99.    On or about March 6, 2006, Davies and Warnock entered into an Assignment of Intellectual Property agreement with Xero, Freer and Eriksson ("IP Assignment"). Pursuant to the IP Assignment, on the Closing Date (the date on which Xero paid $26,000,000 to Davies and Warnock), Davies and Warnock would assign the intellectual property they owned to Xero. The IP Assignment is incorporated herein by reference.

100.   Freer and Eriksson personally guaranteed, jointly and severally, the obligations of Xero under the IP Assignment. If the transactions contemplated by the IP Assignment were not consummated on or before May 31, 2006, Freer and Eriksson would remain liable as guarantors under the 2005 notes.

101.   At the time that Freer and Eriksson entered into the above-described agreement with Davies and Warnock, they had no intention to comply with their guarantee obligations. Plaintiffs were fraudulently induced to enter into such agreement.

102.   Freer and Eriksson have breached the IP Assignment by failing to meet their obligations as guarantors to, *inter alia*, pay $26,000,000 (plus interest) to Davies and Warnock.

103.   Thus, Davies and Warnock continue to maintain their beneficial interest in the intellectual property set forth in the IP Assignment and are owed $26,000,000 plus interest by Freer and Eriksson.

### III.    Media Power

104.   Media Power was founded by Freer and his partner Ljungman.

105.   Ljungman was sentenced in Sweden to prison for tax fraud. On or about September 30, 2008, Ljungman donated $5,000 to Hilary Clinton's political action committee, Hillpac. In doing so, he provided a New York address and stated

1   that he was employed by Media Power, but he failed to disclose that he was a not a
2   U.S. citizen.  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign national to make
3   political contributions.

4          106.   Media Power USA, Inc. was originally established on December
5   31, 2006 as a California Limited Liability Company.  Media Power USA LLC was
6   founded by Freer and Ljungman, with Jenkins as Chief Executive Officer.   On
7   October 27, 2007, the company converted to a California Corporation.  On or about
8   June 8, 2008, Media Power USA Inc, a California corporation, merged with Media
9   Power, a Delaware corporation.

10          107.   Media Power's owners included not only Freer and Ljungman
11  individually, but also related persons and entities under their ownership and control,
12  including without limitation, Dragon Phoenix and 16 companies incorporated in
13  United Arab Emirates or the Isle of Man on or about August 26, 2008. Ljungman,
14  through eCommerce, incorporated 16 companies by using the services of Sovereign
15  Corporate Services.  Dragon Phoenix's website continues to list eCommerce as one of
16  its "partners."  http://www.dragonphoenix.hk/partners.php.

17          108.   In or about late 2007, Freer (along with his son) became involved
18  with Alien King Inc. ("Alien King"), a company financed in whole or in part with the
19  proceeds of the criminal activities by Freer and others as alleged herein.  Alien King
20  provides pornography in the form of "mobile adult entertainment" and operates
21  websites   to   facilitate   its   business,   including   without   limitation,
22  http://www.alienking.com  and  http://mobile.alienking.com.   Freer, directly or
23  indirectly, continues to have an interest in Alien King.  Further, Freer caused a Media
24  Power entity to make a payment to mBlox Inc., which, *inter alia*, facilitates payment
25  to adult content providers.

26          109.   In or around January 2008, Freer made a public statement
27  disseminated by wire that a new Gizmondo product would be developed and sold.  He
28  went on to represent that Tiger would formally own the new Gizmondo and that

certain "deals" were in place to facilitate this plan.

110. As creditors of, *inter alia*, Tiger and Freer, Plaintiffs would be the beneficiary of such a plan. However, Freer's statements were false and misleading at the time they were made.

111. Freer made such statements in order to (a) attract new investors and/or lenders for the fraudulent scheme for himself and Media Power, and (b) deter Plaintiffs as creditors from pursuing legal action to collect on their debts.

112. On or about February 14, 2008, Media Power purchased a 100% membership interest in eCommerce, LLC ("eCommerce") for $1.00 and assumption of debt. eCommerce's sole member was Ljungman, a Media Power shareholder.

113. By no later than Spring 2008, the Joint Liquidators conspired and agreed with, *inter alia*, Freer and Media Power to assist the fraudulent scheme and engage in a pattern of racketeering activity. On or about April 7, 2008, Davis, one of Gizmondo-Liquidation's Joint Liquidators, wrote a letter to "whom it may concern," writing that:

> The Joint Liquidators are pleased to advise that following extensive enquiries and negotiations they have entered into an agreement with one of the Ex Director's [sic] of the Company, Mr. Carl Freer.

> Much time and effort has been spent on finding a resolution in relation to Mr. Carl Freer and the IPR Assets of Gizmondo Europe Limited — in liquidation.

> The continued co-operation afforded us by Mr. Freer will enabled [sic] the Liquidators to recover a substantial sum for the general body of creditors, furthermore, Mr. Freer's continued assistance will reduce the overall indebtedness of the company.

> We have considered the commerciality and viability of selling the IPR Assets to Mr. Carl Freer and feel that in all the circumstances we have achieved the best possible outcome on behalf of the creditors.

FIRST AMENDED COMPLAINT

> Much work has been done by Mr. Freer and the Liquidators in finding ways to uncover value and repair the defunct operations of the company. According to Mr. Freer "the shareholders of Tiger Telematics will now be able to prosper on the re-introduction of the Gizmondo into the market".
>
> The terms of the agreement remain confidential; however, we can advise that a substantial payment has already been made for the purchase by Mr. Carl Freer of the company's IPR Assets.
>
> We wish Mr. Carl Freer every success with his plans to re-establish the Gizmondo in the Augmented Reality environment which will bring the power of Television, the accuracy and accountability of Direct Mail and the interactivity of the Gizmondo to a global audience.

114. On or about May 20, 2008, Media Power and the Joint Liquidators furthered the fraudulent scheme and conspiracy by entering into a guarantee and indemnity agreement ("GI Agreement") with Gizmondo-Liquidation, whereby Media Power agreed to provide payment security to Gizmondo-Liquidation for the major shareholder of Media Power, *i.e.*, Freer. On March 31, 2008, Media Power made an advance payment of $750,000 and as of November 3, 2008, Media Power paid a total of $2,379,596 under the GI Agreement. None of those funds were paid to Plaintiffs as creditors of Gizmondo, Tiger, Freer and Eriksson.

115. Media Power entered into the GI Agreement for the purpose of personally benefiting Freer, and shows Freer's self-serving purpose for which he uses his corporate entities and the use of such companies as his personal piggybank.

116. In 2007 and 2008, Media Power had no clients, no income and no product or services. On or about October 2, 2008, Media Power announced that it was partnering with IT Factory, a Danish company, through its eCommerce subsidiary. Media Power's CEO, Jenkins, stated that "[o]ur new relationship with IT Factory represents a great opportunity for us to find new and expanded markets for our mobile technology." eCommerce's relationship with IT Factory was the only source of

revenue for Media Power.

117.   IT Factory is a central figure in one of the largest frauds in Denmark's history.  It perpetuated a four-year long fraud that involved more than $170 million in fraudulent revenues from nonexistent leasing contracts.

118.   IT Factory was run by Stein Bagger ("Bagger"), who turned himself into the Los Angeles Police Department on or about December 6, 2008, was extradited to Denmark and later pled guilty to fraud in Denmark.  On or about June 11, 2009, Bagger was sentenced to seven years in a Danish prison for fraud.  Bagger was also a close business associate of Ljungman, who is in prison facing fraud charges related to the IT Factory case.

119.   Some or all of the funds Media Power and eCommerce received from IT Factory are the proceeds of criminal conduct.

120.   In addition, Media Power and its subsidiaries and affiliates, including Freer, Irwin, Ljungman, Dragon Phoenix, Corlito Software Limited, IT Factory, Bagger, and others acting in concert with them unlawfully laundered money that was the proceeds of criminal conduct including without limitation, acts reflected on invoices sent by mail or wire dated on or about August 27, 2007, November 30, 2007, December 1, 2007, December 3, 2007, December 7, 2007, December 15, 2007, December 21, 2007, January 30, 2008, February 2, 2008, February 12, 2008, March 15, 2008, March 25, 2008, May 18, 2008, May 24, 2008, June 5, 2008, June 20, 2008, June 25, 2008, July 5, 2008, July 25, 2008, and August 25, 2008.  Such conduct violates 18 U.S.C. § 1956.

121.   Income received by Media Power from the IT Factory fraud was allegedly used by Media Power to develop Augmented Reality technology ("AR").  The results of the technology development allegedly resulted in the filing of patent applications.  This same technology is allegedly the basis for the current business of GetFugu.

122.   IT Factory filed for bankruptcy in Denmark in December 2008.

FIRST AMENDED COMPLAINT

123. After IT Factory filed for bankruptcy, liquidators were appointed ("Danish Liquidators"). The Danish Liquidators conducted an investigation and concluded that the funds paid by IT Factory to eCommerce and Media Power were the proceeds of criminal acts. As such, the technology allegedly developed by Media Power using the proceeds of such criminal conduct could be the subject of claims by the Danish Liquidators.

124. On or about November 27, 2008, the solicitors for the Joint Liquidators notified Irwin, then Media Power's Chief Financial Officer, that Freer was in default under their November 15, 2007 Deed of Settlement and that they had demanded that Freer pay the Joint Liquidators $6 million. The Joint Liquidators demanded payment by December 4, 2008 of $6 million by Media Power pursuant to the May 20, 2008 GI Agreement.

125. In a press release issued on or about December 2, 2008, Media Power, through its CEO, Jenkins, admitted the association and business relationship with IT Factory.

126. In December 2008, the Joint Liquidators and their counsel were notified that, as a result of the IT Factory fraud, Media Power was no longer a viable entity.

127. Freer, Irwin, Jenkins, and others acting in concert with them conspired and schemed to close Media Power and strip it of its assets for their own personal benefit, at the same time making misrepresentations to third-parties as to the future of Media Power. By way of example, on or about December 10, 2008, Media Power sent a letter addressed to its customers. The letter stated that Media Power was "updating and remodeling" its business strategy and projecting total income of almost $1 billion.

128. Both Media Power and eCommerce had offices in New York, where Freer, Jenkins, Ljungman and others worked. They also had an office in Atlanta, Georgia, where they hired employees to work on augmented reality projects

1   and local Atlanta police officers to provide security. Employees received not only late

2   payments, but checks which bounced, and to receive their last checks were told that

3   they had to sign a document whereby they agreed not to criticize Freer, Jenkins or

4   Media Power. The head employee refused, passed out the checks and told the

5   employees to run to the bank to cash them. To this day, the leasing company, which

6   spent approximately $40,000 in construction costs specifically for Media Power has

7   not been paid in full. Nor have the approximately 10 to 12 Atlanta police officials.

8          129.   On or about January 23, 2009, Douglas Holtz of Frishauf Holtz

9   Goodman & Chick P.C. represented that the following alleged patent applications

10  (collectively referred to as "the Eight Patent Applications") were filed by his firm:

| NON-PROVISIONAL U.S. SERIAL NO. | FILING DATE | TITLE | NAMED INVENTORS |
| --- | --- | --- | --- |
| 12/172,803 | 07/14/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LOGO RECOGNITION | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins<br>Jeff Chastine |
| 12/172,827 | 07/14/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LETTERS, NUMBERS, AND/OR MATH SYMBOLS RECOGNITION | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins<br>Jeff Chastine |
| 12/172,843 | 07/14/08 | AUGMENTED REALITY METHOD AND SYSTEM USING LOGO RECOGNITION, WIRELESS APPLICATION PROTOCOL BROWSING AND VOICE OVER INTERNET PROTOCOL TECHNOLOGY | Carl Freer<br>Mikael Ljungman |
| 12/172,857 | 07/14/08 | LOGO RECOGNITION FOR MOBILE AUGMENTED REALITY ENVIRONMENT | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/175,519 | 07/18/08 | AUGMENTED REALITY COLLABORATIVE MESSAGING SYSTEM | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/184,793 | 08/01/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LOGO RECOGNITION | Carl Freer<br>Hong Wu<br>Jeremy Brooks<br>Jason Zhang<br>Panagiotis Oikonomopoulos<br>Maribeth Gandy<br>Jeff Chastine<br>Ivan Kozhuharov<br>Atanas Georgiev |

| Provisional U.S. Serial No. | Filing Date | Title |
|---|---|---|
| 61/094,367 | 09/04/08 | METHOD AND PLATFORM FOR GESTURAL TRANSFER OF DIGITAL CONTENT FOR MOBILE DEVICES |
| 61/104,530 | 10/10/08 | METHOD AND PLATFORM FOR VOICE AND LOCATION BASED SERVICES FOR MOBILE ADVERTISING |

130. Freer is a co-inventor on all of the alleged non-provisional applications. According to the January 23 letter, Ljungman is a co-inventor on four non-provisional applications. The felon Ljungman used his credit card to pay legal fees purported incurred in filing the applications with the USPTO.

131. The Eight Patent Applications reflect the alleged technology developed using the proceeds of the IT Factory/eCommerce criminal conduct.

132. Only three of these alleged Eight Patent Applications have been published by the USPTO. On or about December 3, 2009, the USPTO published the following Freer applications listed above: (a) Application No. 12/175,519, Publication No. 20090300122; (b) Application No. 12/172,803, Publication No. 20090300100; and (c) Application No. 12/184,793, Publication No. 20090298517. As of December 30, 2009, the USPTO has not taken any substantive action in connection with the applications. Nor have the three applications been assigned by Freer to GetFugu or anyone else.

133. On information and belief, at least some of the Eight Patent Applications have been abandoned. Further, an applicant has one year to timely convert provisional applications into non-provisional applications. 37 C.F.R. § 1.53 ("A request to convert a provisional application to a nonprovisional application must also be filed prior to the earliest of: (i) Abandonment of the provisional application filed under paragraph (c) of this section; or (ii) Expiration of twelve months after the filing date of the provisional application filed under paragraph (c) of this section."); Manual of Patent Examination Procedure § 601.01(c)(II).

134. On information and belief, the applicant did not file the provisional applications by September 4, 2009 or October 10, 2009.

135. Even though the Eight Patent Applications were described in Media Power's brochures, they somehow became the property of MARA Group Limited ("MARA"), an alleged company wholly owned by Freer. Thus, Freer managed to become the personal beneficiary of Media Power's alleged intellectual property assets that were financed by the IT Factory $100 million fraud.

136. Media Power shut down most of its activities in early 2009, and its website disappeared.

**IV.   Madero/GetFugu**

137. With Media Power's failure as a result in its involvement in and discovery of the IT Factory fraud, Freer, Eriksson, Jenkins, Irwin and other conspirators needed a different corporate vehicle to continue their corrupt endeavors. They found that vehicle in Madero, later re-named GetFugu.

138. On or about August 29, 2008, Media Power entered into a Stock Purchase Agreement with Madero, a publicly traded Nevada corporation on the over-the-counter bulletin board under the symbol MDRQ. The purchase price was disclosed as $264,000, and Media Power received four million shares of common stock. Madero was a shell corporation, with its sole Director being a manager/waiter of a restaurant located in Los Mochis, Sinola, Mexico. After closing, Jenkins, Media Power's CEO, was named President, Chief Executive Officer, Chief Financial Officer and Secretary of Madero.

139. Effective January 30, 2009, three individuals were appointed to serve as members of the Board of Directors of Madero: Stern, Irwin, and LaPresle; Stern was named Chairman of the Board of Directors. The same day, Jenkins resigned as the CEO, President, Chief Financial Officer, and Secretary of Madero and was replaced in those positions by Irwin (Media Power's Finance Director). Jenkins remained a member of the Board.

140.   On or about February 1, 2009, a unanimous written consent of the Directors of Media Power gave Media Power's 4,000,000 shares of Madero to certain persons, including without limitation, Jenkins (416,667 shares), Irwin (240,000 shares), Freer (1,700,000 shares), and Steran (416,667 shares).  Many, if not all, of the persons receiving shares were asked to sign a "Donation Agreement" that required the shareholders to not disparage Freer.  The document was drafted or reviewed by an attorney, Alan Sussman.

141.   On or about February 5, 2009, Odin Thorpe of CVA issued a valuation report addressed to Jason Irwin, CEO of Madero, "with the understanding that Madero, Inc. has proposed to acquire these eight patent applications from Mr. Freer."  CVA valued the Eight Patent Applications relating to a technology called augmented reality at $35 million to $52 million.

142.   CVA's valuation report was false and misleading, negligent and/or grossly negligent for several reasons, including without limitation, the following:

    (a)   The specific patent applications were never specifically identified;

    (b)   There is no suggestion that CVA reviewed the applications, confirmed that they had been filed with the USPTO, or ascertained the status of the applications before the USPTO or the assignee of such applications;

    (c)   CVA has no expertise in the complex mobile content, emerging technology fields required to make such assessments;

    (d)   CVA boldly (but unrealistically) assumed that the USPTO would issue patents on the applications;

    (e)   CVA's entire valuation is entirely based on management's revenue predictions and CVA made no attempt to confirm, test or validate the wildly inflated revenue predictions;

FIRST AMENDED COMPLAINT

(f)   The valuation did not take into account the fact that GetFugu's alleged technology is based on open source, non-proprietary software;

(g)   None of the Eight Patent Applications had been published by the USPTO (and only three applications would be subsequently published, on December 3, 2009); and

(h)   CVA's valuation did not consider whether any of the Eight Patent Applications would be patentable under U.S. law, *e.g.*, novelty, utility, enablement, written description and best mode.

143.   CVA's valuation reports are thus negligent, grossly negligent and/or made misrepresentations of material facts or omitted to state material facts that render their reports misleading. CVA knew that Madero, GetFugu and third parties would be relying on its valuation reports.

144.   Schloth worked with CVA to obtain the valuation. During this time, he communicated with CVA by mail or wire.

145.   On or about February 25, 2009, Freer personally entered into a "Head of Terms" with Gizmondo-Liquidation's U.K. Joint Liquidators. The Joint Liquidators entered into this agreement knowing that Freer and Media Power was involved with the IT Factory fraud, that Media Power had unpaid creditors and employees and was insolvent.

146.   The terms and conditions of the Head of Agreement included, *inter alia*, the following:

(a)   Payment of $500,000 to the Joint Liquidators;

(b)   Upon payment of the $500,000, the Joint Liquidators would issue a press release that they were "supportive" of Freer and "his new venture" and that creditors of Gizmondo and "certain shareholders" of Tiger "would share in the success

of the new venture."

     (c)    A presumption that all intellectual property rights in Freer's name had been transferred to GetFugu;

     (d)    Shares in GetFugu would be transferred to the Joint Liquidators; and

     (e)    If Freer breached the agreement, the balance outstanding under the November 2007 Deed of Settlement would become due and payable by Freer and by Media Power.

147.   The agreement was negotiated and executed in Los Angeles, California. By entering into this Head of Agreement and acting in compliance with it, the Joint Liquidators were and are complicit with the illegal actions of Freer and other Defendants to violate U.S. law and breach their fiduciary duties.

## V.   **GetFugu**

148.   Effective March 25, 2009, Madero amended its Articles of Incorporation to change its name to GetFugu, Inc.

149.   Media Power had owned 48% of GetFugu until February 1, 2009, when it transferred its interest to certain persons, including Freer, Irwin and Steran. Freer received approximately 1,200,000 of Media Power's 4,000,000 shares. The balance of GetFugu's shares are owned by Freer and Ljungman, directly or indirectly, the 16 U.A.E. and Isle of Man shell companies, as alleged above.

150.   Effective as of April 2, 2009, Irwin resigned as a member of the Board of Directors and as President, CEO, Chief Financial Officer and Secretary of GetFugu, and Stolar, was elected to serve as the President and CEO. Effective as of April 4, Stoppenhagen was elected to serve as the Interim Chief Financial Officer and Secretary of GetFugu.

151.   On or about April 6, 2009, CVA disseminated by wire or mail a second valuation report addressed to Stolar at GetFugu "with the understanding that GetFugu, Inc. has proposed to acquire these eight patent applications from Mr. Freer."

The April 6 report was virtually identical to the February 5, 2009 report to Madero. CVA again fraudulently valued the Eight Patent Applications at a range of $35 million to $52 million. This second report suffers from the same flaws that the first had. Schloth was again involved with CVA in obtaining the valuation and communicated with CVA by mail or wire.

152.   In April 2009, GetFugu raised $502,500 in a private placement of the company's securities. GetFugu used CVA's valuation to induce persons to invest in Madero.

153.   On or about April 9, 2009, GetFugu allegedly entered into an Agreement for the Assignment of Patent Rights with MARA to acquire the Eight Patent Applications for 25 million shares of GetFugu, which were purportedly valued at the time of the transaction at $60 million. The agreement was signed by Freer for MARA and by Stolar for GetFugu. While the agreement recites that GetFugu is a Nevada corporation, there is no indication that MARA had or has a separate corporate existence.

154.   On or about April 9, 2009, GetFugu distributed a press release, which represented to the public that GetFugu purchased the IP Portfolio from MARA. The press release contains untrue material misrepresents and omits information needed to render the statements therein to be true. The press release failed to disclose that the alleged assignment from MARA (owned by Freer) to Madero/GetFugu (in which Freer is the largest shareholder) was not an arms-length transaction or that the consideration paid to MARA was based on the fraudulent, grossly negligent, and/or negligent CVA valuation reports.

155.   While the assignment agreement with MARA was filed with the SEC, no list of the alleged Eight Patent Applications was filed.

156.   The electronic records of the USPTO assignment database reveals that MARA, Madero or GetFugu are not the assignees of any U.S. patent or patent application.

157.   The Eight Patent Applications either do not exist or have been abandoned, there is no evidence that provisional applications were converted into non-provisional applications.  Only three applications have been published and the USPTO has not taken any substantive action on the applications.  Further, the three published applications do not fulfill the requirements for patentability under the U.S. patent statute, *e.g.*, novelty, utility, enablement, written description and best mode.  As such, the Eight Patent Applications have no value.   The ownership and existence of intellectual property assets is material information.  GetFugu and the Defendant who are its owners, directors, agents, employees and majority shareholders have made misrepresentations and failed to disclose the material issue of ownership and existence of GetFugu's alleged intellectual property assets.

158.   GetFugu's April 9, 2009, press release, disseminated using the mail or wire, stating that "GetFugu strengthened its core technology base" as a result of the alleged assignment by MARA is false and misleading.

159.   On April 16, 2009 GetFugu Inc. released a press statement, disseminated using the mail or wire, in which its then Chairman of the Board, Steran, was quoted as saying that "GetFugu has built the next generation mobile search tool."  It continued with the company's CEO, Stolar, stating that "GetFugu has developed the most unique mobile technology that I have seen to date."  Both statements are wholly misleading. Notwithstanding this fact, GetFugu's share price rose.

160.   In addition, while GetFugu's public statements, disseminated by mail or wire,  hype its "revolutionary new mobile technology" (*see, e.g.*, September 11, 2009 press release), GetFugu in fact uses open source technology that is available to anyone, including without limitation, Boost and OpenCV libraries, standard C++ STL (standard templates) and public domain algorithms published by Dr. Lowe in British Columbia.  As such, GetFugu's purported technology cannot be protected by either patents or as trade secrets.  Thus, GetFugu's purported technology has little, in

- 41 -
FIRST AMENDED COMPLAINT

1   any, real value.  CVA's valuation certainly did not reveal the use of this open source

2   software or take that fact into consideration in grossly inflating the alleged value of

3   the Eight Patent Applications.

4          161.   Further, the company's officers and directors knew or should have

5   known that GetFugu's public statements as to proprietary technology, disseminated by

6   mail or wire, were false and misleading, but either caused or permitted such

7   statements to be made.

8          162.   Effective April 20, 2009, Jenkins resigned as a director of

9   GetFugu, and on May 5, Peters was appointed a director.

10         163.   Solomon was appointed to GetFugu's Board of Directors on May

11  18, 2009, and has served as its Chairman since July.

12         164.   GetFugu provided shares in the company to Freer, members of his

13  family and associated persons without any disclosure of the reason that the officers

14  and directors did so.

15         165.   On October 16, 2009, Freer created a limited liability company

16  controlled by three individuals including his current wife, Ericka Freer. All shares of

17  GetFugu common stock owned by Freer were transferred to this limited liability

18  company. (SEC Form 10-Q, filed Nov. 23, 2009).   Such transfer was a fraudulent

19  transfer pursuant to Cal. Civ. Code § 3439 *et seq.* and the common law.

20         166.   GetFugu operates a website, *www.getfugu.com*.  The website was

21  registered by Kozhuharov.

22         167.   GetFugu's website included graphics with trademarked names

23  and/or logos of third-party companies, including without limitation, American

24  Express, Cisco, Coca-Cola, Dallas Cowboys, Disney, eBay, ESPN, Ford Motor,

25  Goldman Sachs, Google, HBO, Los Angeles Lakers, McDonald's, Microsoft, NBC,

26  Nike, Paramount, Pepsi, Pfizer, and many others. On information and belief, GetFugu

27  has not obtained authorization or a license to use the names and trademarks of some or

28  all of these companies.   Thus, GetFugu, its officers, directors and/or majority

1   shareholders have subjected GetFugu to numerous potential claims of trademark
2   infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and the common
3   law.  Upon a finding of trademark infringement, the Court may award the trademark
4   registrant either actual damages, or statutory damages of up to $200,000 or, in the case
5   of willful infringement, up to $2,000,000. 15 U.S.C. § 1117(c).

6        168.   In addition, GetFugu's website also renders the company
7   potentially liable to third-parties for violating Section 43(a) of the Lanham Act, 15
8   U.S.C. § 1125(a).  In connection with its goods or services, GetFugu may be using
9   one or more words, terms, names, symbols, or devices, alone or in combination, as
10  well as false designations of origin, false or misleading descriptions or representations
11  of fact (disseminated by mail or wire), which are (a)  likely to cause confusion, or to
12  cause mistake, or to deceive as to the affiliation, connection, or association of
13  GetFugu with the third-parties shown on GetFugu's website, or as to the origin,
14  sponsorship, or approval of its goods, services, or commercial activities by another
15  person, and/or (b) in commercial advertising or promotion (including without
16  limitation its website), GetFugu misrepresents the nature, characteristics, qualities, or
17  geographic origin of its goods, services, or commercial activities.   GetFugu's
18  violations of the Lanham Act could be found to be willful.

19       169.   In September 2009, GetFugu entered into a financial agreement
20  with Spongetech Delivery Systems, Inc. After receipt of $1,750,000 on September 24,
21  GetFugu allegedly terminated the agreement, told Spongetech that it would not accept
22  any further funds and that it would return the amounts received to date, plus accrued
23  interest, "as soon as it is able."  GetFugu announced that it terminated the agreement
24  "due to allegations of wrongdoing against SpongeTech."  GetFugu's September 24
25  letter stated that:

26          We have reason to believe that you [Spongetech] have been
27          engaging in short selling of Company stock in anticipation
            of your proposed investment in the Company in violation of
28          federal securities laws.

SpongeTech has been publicly accused of forgery and identity theft in connection with attorney opinion letters allegedly forged by SpongeTech.

170.   GetFugu's SEC Form 8-K disclosed that it:

concluded that GetFugu can no longer be associated with SpongeTech or Vanity, and our continued public association with SpongeTech and its potentially illegal activities is jeopardizing GetFugu and its continued viability. We therefore have no choice but to immediately terminate any further negotiations regarding an investment in the Company or any other business transaction.

171.   On September 30, 2009, Spongetech sued GetFugu in U.S. District Court for the Southern District of New York, alleging fraud, conversion, breach of contract, breach of fiduciary duty and obligation to deal in good faith, and seeking damages and other relief.  GetFugu and its officers, directors and employees failed to conduct adequate due diligence before entering into the agreement with Spongetech, resulting in wasteful litigation expenses.  On November 6, 2009, GetFugu entered into a Settlement Agreement with SpongeTech, including a continuing business relationship with SpongeTech.  GetFugu, however, did not give any indication that GetFugu had investigated and concluded that SpongeTech had not engaged in any illegal activities.

172.   On or about September 25, 2009, Stolar, GetFugu's CEO, disclosed a letter addressed to GetFugu's shareholders that included the statement, *inter alia*, that: "It has been an exciting month for GetFugu. We have met or exceeded all targets to date, have **more than adequate funding to continue operations into the foreseeable future**" (emphasis added).  However, the day before, on September 24, Stolar sent a letter to Spongetech representing that GetFugu did **not** have adequate funds to return the $1,750,000.  Moreover, since the September 25 letter, GetFugu has closed the doors of its San Francisco headquarters and left employees unpaid.  Stolar's letter, disseminated by mail or wire, was false and misleading.

- 44 -
FIRST AMENDED COMPLAINT

1        173.  On or about September 4, 2009, Jenkins represented that Freer was

2  not an officer or director of GetFugu.

3        174.  On September 14, 2009, GetFugu and Freer filed a lawsuit against

4  Davies and Warnock in the Superior Court of California, Los Angeles County,

5  captioned *GetFugu, Inc., et al. v. Simon Davies, et al.*, Case No. BC421759. GetFugu

6  and Freer filed three amended complaints to identify Doe defendants. The complaint

7  asserts a variety of claims and seeks compensatory and punitive damages in excess of

8  $600,000,000. The allegations of the complaint lack any legal or factual basis and are

9  frivolous. The filing and continuation of this action is a waste of GetFugu's corporate

10  assets and is nothing more than an obvious attempt to intimidate Plaintiffs from

11  pursuing their claims against Freer and his corrupt associates. Further, GetFugu and

12  Freer filed the lawsuit without either disclosing it to the Board of Directors or

13  obtaining getting Board approval. GetFugu has not disclosed the filing of the lawsuit

14  to the investing public in a Form 8-K filing with the SEC.

15        175.  Effective October 20, 2009, LaPresle and Peters resigned from the

16  Board of Directors. LaPresle continued to serve as an employee, and Peters as a

17  consultant.

18        176.  On or about November 2, 2009, Stolar resigned as President (but

19  remained CEO) and Freer was appointed as GetFugu's President and as a member of

20  the Board of Directors. GetFugu's November 6, 2009 SEC Form 8-K (signed by

21  Freer) disclosed that:

22        Mr. Freer has more than 15 years experience as a marketing

23        and technology entrepreneur, successfully raising over $350
million in investment capital, and amassing $2.5 billion in

24        market capitalization for his companies. Prior to co-
founding GetFugu in April 2009, he served as SVP Business

25        Development of Media Power Inc. in 2008. Mr. Freer

26        founded mobile gaming platform Gizmondo in 2002, and
was chairman of the board of directors at its parent

27        company, Tiger Telematics Inc. until October 2005. He has

28        been recognized as a pioneer in mobile technology and

innovative approaches to advertising.

177.   The same Form 8-K also disclosed Freer's criminal history:

> In October 2005, Mr. Freer was sentenced to probation and fined by a court in Germany, for buying four luxury cars with a bad check, though Mr. Freer contended he had canceled the check after believing the cars did not have proper title and immediately informed the authorities. Upon being informed that only one of the four cars had a title issue, Mr. Freer resubmitted the check.

178.   Also on or about November 2, 2009, Bailey was appointed a member of the Board of Directors.

179.   On or about November 2, 2009, each of GetFugu's Directors entered into a standard form of Board of Directors Service and Indemnification Agreement, which provides, inter alia, that:  "The Company shall at all times during the Term of this Agreement maintain a standard occurrence based policy of D&O insurance covering the actions of the Board, including those of Director, on behalf of the Company, in an amount to be determined by the Board."

180.   The material misrepresentations and gross mismanagement of GetFugu by its officers and directors is reflected in its most request SEC Form 10-Q, filed November 23, 2009, which disclosed that:

> The Company needs to raise additional capital from external sources in order to sustain its operations while continuing the longer term efforts contemplated under its business plan. The Company expects to continue incurring losses for the foreseeable future and must raise additional capital to pursue its product development initiatives, to penetrate markets for the sale of its products and to continue as a going concern. The Company cannot provide any assurance that it will raise additional capital. If the Company is unable to secure additional capital, it may be required to curtail its research and development initiatives and take additional measures to reduce costs in order to conserve its cash in amounts sufficient to sustain operations and meet it obligations. These measures could cause significant delays in the

Company's efforts to commercialize its products, which is critical to the realization of its business plan and the future operations of the Company. These matters raise substantial doubt about the Company's ability to continue as a going concern.

181.  The November 23 SEC disclosure, signed by Stolar, is expressly contrary to Stolar's September 25, 2009 letter publicly representing to GetFugu's shareholders that the company has **"more than adequate funding to continue operations into the foreseeable future."**  (Emphasis added).

182.  Despite the doubts about GetFugu's ability to survive, the officers and directors have not taken any action to reduce costs.  To the contrary, GetFugu's general and administrative expenses totaled more than $21 million for the three months ended September 30, 2009.  (SEC Form 10-Q, filed Nov. 23, 2009).

183.  Moreover, the officers and directors continue to operate the company for their own personal benefit, rather than the benefit of its shareholders. The November 23 SEC Form 10-Q disclosed that:

> A meeting of the Board of the Company was held on November 2, 2009.  At this meeting, the Board approved (i) the appointment of five new directors (ii) board compensation of $15,000 per month for the chairman and $10,000 a month for board members, and (iii) granted 2,000,000 options to each of the new directors at the fair value on the grant date of $.37 per share and of which 333,333 options vest in six months and the remainder vests over a period of 3 years.

184.  On or about November 13, 2009, GetFugu allegedly created a new wholly-owned subsidiary, GetFugu Research, Inc., a Delaware corporation, and entered into a merger agreement with IKDATA DE, Inc. ("IKDATA") and its sole stockholder, Kozhuharov, GetFugu's Chief Software Architect.  (SEC Form 10-Q filed Nov. 23, 2009).  Under the alleged agreement, GetFugu acquired IKDATA and its intellectual property in exchange for an agreement to issue Kozhuharov five million shares of GetFugu's common stock immediately and an additional five million

1    shares in March 2010. Kozhuharov also entered in to an employee agreement and a

2    six month non-competition agreement. (*Id.*). However, as an officer of GetFugu, any

3    intellectual property conceived or created is a corporate opportunity of GetFugu and

4    not Kozhuharov or IKDATA. Further, the SEC filing does not disclose what

5    intellectual property GetFugu acquired or whether the officers and directors obtained

6    any independent due diligence and review of the validity and valuation of the

7    purported intellectual property.

8            185. GetFugu's officers and directors have failed to publicly disclose

9    that, in a recent presentation to a Fortune 500 company, GetFugu's technology simply

10   did not work. Particularly given the April 16, 2009 statements by Stolar and Steran

11   touting GetFugu's technology, its failure to work is material information that should

12   be disclosed to the investing public.

13           186. The enforcement staff of the SEC is conducting an inquiry to

14   determine whether there have been violations of the federal securities laws pertaining

15   to GetFugu.

16           187. GetFugu has not disclosed this action to its shareholders.

17           188. The actions, agreements, statements, omissions and ratifications of

18   Defendants including Freer, Champion, Irwin, Jenkins, Kozhuharov, LaPresle,

19   Norton, Schloth, Solomon, Steran, and Stolar constitute a scheme or artifice to deprive

20   GetFugu and its shareholders of the intangible right of honest services.

21           189. The actions, agreements, statements, omissions and ratifications of

22   Defendants including Freer, Bailey, Begbies, Champion, CVA, DRP, Davis, Dolder,

23   Ericka Freer, Hudson, Irwin, Jenkins, Kozhuharov, Kurz, LaPresle, Miller, Norton,

24   O'Connor, Peters, Rubin, Schloth, Solomon, Steran, Stolar, Stoppenhagen, and Timpe

25   constitute a conspiracy for a scheme or artifice to deprive GetFugu and its

26   shareholders of the intangible right of honest services.

27           190. The documents referred to in this complaint are incorporated

28   herein by reference.

## COUNT I

**(RICO § 1962(c) – Against Freer, Carrender, Dragon Phoenix Eriksson, Anneli Freer, Irwin, Jenkins, Kozhuharov, Ljungman, Schloth, Tiger, Media Power And Asiatic)**

191.  The foregoing allegations of the first amended complaint are incorporated by reference.

192.  RICO prohibits entities and individuals from engaging in racketeering or criminal activities. 18 U.S.C. § 1961, *et seq.* RICO provides that it is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in an enterprise through a pattern of racketeering activity or the collection of an unlawful debt. 18 U.S.C. § 1962(c).

193.  At all relevant times, each Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c), because each Plaintiff was "capable of holding a legal or beneficial interest in property" and "were injured in their business or property by a violation of 18 U.S.C. § 1962."

194.  At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

195.  The Enterprise, as that term is defined in 18 U.S.C. § 1961(4), consists of an association in fact between and among Tiger, Gizmondo, Freer, Eriksson, Media Power, MARA, and GetFugu (formerly Madero), Ljungman, Solomon, Steran, Stolar, Irwin and Kozhuharov ("the Gizmondo Enterprise"). The Gizmondo Enterprise has functioned as an organized, continuous, and ongoing association-in-fact to achieve, through illegal means, their shared goals and to commit unlawful acts and to avoid the consequences of their actions for their own gain at the expense of the Plaintiffs and others.

196.  The members of the Gizmondo Enterprise had legal existences separate from their participation in the racketeering. The corporations made the RICO

1   activities possible and profitable by providing a legal shield for the illegal activity.

2   While the Defendants participated in the common enterprise, they also have an

3   existence separate and distinct from the enterprise.

4        197.   The Gizmondo Enterprise engaged in and affected interstate and

5   foreign commerce.

6        198.   At times pertinent to this complaint, Defendants Freer, Carrender,

7   Dragon Phoenix Eriksson, Anneli Freer, Irwin, Jenkins, Kozhuharov, Ljungman,

8   Schloth, Tiger, Media Power and Asiatic ("the Gizmondo Defendants"), individually

9   and through their agents, directors, officers, employees, alter egos, affiliates, parents,

10  or subsidiaries, materially participated in the Gizmondo Enterprise, and materially

11  participated, conspired, assisted, encouraged, and otherwise aided and abetted one or

12  more of the other Defendants in the unlawful, misleading, and fraudulent conduct

13  alleged herein, and has affected foreign and interstate commerce in the United States,

14  including in California. The Defendants acted in concert with each other in order to

15  further their illegal schemes.

16       199.   Each Gizmondo Defendant has exerted control over the Gizmondo

17  Enterprise and has participated in the operation and management of that enterprise and

18  has committed numerous acts to maintain and expand that enterprise.

19       200.   The Gizmondo Defendants conducted or participated, directly or

20  indirectly, in the Gizmondo Enterprise through a pattern of racketeering activity as

21  defined in 18 U.S.C. § 1961(5) and as alleged above.  In furtherance of their scheme,

22  these defendants have engaged in at least two predicate acts in violation of 18 U.S.C.

23  §§ 1341, 1343, 1346, and 1956 within the last ten years as described above.

24       201.   In order to avoid discovery of their illegal and fraudulent acts, the

25  Gizmondo Defendants have made false and deceptive statements and have concealed

26  material information from Plaintiffs, the public, shareholders, government entities,

27  and others.

28       202.   The above described racketeering activities amounted to a common

- 50 -
FIRST AMENDED COMPLAINT

1  course of conduct intended to deceive Plaintiffs.  The defendants' acts of racketeering

2  had the same pattern and a similar purpose of defrauding Plaintiffs.  Each such act of

3  racketeering activity was related, had similar purposes, involved the same or similar

4  participants and methods of commission, and had similar results affecting similar

5  victims, including Plaintiffs.  The Gizmondo Defendants' fraudulent activities are part

6  of their ongoing business and constitute a continuing threat to Plaintiffs' business and

7  property.

8  203.  The pattern of racketeering alleged herein and the Gizmondo

9  Enterprise are separate and distinct from each other.  The Gizmondo Defendants

10  engaged in a pattern of racketeering activity alleged herein for the purpose of

11  conducting the affairs of the enterprise.

12  204.  Plaintiffs relied to their detriment on the Gizmondo Defendants'

13  false and misleading acts and statements alleged herein.

14  205.  As a direct and proximate cause of the Gizmondo Defendants'

15  acts, Plaintiffs have been injured in their business or property by reason of the

16  violation of 18 U.S.C. § 1962.  Such injuries were foreseeable by the Gizmondo

17  Defendants, there was no intervention of other independent causes, and the casual

18  connection is factually direct.

19  206.  By reason of these RICO violations, the defendants are jointly and

20  severally liable to Plaintiffs for a judgment for compensatory damages in an amount to

21  be proven at trial, treble damages, and payment of reasonable attorneys' fees and

22  costs.

23  ## COUNT II

24  **(RICO Conspiracy § 1962(d) – Against Freer, Begbies, Carrender, Dragon**

25  **Phoenix, DRP, Davis, Dolder, Eriksson, Anneli Freer, Hudson, Irwin, Jenkins,**

26  **Kozhuharov, Ljungman, Hazina Ljungman, Miller, Rubin,  Schloth, Tiger,**

27  **Media Power and Asiatic)**

28  207.  The foregoing allegations of the first amended complaint are

- 51 -

FIRST AMENDED COMPLAINT

incorporated by reference, including Count I, *supra*.

208. Section 1962(d) makes it unlawful for a person to conspire to violate subsections (a), (b) or (c) of 18 U.S.C. § 1962. Any person who agrees or conspires to pursue the same criminal objective can be held liable for a RICO violation.

209. Defendants Freer, Begbies, Carrender, Dragon Phoenix, DRP, Davis, Dolder, Eriksson, Anneli Freer, Hudson, Irwin, Jenkins, Kozhuharov, Ljungman, Hazina Ljungman, Miller, Rubin, Schloth, Tiger, Media Power and Asiatic ("the Gizmondo Conspiracy Defendants")have violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the affairs of the Enterprise previously alleged through a pattern of racketeering activity.

210. As alleged above, the co-conspirators have engaged in numerous predicate and fraudulent acts of racketeering in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs of money and property.

211. The nature of the above described co-conspirators' acts, misrepresentations and omissions give rise to an inference that they not only agreed to a violation of § 1962(d) by conspiring to violate § 1962(c), but also that they were aware that their ongoing acts and statements have been and are part on an overall pattern of racketeering activity.

212. Each co-conspirator was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy. Further, each agreed to or ratified the overall objective of the conspiracy.

213. The co-conspirators have engaged in overt acts in support of the conspiracy, including the predicate acts alleged above.

214. As a direct and proximate result of the foregoing, Plaintiffs have been injured in their business or property.

FIRST AMENDED COMPLAINT

215.   By reason of these RICO violations, the defendants are jointly and severally liable to Plaintiffs for a judgment for compensatory damages in an amount to be proven at trial, treble damages, and payment of reasonable attorneys' fees and costs.

## COUNT III

### (RICO § 1962(c) – By Warnock, Individually And Derivatively, Against Freer, Champion, Irwin, Jenkins, Kozhuharov, LaPresle, Norton, Schloth, Solomon, Steran, And Stolar)

216.   The foregoing allegations of the first amended complaint are incorporated by reference, including Count I, *supra*.

217.   RICO prohibits entities and individuals from engaging in racketeering or criminal activities.  18 U.S.C. § 1961, *et seq*.  RICO provides that it is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in an enterprise through a pattern of racketeering activity or the collection of an unlawful debt.  18 U.S.C. § 1962(c).

218.   At all relevant times, each Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c), because each Plaintiff was "capable of holding a legal or beneficial interest in property" and "were injured in their business or property by a violation of 18 U.S.C. § 1962."

219.   At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

220.   The enterprise, as that term is defined in 18 U.S.C. § 1961(4), consists of GetFugu (formerly Madero) ("GetFugu Enterprise").

221.   The GetFugu Enterprise has a legal existence separate from any participation in the racketeering.

222.   The Enterprise engaged in and affected interstate and foreign commerce.

223. At times pertinent to this complaint, Defendants Freer, Champion, Irwin, Jenkins, Kozhuharov, LaPresle, Norton, Schloth, Solomon, Steran, and Stolar ("GetFugu RICO Defendants"), individually and through their agents, directors, officers, employees, alter egos, affiliates, parents, or subsidiaries, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including in California. The GetFugu RICO Defendants acted in concert with each other in order to further their illegal schemes.

224. Each GetFugu RICO Defendant has exerted control over the Enterprise and has participated in the operation and management of that enterprise and has committed numerous acts to maintain and expand that enterprise.

225. The GetFugu RICO Defendants conducted or participated, directly or indirectly, in the enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5) and as alleged above. In furtherance of their scheme, these defendants have engaged in at least two predicate acts in violation of 18 U.S.C. §§ 1341, 1343, and 1346 within the last ten years as described above.

226. In order to avoid discovery of their illegal and fraudulent acts, the GetFugu RICO Defendants have made false and deceptive statements and have concealed material information from Plaintiffs, the public, shareholders, government entities, and others.

227. The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiffs. The defendants' acts of racketeering had the same pattern and a similar purpose of defrauding Plaintiffs. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. GetFugu RICO Defendants' fraudulent activities are part

- 54 -
FIRST AMENDED COMPLAINT

1   of their ongoing business and constitute a continuing threat to GetFugu and Plaintiffs'

2   business and property.

3       228.  The pattern of racketeering alleged herein and the GetFugu

4   Enterprise are separate and distinct from each other.  The GetFugu RICO Defendants

5   engaged in a pattern of racketeering activity alleged herein for the purpose of

6   conducting the affairs of the enterprise.

7       229.  Plaintiffs relied to their detriment on the GetFugu RICO

8   Defendants' false and misleading alleged herein.

9       230.  As a direct and proximate cause of the GetFugu RICO Defendants'

10  acts, Plaintiffs, including the shareholders of GetFugu, have been injured in their

11  business or property by reason of the violation of 18 U.S.C. § 1962.  Such injuries

12  were foreseeable by the GetFugu RICO Defendants, there was no intervention of other

13  independent causes, and the casual connection is factually direct.

14      231.  By reason of these RICO violations, the GetFugu RICO

15  Defendants are jointly and severally liable to Plaintiffs for a judgment for

16  compensatory damages in an amount to be proven at trial, treble damages, and

17  payment of reasonable attorneys' fees and costs.

18                            **COUNT IV**

19  **(RICO Conspiracy § 1962(d) – By Warnock, Individually And Derivatively,**

20  **Against Defendants Freer, Bailey, Begbies, Champion, CVA, DRP, Davis,**

21  **Dolder, Ericka Freer, Hudson, Irwin, Jenkins, Kozhuharov, Kurz, LaPresle,**

22  **Miller, Norton, O'Connor, Peters, Rubin, Schloth, Solomon, Steran, Stolar,**

23  **Stoppenhagen, And Timpe)**

24      232.  The foregoing allegations of the first amended complaint are

25  incorporated by reference, including Counts I, II, and III, *supra*.

26      233.  Section 1962(d) makes it unlawful for a person to conspire to

27  violate subsections (a), (b) or (c) of 18 U.S.C. § 1962.  Any person who agrees or

28  conspires to pursue the same criminal objective can be held liable for a RICO

1    violation.

2        234.   Defendants Freer, Bailey, Begbies, Champion, CVA, DRP, Davis,

3    Dolder, Ericka Freer, Hudson, Irwin, Jenkins, Kozhuharov, Kurz, LaPresle, Miller,

4    Norton, O'Connor, Peters, Rubin, Schloth, Solomon, Steran, Stolar, Stoppenhagen,

5    and Timpe have violated § 1962(d) by conspiring to violate § 1962(c) ("GetFugu

6    Conspiracy Defendants"). The object of this conspiracy has been and is to conduct or

7    participate in, directly or indirectly, the affairs of the GetFugu Enterprise previously

8    alleged through a pattern of racketeering activity.

9        235.   As alleged above, the GetFugu Conspiracy Defendants have

10   engaged in numerous predicate and fraudulent acts of racketeering in furtherance of

11   the conspiracy, including material misrepresentations and omissions designed to

12   defraud Plaintiffs, including the shareholders of GetFugu of money and property and

13   to deprive them of the right of honest services.

14       236.   The nature of the above described co-conspirators' acts,

15   misrepresentations and omissions give rise to an inference that they not only agreed to

16   a violation of § 1962(d) by conspiring to violate § 1962(c), but also that they were

17   aware that their ongoing acts and statements have been and are part on an overall

18   pattern of racketeering activity.

19       237.   Each co-conspirator was aware of the general nature of the

20   conspiracy and its role in facilitating the objectives of the conspiracy. Further, each

21   agreed to or ratified the overall objective of the conspiracy.

22       238.   The co-conspirators have engaged in overt acts in support of the

23   conspiracy, including the predicate acts alleged above.

24       239.   As a direct and proximate result of the foregoing, Plaintiffs have

25   been injured in their business or property.

26       240.   By reason of these RICO violations, the GetFugu Conspiracy

27   Defendants are jointly and severally liable to Plaintiffs, including GetFugu

28   shareholders, for a judgment for compensatory damages in an amount to be proven at

trial, treble damages, and payment of reasonable attorneys' fees and costs.

## COUNT V

### (Cal. Bus. & Prof. C. § 17200, et seq. – Against All Defendants)

241.  The foregoing allegations of the first amended complaint are incorporated by reference.

242.  At times pertinent to this complaint, Defendants, individually and through their agents, directors, officers, employees, alter egos, affiliates, parents, or subsidiaries (collectively, "the UCL Defendants") have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

243.  The UCL Defendants have violated other laws, including without limitation, 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1346 (scheme or artifice to deprive another of the intangible right of honest services) and 1956 (money laundering).

244.  The UCL Defendants violations of such other laws were committed while they were engaged in business activity.

245.  Plaintiffs, individually, and Warnock, individually and derivatively for the shareholders of GetFugu, have suffered injury in fact and have lost money or property as a result of the violation, in an amount to be determined at trial, in excess of $35 million.

## COUNT VI

### (Breach Of Fiduciary Duties – Derivative Claim – Against Defendants Freer, Bailey, Champion, Irwin, Kozhuharov, Kurz, LaPresle, Norton, O'Connor, Peters, Solomon, Steran, Stolar, Stoppenhagen, Timpe)

246.  The foregoing allegations of the first amended complaint are incorporated by reference.

247.  Defendants Freer, Bailey, Champion, Irwin, Kozhuharov, Kurz, LaPresle, Norton, O'Connor, Peters, Solomon, Steran, Stolar, Stoppenhagen, Timpe are officers, directors, managers, and/or majority shareholders of GetFugu ("Fiduciary

Defendants").

248.   By reason of their positions as officers, directors, managers and/or majority shareholders of GetFugu and because of their ability to control the business and corporate affairs of GetFugu, the Fiduciary Defendants owed GetFugu and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage GetFugu in a fair, just, honest, and equitable manner, and conduct themselves with absolute loyalty to GetFugu. The Fiduciary Defendants were and are required to act in furtherance of the best interests of GetFugu and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. They were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of GetFugu. Further, they were required to have and implement appropriate corporate governance policies. They were also precluded from usurping corporate opportunities of GetFugu.

249.   The Fiduciary Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

250.   The Fiduciary Defendants breached their fiduciary obligations to GetFugu by, among other things, the following acts and omissions:

(a)   Failed to exercise good faith in ensuring that the affairs of GetFugu were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b)   Failed to exercise good faith in ensuring that GetFugu was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

(c)   Failed to exercise good faith in supervising the preparation,

filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of GetFugu;

(d)   Failed to exercise reasonable and prudent supervision over the management, policies, practices and controls of GetFugu;

(e)   Failed to enact and implement appropriate corporate governance policies; (e) unduly benefiting themselves and other GetFugu insiders at the expense of GetFugu; and

(f)   Usurped corporate opportunities belonging to GetFugu.

251.   In further breach of their fiduciary duties of due care, loyalty and good faith, the Fiduciary Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action to breach said duties.

252.   The acts and omissions of the Fiduciary Defendants' was alleged herein were not, and could not have been, an exercise of good faith business judgment.

253.   As a direct and proximate result of the Fiduciary Defendants' breaches of fiduciary duties, GetFugu and its shareholders, including Warnock, have sustained damages, in an amount to be proven at trial, in excess of $75,000.

## COUNT VII

### (Fraud – Derivative Claim - Against CVA)

254.   The foregoing allegations of the first amended complaint are incorporated by reference.

255.   CVA was engaged by GetFugu to provide valuation services and CVA undertook a duty to provide such services to GetFugu.

256.   As described above, CVA's valuation made false and misleading

- 59 -
FIRST AMENDED COMPLAINT

representations of material fact or made material omissions that rendered such reports false and misleading.  GetFugu justifiably relied on the material misrepresentations. As a direct and proximate result, GetFugu suffered damages, in an amount to be proven at trial, in excess of $52 million.

## COUNT VIII

### (Negligence – Derivative Claim - Against CVA)

257.   The foregoing allegations of the first amended complaint are incorporated by reference.

258.   CVA was engaged by GetFugu to provide valuation services and CVA undertook a duty to provide such services to GetFugu.

259.   As described above, CVA's valuation services were negligent and grossly negligent and failed in all material respects to adequately discharge its duty. As a direct and proximate result of said negligence and gross negligence, GetFugu suffered damages, in an amount to be proven at trial, in excess of $52 million.

## COUNT IX

### (Breach Of Contract – Against Freer and Eriksson)

260.   The foregoing allegations of the first amended complaint are incorporated by reference.

261.   Plaintiffs entered into valid and binding promissory notes and contracts with Tiger, Gizmondo, Freer and Eriksson.

262.   Plaintiffs completely fulfilled all of their contractual obligations.

263.   Freer and Eriksson failed to repay the promissory notes or comply with their contractual obligations.  They are therefore in material breach of the contracts.

264.   Defendants' breach has directly and proximately harmed Plaintiffs in the amount of no less than $26,000,000 plus pre-judgment interest.

## COUNT X

### (Account Stated – Against Freer and Eriksson)

265. The foregoing allegations of the first amended complaint are incorporated by reference.

266. On or about October 8, 2009, Plaintiffs notified Freer in writing that their repayment obligations were overdue. Freer did not deny that they were in default on their payment obligations or the amount of the payment due.

267. The obligations by Freer and Eriksson constitutes an account stated. They failed to object to statements by or on behalf of Plaintiffs that money was due or the amount that was due and owed, despite the reasonable passage of time.

268. Plaintiffs have been injured in the amount of no less than $26,000,000 plus pre-judgment interest.

## COUNT XI

### (Unjust Enrichment – Against Freer and Eriksson)

269. The foregoing allegations of the first amended complaint are incorporated by reference.

270. In the event that the Defendants assert that any of the aforementioned contracts are not valid and binding agreements, Plaintiffs assert this unjust enrichment claim in the alternative.

271. Freer and Eriksson induced Plaintiffs into loaning them $26,000,000 and Plaintiffs made such loans with the reasonable expectation and understanding that the money loaned would be repaid.

272. Despite the passage of several years, Freer and Eriksson have failed to repay any part of the loans.

273. Freer and Eriksson would be unjustly enriched at Plaintiffs' expense if they were permitted to retain the benefits of the loan without repayment. To prevent this unjust enrichment, Plaintiffs are entitled to a judgment of no less than $26,000,000 plus pre-judgment interest.

## COUNT XII

### (Civil Conspiracy – Against All Defendants)

274.   The foregoing allegations of the first amended complaint are incorporated by reference.

275.   All of the individual Defendants named herein have combined and conspired for an unlawful purpose, *i.e.*, conduct a RICO Enterprise, commit mail and fraud, failing to provide honest services, fraud, and breach of fiduciary duty for their own personal benefit.

276.   As a direct and proximate result of the civil conspiracy, Plaintiffs, individually and derivatively, have been injured by the individual Defendants in an amount to be proven at trial in excess of $75,000.

## COUNT XIII

### (Fraud – Against Freer and Eriksson)

277.   The foregoing allegations of this complaint are incorporated by reference.

278.   Freer and Eriksson defrauded Plaintiffs by wrongfully, and with the intent that they rely thereon, making representations of material fact, which were untrue, but which Plaintiffs believed to have been true, and by concealing facts that Freer and Eriksson had but did not disclose to Plaintiffs.   Specifically, Freer and Eriksson made misrepresentations and/or omissions that:

     (a)    Freer and Eriksson had no intention of complying with their obligations in connection with the loan-related agreements alleged above;

     (b)    Failed to disclose that the press statements by Tiger and Gizmondo in connection with the alleged Gizmondo product were false and misleading;

     (c)    Failed to disclose Gizmondo and Tiger's material financial weakness at the time the loan related agreements were made;

279.   Freer and Eriksson thus knowingly and/or intentionally or recklessly in disregard of facts known to it made false statements to Plaintiffs and/or

- 62 -

FIRST AMENDED COMPLAINT

1  omissions causing Plaintiffs to enter into the loan agreement.

2       280.  Freer and Eriksson intended that Plaintiffs rely on, and they

3  justifiably did rely on, the aforesaid misrepresentations and concealments by Freer and

4  Eriksson to Plaintiffs' detriment.

5       281.  As a direct and proximate result of Freer and Eriksson's

6  misrepresentations and concealments, Plaintiffs have suffered and will suffer

7  damages, in an amount to be proven at trial exceeding $26,000,000, plus pre- and

8  post-judgment interest.

9  ## COUNT XIV

10  **(Fraudulent Transfer Act and Common Law Fraudulent Transfer –**

11  **Against Freer, Ericka Freer, and Doe LLC)**

12       282.  The foregoing allegations of the first amended complaint are

13  incorporated by reference.

14       283.  Since at least May 9, 2005, Plaintiffs have been creditors of Freer,

15  as the term "creditor" is defined by Cal. Civ. Code § 3439.01(c).

16       284.  Plaintiffs' claim arose before transfers of assets by Freer that are

17  the subject of this claim.

18       285.  Freer has incurred a "debt" to Plaintiffs as that term is defined by

19  Cal. Civ. Code § 3439.01(d).

20       286.  Freer is a "debtor" as that term is defined by Cal. Civ. Code

21  § 3439.01(e).

22       287.  On or about October 16, 2009, Freer created an unnamed limited

23  liability company controlled by three individuals including his current wife, Ericka

24  Freer ("Doe LLC"). All shares of GetFugu common stock owned by Freer were

25  transferred to this unnamed limited liability company. (SEC Form 10-Q, filed Nov.

26  23, 2009).

27       288.  Freer was insolvent at the time he transferred his assets. (Cal. Civ.

28  Code § 3439.02(a), (c).

289. Freer made the transfers with the actual intent to hinder, delay or defraud Freer's creditors, including Plaintiffs.

290. Freer's transfers of assets to Ericka Freer, Doe LLC, or others were fraudulent transfers pursuant to Cal. Civ. Code § 3439 and the common law.

291. As a direct and proximate result of the foregoing, Plaintiffs have suffered and will suffer damages, in an amount to be proven at trial exceeding $26,000,000, plus pre- and post-judgment interest.

<u>**COUNT XV**</u>

**(Aiding and Abetting Breach of Fiduciary Duty – Against CVA)**

292. The foregoing allegations of the first amended complaint are incorporated by reference.

293. As alleged above, a fiduciary relationship existed between the Fiduciary Defendants and GetFugu and its shareholders, including Warnock.

294. The Fiduciary Defendants breached such fiduciary duties.

295. CVA knowingly and substantially participated in that breach by, among other things, providing the fraudulent, gross negligent and/or valuation reports to GetFugu.

296. CVA knowingly and substantially participated in that breach by, among other things, acting in concert with and substantially aiding, abetting and assisting the Fiduciary Defendants in breaching their fiduciary duties.

297. As a direct and proximate result of CVA's aiding and abetting Fiduciary Defendants' breach of fiduciary duties, GetFugu and its shareholders, including Warnock, have sustained damages in an amount to be proven at trial, in excess of $75,000.

<u>**COUNT XVI**</u>

**(Aiding and Abetting Breach of Fiduciary Duty – Against Joint Liquidators)**

298. The foregoing allegations of the first amended complaint are incorporated by reference.

FIRST AMENDED COMPLAINT

299.   As alleged above, a fiduciary relationship existed between the Fiduciary Defendants and GetFugu and its shareholders, including Warnock.

300.   The Fiduciary Defendants breached such fiduciary duties.

301.   The Joint Liquidators knowingly and substantially participated in that breach by, among other things, providing Madero and GetFugu with valuations of the Eight Patent Applications that were fraudulent, grossly negligent, and negligent. The Fiduciary Defendants relied and used such valuations in connection with acts, statements and omissions that constituted breach of their fiduciary duties.

302.   The Joint Liquidators knowingly and substantially participated in that breach by, among other things, acting in concert with and substantially aiding, abetting and assisting the Fiduciary Defendants in breaching their fiduciary duties.

303.   As a direct and proximate result of the Joint Liquidators' aiding and abetting Fiduciary Defendants' breach of fiduciary duties, GetFugu and its shareholders, including Warnock, have sustained damages in an amount to be proven at trial, in excess of $75,000.

## PRAYER FOR RELIEF

Plaintiffs respectfully request:

(a)   Judgment for compensatory damages, jointly and severally;

(b)   An award of treble damages;

(c)   An award of pre- and post-judgment interest;

(d)   Reasonable attorneys' fees as allowed by law;

(e)   An Order declaring that Freer's transfers of assets to Ericka Freer, Doe LLC, and/or other persons or their agents or parties holding assets on their behalf are null and void;

(f)   An Order requiring Ericka Freer, Doe LLC, and/or other persons or their agents or parties holding assets on their behalf, to convey any assets transferred to them by Freer to Plaintiffs;

(g)   An attachment against the assets of Freer transferred to Ericka

FIRST AMENDED COMPLAINT

Freer, Doe LLC, and/or other persons, and/or an attachment of the proceeds of the sale of these assets;

(h)   An Order granting Plaintiffs all remedies set forth in Cal. Civ. Code § 3439.07;

(i)   Costs as allowed by law; and

(j)   Such other relief as the Court deems just and appropriate under the circumstances.

DATED:  January 4, 2010          IMAN REZA
                                 **CUMMINS & WHITE, LLP**


                                 Iman Reza
                                 Attorney for Plaintiffs
                                 SIMON DAVIES AND DAVID WARNOCK

FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2        Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury

3    issues in this action so triable by jury.

4

5    DATED:  January 4, 2010        IMAN REZA
                                    **CUMMINS & WHITE, LLP**

6

7

8                                  _____
                                            Iman Reza
9                                  Attorney for Plaintiffs
                                   SIMON DAVIES AND DAVID WARNOCK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28