## EXHIBIT A TO SECOND AMENDED RICO CASE STATEMENT

## PARTIES

1.      Plaintiff Simon Davies ("Davies") is a citizen of the United Kingdom.

2.      Plaintiff David Warnock ("Warnock") is a citizen of the United Kingdom.

3.      Defendant and nominal defendant GetFugu, Inc. ("GetFugu") is a Delaware corporation with its principal place of business in Los Angeles, California.  Prior to October 16, 2009, GetFugu was a Nevada corporation.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

4.      Defendant Carl Freer, a/k/a Eric Jonsson, Johan Freer, and Brian Littleton ("Freer") is a citizen of Sweden who is a resident of California.  Freer is the founder, largest shareholder, and an officer and director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.  Also, Freer personally guaranteed loans made by Davies and Warnock.

5.      Defendant Alan J. Bailey ("Bailey") is a citizen of the State of California.  On or about November 2, 2009, he became a Director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

6.      Defendant Begbies Traynor Group ("Begbies") is a United Kingdom corporation with its principal place of business in the United Kingdom, but with offices in the United States, including New York, New Jersey and Atlanta.  The company provides services related to business rescue, recovery and restructuring.  Begbies employed two of the Joint Liquidators for Gizmondo Europe Limited (in Liquidation) ("Gizmondo-Liquidation").  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

-1-

1      7.     Defendant Michael Carrender ("Carrender") is a citizen of the State of Florida

2   and served as President of Tiger.   At all material times, he acted, aided and abetted,

3   conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged

4   below.

5      8.     Defendant Mark Champion ("Champion") is a citizen of the State of

6   California.  He was and is the Chief Financial Officer of GetFugu.  At all material times, he

7   owed fiduciary duties to GetFugu and its shareholders and breached such duties, and acted,

8   aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and

9   omissions alleged below.

10     9.     Defendant Corporate Valuation Advisors, Inc. ("CVA") is a Wisconsin

11  corporation with its principal place of business in Wisconsin.  At all material times, it acted,

12  aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and

13  omissions alleged below.

14     10.    Defendant Dragon Phoenix (China) Ltd. ("Dragon Phoenix") is a Chinese

15  corporation with its principal place of business in Hong Kong.  At all material times, it

16  acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal

17  acts and omissions alleged below.

18     11.    Defendant David Rubin & Partners ("DRP") is a United Kingdom corporation

19  with its principal place of business in the United Kingdom.  The company provides services

20  related to business rescue, recovery and restructuring.  DRP employed two of the Joint

21  Liquidators for Gizmondo-Liquidation.  At all material times, it acted, aided and abetted,

22  conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged

23  below.

24     12.    Defendant Paul Davis ("Davis") is a citizen of the United Kingdom.   During

25  relevant time periods, he was employed by Begbies Traynor and was one of the Joint

26  Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and abetted,

27  conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged

28  below.

13.     Defendant Timothy Dolder ("Dolder") is a citizen of the United Kingdom. During relevant time periods, he was employed by Begbies Traynor and was one of the Joint Liquidators of Gizmondo-Liquidation.   At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

14.     Defendant Stefan Eriksson ("Eriksson") is a citizen of Sweden.  He has held various positions with numerous entities, including without limitation, Gizmondo, Tiger and Xero.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below. Also, Eriksson personally guaranteed loans made by Davies and Warnock.

15.     Defendant Anneli Freer is a citizen of the State of California and is Freer's ex-wife.  At all material times, she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

16.     Defendant Ericka Freer is a citizen of the State of Colorado.  She is Freer's current wife and has participated in and/or personally benefited from the wrongful acts and omissions described herein.  At all material times, she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

17.     Defendant David Hudson is a citizen of the United Kingdom.   During relevant time periods, he was employed by Begbies Traynor and was one of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

18.     Defendant Jason Irwin ("Irwin") is a citizen of the State of New York.  Irwin was President, Chief Executive Officer, Chief Financial Officer, Secretary, and a Director of GetFugu from January 30, 2009 to April 2, 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

19.     Defendant Richard Jenkins ("Jenkins") is a citizen of the State of California. Jenkins was the Chief Executive Officer, President, Chief Financial Officer, and Secretary and Chairman of the Board of Directors of GetFugu from August 29, 2008 to January 30, 2009.  On or about April 20, 2009, he resigned as a Director of the Company.  Beginning in August 2008, Jenkins served as Chief Executive Officer of Media Power Inc.   From January 2007 to August 2008, Jenkins served as Chief Operating Officer of Media Power Inc.

20.     Defendant Juanita Group Ltd. ("Juanita Group") is a United Kingdom corporation with its principal place of business in California. At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

21.     Defendant Ivan D. Kozhuharov ("Kozhuharov") is a citizen of the State of Connecticut.   Kozhuharov was Chief Technology Officer of Media Power, Madero and GetFugu.   His current position at GetFugu is called Chief Software Architect.   At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

22.     Defendant Donald A. Kurz ("Kurz") is a citizen of the State of California.  On or about November 13, 2009, Kurz was appointed to GetFugu's Board of Directors.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

23.     Defendant Mark LaPresle ("LaPresle") is a citizen of the State of California. LaPresle has been a member of the Board of Directors of GetFugu since January 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

- 4 -

24.     Defendant Mikael Ljungman ("Ljungman") is a citizen of Sweden and he is current incarcerated in Sweden.   At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

25.     Defendant Hazina Ljungman is a citizen of Sweden.   She is Ljungman's wife and has participated in and/or personally benefited from the wrongful acts and omissions described herein.   At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

26.     Defendant Asher D. Miller ("Miller") is a citizen of the United Kingdom. During relevant time periods, he was a partner in DRP and was one of the Joint Liquidators of Gizmondo-Liquidation.   At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

27.     Defendant Derek Norton ("Norton") is a citizen of the State of California.   On or about October 19, 2009, he became Chief Operating Officer of GetFugu.   At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

28.     Defendant Michael O'Connor ("O'Connor") on information and belief, is a citizen of Canada.   On or about July 26, 2009, he became a Director of GetFugu.   At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

29.     Defendant Christine Peters ("Peters") is a citizen of the State of California. Peters has been a Director of GetFugu since on or about May 5, 2009.   At all material times, she owed fiduciary duties to GetFugu and its shareholders and breached such duties, and she acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

- 5 -

30.     Defendant David Antony Rubin ("Rubin") is a citizen of the United Kingdom.  During relevant time periods, he was a partner in DRP and was one of the Joint Liquidators of Gizmondo-Liquidation.  At all material times, he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

31.     William Schloth, CPA ("Schloth") is a citizen of the State of Connecticut.  He was involved with Media Power and Madero.  Schloth is currently employed by Southridge Investment Group LLC.

32.     Defendant Michael Jay Solomon ("Solomon") is a citizen of the State of California. Solomon became Chairman of the Board of Directors of GetFugu on or about July 22, 2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

33.     Defendant Leathem Steran ("Steran") is a citizen of the State of Connecticut. Leathem was the Chairman of the Board of Directors of GetFugu from approximately January 2009 to approximately July 22, 2009; he continues to be a director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

34.     Defendant Bernard Stolar ("Stolar") is a citizen of the State of California. Stolar was Chief Executive Officer and President and a director of GetFugu since approximately January 2009.  On or about November 2, 2009, Stolar resigned as President (but remained CEO).  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

35.     Defendant Eric Stoppenhagen ("Stoppenhagen") is a citizen of the State of California.  Stoppenhagen, a Certified Public Accountant, was the interim Chief Financial Officer and Secretary and a director of GetFugu from on or about April 4, 2009 to May 4,

2009.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

36.     Defendant Tiger Telematics, Inc. ("Tiger") is incorporated under Delaware law and its principal place of business is in Jacksonville, Florida.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

37.     Defendant Chuck Timpe ("Timpe") is a citizen of the State of California. On or about November 2, 2009, he became a Director of GetFugu.  At all material times, he owed fiduciary duties to GetFugu and its shareholders and breached such duties, and he acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

38.     Defendant Media Power USA LLC ("Media Power") is a California corporation with its principal place of business in Los Angeles, California.  Media Power's predecessor was Media Power USA, Inc., which was originally established on December 31, 2006 as a California Limited Liability Company.  At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

39.     Defendant Asiatic Commerce Bank ("Asiatic") is a United Kingdom bank with its principal place of business at 6 Albemarle Street, London. At all material times, it acted, aided and abetted, conspired, facilitated and participated in the unlawful and illegal acts and omissions alleged below.

**I.      Tiger/Gizmondo**

40.     In 2000, Freer was director of a UK-based company, Eagle Eye Scandinavian Distribution Ltd. ("Eagle Eye").

41.     Freer became interested in Floor Décor, Inc. ("FDI"), not because of its flooring business, but because in 2001, it became a public company by way of a reverse merger with Media Communications Group Inc. ("MCGI"), a publicly-traded marketing

1  and distribution company.  Freer came to believe that a publicly-traded company can create

2  money by selling stock, borrowing money from shareholders, creating more shares of stock,

3  and even using them in lieu of cash.  The latter was what FDI accomplished with its reverse

4  takeover of MCGI.  By the end of 2001, FDI had an accumulated deficit of almost two

5  million dollars, the annual report noted "strained" liquidity and the possibility of having to

6  start cost-saving measures to increase available cash.

7        42.    On or about February 4, 2002, FDI purchased Freer's company, Eagle Eye,

8  with 7,000,000 shares of its stock and changed its name to Tiger Telematics Ltd.  It also

9  relieved itself of indebtedness to various shareholders by converting the debts into stock.

10  FDI had managed to acquire a new subsidiary, and reduce its liabilities by over $4 million,

11  without actually spending any money.

12        43.    By July 2002, FDI had changed its name to Tiger Telematics Inc., announced

13  plans to dispose of its unprofitable flooring business and leased a London office for Tiger

14  Telematics Ltd. (paying for the first year with 500,000 shares).

15        44.    Tiger bought Comworxx Inc., a U.S.-based telematics provider. The deal was

16  for $4.2 million worth of Tiger stock, the assumption of some of Comworxx's liabilities,

17  and the provision of $500,000 of funding. A subsequent review of Comworxx's operations

18  concluded, rather surprisingly, that Comworxx was not a viable business. Tiger then wrote

19  off the value of the purchase completely, adding almost five million dollars to its losses for

20  that year.

21        45.    In 2002, Tiger formed a new subsidiary, Tiger Telematics Europe Ltd.,

22  subsequently named Gizmondo Europe, Ltd. ("Gizmondo"), to provide telematics products

23  and services to customers in England and Western Europe.  Freer was made Managing

24  Director of this new subsidiary, and Steve Carroll ("Carroll"), originally employed by

25  Freer's company Eagle Eye, became Technical Director.   Freer subsequently became

26  Chairman of the Board.

27        46.    A short time later, Christian & Timbers ("C&T") sued Tiger because Tiger

28  Ltd. had defaulted on its lease payments and Tiger guaranteed the lease.  Although the UK

1  Court entered a $300,000 judgment, Tiger issued C&T with "shares of common stock to

2  satisfy the amount of the outstanding judgment."

3      47.    The 2002 annual report of Tiger first mentioned Freer and described his

4  alleged background and listed a number of previous appointments, including as a trustee on

5  the Kings Medical Research Trust and a founder of a company called Vxtreme.  Neither of

6  those statements was true. In fact, Freer promised Kings Medical Research Trust millions

7  of dollars, but in the end offered the Trust nothing more than stock at the time, and that was

8  not good enough – a pattern which has followed Freer to this day. Freer is notorious for

9  offering stock to charities, universities, debt collectors and colleagues, for yacht, art, and

10  self-serving needs.

11      48.    Meanwhile, under Freer's direction, Tiger was only able to continue operating

12  by borrowing money (usually from shareholders) or by using shares in lieu of cash to pay

13  suppliers and even employees. As a result, Tiger's losses for 2003 misleadingly appeared to

14  be less from those in 2002.

15      49.    Tiger and its subsidiaries, including a company named Smart Adds, Inc.

16  ("Smart Adds"), were allegedly engaged in the business of developing and marketing a

17  wireless handheld multi-entertainment gaming device called the Gizmondo and related

18  games and accessories associated with the device.  In an article published by Business

19  Week on or about June 21, 2004, Carrender said that "It's clear the growth is going to be

20  astronomical . . . ."

21      50.    In August 2004, a press release announced that Gizmondo had purchased a

22  purported Stockholm game developer called Indie Studios AB ("Indie"), for $850,000 and

23  shares valued at $2,740,000 – in total over three million dollars in excess of its stated value.

24  The excess of purchase price over the value of the tangible assets acquired ($3,651,713),

25  was assigned to "goodwill."

26      51.    The Indie acquisition marked both the entry into the company of Freer's

27  Swedish associates and the first seriously questionable business deal.   Indie was bought

28  from a company called Golden Sands Investment Holdings. Its directors included Eriksson

1 and Peter Uf.  Eriksson had been convicted of robbery, drug trafficking, assault and

2 counterfeiting, released from prison in 2000 after serving six years of a ten-year sentence

3 for fraud.  He was alleged to be a member of a Swedish organized crime group known as

4 the "Uppsala Mafia."  On November 7, 2006, Eriksson pleaded no contest to embezzling

5 the two sport cars and illegally possessing a gun and was sentenced to three years in prison.

6 In or about January 2008, Eriksson was released from prison in the US and extradited to

7 serve a prison term in Europe.  Peter Uf had also been imprisoned for fraud.

8    52.    A number of personnel changes followed the acquisition: Freer was made a

9 Director of Tiger and Board Chairman as well as Managing Director of Gizmondo,

10 Eriksson and Uf were brought on as Directors of Gizmondo and Carroll was made Tiger's

11 Chief Technology Officer. Johan Enander, an associate of Eriksson, was made Head of

12 Security for Gizmondo.  Enander, another alleged member of the Uppsala Mafia, had been

13 convicted of extortion and grand theft.  Further, when he was hired by Gizmondo as Head

14 of Security he had only just finished an 18-month sentence for assaulting a woman and was

15 still wanted by the Swedish police.

16    53.    Tiger's 2004 SEC Form 10-K revealed not only a massive, $99.2 million loss

17 but very generous executive compensation packages, provided in the form of cash, loans,

18 automobile allowances and stock.  This Form 10-K was certified by Carrender.

19    54.    Freer and Eriksson used Tiger and Gizmondo and Tiger's other affiliates to

20 enrich themselves and their associates at the expense of the companies and their creditors

21 and stockholders.  They caused the corporate entities to pay their personal expenses.

22    55.    Freer, Eriksson and their corrupt associates developed elaborate schemes to

23 divert corporate assets to their own personal use and benefit.  Examples of such conduct

24 include, without limitation:

25        (a)    In or about September 2004, Gizmondo entered into a License

26            Agreement with Northern Lights Software Limited ("Northern

27            Lights"), under which Gizmondo paid Northern Lights approximately

28            $3.5 million.  At the time of the agreement Freer and Eriksson were the

- 10 -

only directors of both Northern Lights and Gizmondo. Freer and Eriksson each was the beneficial owner of 23.5% of the outstanding shares of Northern Lights. The 52% owner of Northern Lights was said to be Asiatic. Freer and/or Eriksson owned and controlled, directly or indirectly, Asiatic.

(b)     Tiger disclosed that in 2004, Freer and Eriksson caused "Asiatic Bank and Finance", a company allegedly registered in Panama with its head office in Hong Kong, to pay $7.6 million that was said to have been owed by Asiatic to Freer and Eriksson, directly to 3P PreForm Marketing and Research AB, a systems developer based in Stockholm, and others supposedly in repayment of research and development expenditures owed to these parties by Gizmondo. Gizmondo then credited this amount in payment of amounts previously owed by Freer and Eriksson to Gizmondo. Asiatic was also a Tiger shareholder. What Tiger did not disclose was that Freer and/or Eriksson, directly or indirectly, owned most if not all of Asiatic. Carrender certified this Form 10-K.

(c)     Gizmondo paid Freer's wife for unearned "consultancy services."

(d)     Freer had a dual role selling Tiger stock to the Palestinian Investment Fund ("PIF"). According to Tiger's April 28, 2005 SEC Form 8-K (signed by Carrender), on or about April 28, 2005, Tiger completed a sale of approximately 1,640,724 shares of its common stock for an aggregate purchase price of approximately $21,437,537 million. Approximately 1,220,588 of the shares were sold to PIF, for $17 a share. The Form 8-K goes on to say that PIF was involved in a stock swap with an unnamed shareholder who sold Tiger shares to an investment fund. Later, they remitted the funds to Tiger in exchange for newly issued shares at a discounted price to reflect the restrictions.

- 11 -

Tiger paid approximately $1,640,000 to Earlsdon Investments Ltd. in part as a placement fee.  Among other things, Tiger did not disclose that:

(1)     Tiger had transferred 1,295,588 of its shares to Juanita Group, a company that is owned by Freer and his wife, Anneli Freer.

(2)     On or about April 11, 2005, Tiger's President, Carrender,  wrote four letters to PIF transmitting shares (one for 200,000 shares, 20,588 shares, 600,000 shares, and 400,000 shares) and certifying "that the above certificate for shares was purchased from a non-affiliated shareholder" (emphasis added). In fact, the certificates came from Juanita Group.   In addition to his ownership interest in Juanita Group, Freer was Chairman of the Board of Tiger at the time.  Thus, these letters were false and misleading.

(3)     The actual amount paid by PIF was $20,750,000 (for 1,220,588 shares) not $21,437,537.  Moreover, PIF paid this amount to Juanita Group, not Tiger. Tiger only received $14,119,880.

56.     Thus, Freer and Anneli Freer were able to fraudulently and improperly obtain money, to the detriment of Tiger.

57.     By spring 2005, Gizmondo disseminated several news releases and public statements touting the prospects of Tiger, Gizmondo and the Gizmondo product.  Such statements were false and misleading and failed to disclose that the assets of Tiger, Gizmondo and its affiliates were being improperly used by Freer and Eriksson for their own personal benefit.

58.     Tiger's share prices rose to $32.50, valuing the company in excess of $1 billion.  In April 2005, Tiger raised $21.4 million in a stock sale.

59.     In May 2005, Tiger reported that in the second quarter of 2005, it had borrowed approximately $21.2 million from two shareholders, Plaintiffs Warnock and

- 12 -

Davies.  (SEC Form 10-Q filed Nov. 30, 2005).   The contracts between Tiger, Gizmondo, Freer and Eriksson and Davies and Warnock included the following:

      (a)      On or about May 9, 2005, Warnock loaned Gizmondo £4,000,000, documented in a promissory note.  The note was due June 2, 2005. Gizmondo, Tiger, Freer, and Eriksson signed and personally guaranteed the note.  A copy of the document is incorporated by reference.

      (b)      On or about May 31, 2005, Gizmondo signed a note in the amount of £4,000,000 in favor of Warnock, which, inter alia, extended the due date of the May 9, 2005 note to June 30, 2005.  Gizmondo, Tiger, Freer and Eriksson signed and personally guaranteed the note.  A copy of the document is incorporated by reference.

      (c)      On or about June 13, 2005, Warnock and Davies loaned Gizmondo £6,000,000, documented in a promissory note.  The note was due July 31, 2005.  Gizmondo, Tiger, Freer and Eriksson signed and personally guaranteed the note.  A copy of the document is incorporated by reference.

      (d)      On or about June 13, 2005, Warnock and Davies loaned Gizmondo £1,000,000, documented in a promissory note.  The note was due July 31, 2005.  Gizmondo Tiger, Freer and Eriksson signed and personally guaranteed the note.  A copy of the document is incorporated by reference.

      (e)      On or about July 5, 2005, Warnock and Davies agreed to extend the maturity of the June 13, 2005 note in the amount of £1,000,000 to September 30, 2005.  The guarantee of Tiger was extended to October 1, 2005 and the guarantee of Eriksson and Freer were extended to October 2, 2005.  A copy of the document is incorporated by reference.

(f)     On or about July 5, 2005, the maturity of the note with the original due date of June 2, 2005 was extended to December 31, 2005, with the addition of a 1,027,069 stock option.

60.     Davies and Warnock entered into these agreements in justifiable reliance on statements and omissions of material fact made by Tiger, Gizmondo, Eriksson, Freer and Carrender.

61.     Further, Tiger failed to disclose to Davies and Warnock before entering into the agreements, that in the first quarter of 2005, the quarter in which it launched Gizmondo in the United Kingdom, Tiger lost $163.8 million.  Reflecting Freer's pattern and practice of looting companies, $151.1 million of that loss arose from general and administrative operating expenses.  By contrast, the company spent just $455,092 on goods sold.  This information was not disclosed to the public, let alone Plaintiffs, until October 2005. (SEC Form 10-Q, filed Oct. 20, 2005, signed by Carrender).

62.     At the time that Gizmondo, Tiger, Freer and Eriksson entered into the above-described agreements with Davies and Warnock, they had no intention to repay their loan obligations or comply with their guarantee obligations.

63.     Plaintiffs thus were fraudulently induced to enter into such agreements.

64.     The amount of the debt owed to Davies and Warnock was liquidated and could be readily calculated based on the amount of the principal plus interest.

65.     On or about August 11, 2005, two patent applications were filed with the U.S. Patent and Trademark Office ("USPTO"):   No. 2006/0064350, titled "Method for advertising" ("Smart Adds I") and No. 2006/0074550, titled "System & method for distributing multimedia content via mobile wireless platforms" ("Smart Adds II").  Freer was listed as the inventor on both patent applications.  Both applications were assigned to Warnock and Davies and such assignments were properly recorded with the USPTO.

66.     Incredibly, for the first three quarters of 2005, Tiger had spent over $218 million on "general and administrative expenses."  Tiger later disclosed that:

The Company has sustained net losses aggregating over $382.5 million for the three years and nine months ended September 30, 2005.  In addition, the Company had a net working capital deficiency of $76.4 million at September 30, 2005.  During those periods, the Company sold $121.3 million of restricted common stock shares and, in order to conserve cash, the Company funded $178.3 million of the losses by issuing restricted common stock in exchange for services and other expenses.  Management anticipates proceeds from sales of Gizmondo units and accessories to increase significantly after the U.S. launch of the product on October 22, 2005.  Management also anticipates the ability to continue issuing equity securities to meet working capital requirements and to fund development costs incurred in connection with developing products that the Company believes will enhance its operations. No assurances can be given that these funds will be available.   Additionally, the Company borrowed approximately $21.2 million from shareholders on a short-term basis during the second quarter of 2005 (See Note J).

(SEC Form 10-Q filed Nov. 30, 2005, signed by Carrender).

67.   On or about September 30, 2005, Tiger announced that three new "independent" directors joined the Board.  (See SEC Form 8-K dated Sept. 30, 2005).  They formed a special committee to investigate Tiger's related party transactions, including those involving Freer and Erickson.  Tiger disclosed that the committee was conducting an active review of the matters.  "Should any transactions be deemed inappropriate or unfair to the Company by this committee, they will be fully investigated and remedial action taken accordingly."  No such action was ever taken by the committee.

68.   On or about October 19, 2005, Davies provided Freer with instructions on how to repay the two loans of £4 million and £7 million.  Freer did not contest the debt that he personally guaranteed.

69.   In October 2005, Freer was sentenced to probation and fined by a court in Germany for buying four luxury cars with a bad check.  He had previously forged his own parents' signature for a loan and was convicted of fraud.  Further, between November 2007 and September 2008, Freer contributed at least $18,450 to Hilary Clinton or her political action committee.  In doing so, he provided a California address with the contribution but failed to disclose that he was a not a U.S. citizen.  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign national to make political contributions.

- 15 -

70.     In October 2005, Freer and Eriksson traveled to California for the purported U.S. launch of the Gizmondo product. However, they resigned their positions with Tiger, Gizmondo and other Tiger affiliates on or about October 20, 2005.  Uf also resigned.  Tiger then disclosed that:

> Since their resignations, Messrs. Freer, Eriksson and Uf have been the subject of several articles published in Sweden reporting alleged questionable activities and association with a Swedish crime family and, in the case of Messrs. Eriksson and Uf, prior convictions for fraud and other economic crimes.  Mr. Freer has advised the Company that the allegations and implications of illegal activities or improprieties attributed to him are not true and that he intends to file suit against the newspapers.  Prior to these reports, the Company had no prior knowledge of the past history described in these reports.  The Company conducts background checks of all of its senior executives.  The background checks did not reveal these convictions or other illegal activities.

(SEC Form 10-Q filed Nov. 30, 2005).

71.     Thus, by no later than November or December 2005, Tiger had knowledge of the fraud and racketeering activity of, inter alia, Freer and Eriksson that directly and proximately injured the business and property of Tiger, its Gizmondo subsidiary, and its creditors, including Davies and Warnock.  As such, Tiger also knew that it was liable on the guarantees it provided for the loans made by Davies and Warnock but did not have sufficient funds or assets to repay the debt to them.

72.     As a direct and proximate result of the fraud and racketeering activity of, inter alia, Freer and Eriksson with respect to Tiger and Gizmondo, Davies and Warnock were injured in their business and property.  The debt owed to them by Tiger, Gizmondo, Freer and Eriksson has never been paid.

73.     On or about December 14, 2005, Smart Adds entered into a Security Agreement with Davies and Warnock.  Smart Adds granted Davies and Warnock a security in its intellectual property as security for the loans to Gizmondo.

74.     On or about January 20, 2006, Gizmondo filed a High Court application for administration in the United Kingdom.

- 16 -

75.     On or about February 2, 2006, liquidators were appointed for Gizmondo, for the purpose of winding up the company's affairs and distributing its assets.  The joint liquidators appointed for Gizmondo-Liquidation were Davis and Dolder of Begbies Traynor, and Rubin and Miller of DRP (collectively, "the Joint Liquidators").  The Joint Liquidators disclosed that they had conducted a "detailed investigation" of Gizmondo pursuant to the UK Insolvency Act 1986.  The Joint Liquidators contended that they had claims against Freer, his then-wife, other entities affiliated with Freer, Eriksson, Tiger and others.  As set forth below, the Joint Liquidators subsequently became part of the illegal activities and conspiracy alleged herein.

76.     In March 2006, Warnock and Davies demanded payment of their loan from Tiger as guarantor.  However, Tiger had no funds to honor its guarantee.  Tiger's subsidiary, Smart Adds, did own intellectual property, including without limitation Smart Adds I and Smart Adds II.

77.     On or about March 1, 2006, Smart Adds, Tiger, Davies and Warnock entered into an Assignment of Intellectual Property and Release of Security Agreement ("Assignment and Release").  Pursuant to the Assignment and Release, Smart Adds assigned its intellectual property assets to Davies and Warnock, including without limitation Smart Adds I and Smart Adds II.

78.     On or about November 15, 2007, the Joint Liquidators, Gizmondo-Liquidation, and Freer entered into a Deed of Settlement to settle their claims against Freer. In pertinent part, the Deed of Settlement provided that:

(a)     Freer would pay the Joint Liquidators $6,010,000, with an initial payment of $10,000 and eight installments of $750,000 each;

(b)     If any of the installments were not timely paid, the entire amount of $6 million would immediately be due and payable;

(c)     Gizmondo-Liquidation would assign and transfer any intellectual property rights to trade names to Freer; and

- 17 -

(d)     On February 29, 2008, on the condition that Freer was then current with the payment schedule, the Liquidators would send Freer a letter confirming, inter alia, the cooperation and assistance given by Freer to the Liquidators.

## II.     Xero

79.     In February 2006, Freer engineered the formation of Xero Mobile, Inc. ("Xero"), a "Mobile Virtual Network Operator" in Los Angeles. It planned to offer a free cell phone service for college students, subsidized by advertisements delivered to their handsets.

80.     Xero was projecting incomes of $1.8 billion after three years, and was soon rumored to have raised $300 million in European investment.

81.     On or about June 26, 2006, Roger Davis, the President of Xero Mobile, wrote a letter "to whom it may concern" representing that Freer was the company's majority shareholder.  Other former Tiger and Gizmondo personnel were involved in management of Xero.

82.     On or about June 29, 2006, Thomas S. Loo, a shareholder in the law firm Greenberg Traurig LLLP, sent a letter to Wayne Levy of Equity Funding Group representing that:

> We serve as outside legal counsel to Xero Mobile, a Nevada corporation ("Xero Mobile" or the "Company").  As requested by the Company, we wish to confirm to you that Carl Freer was the founder of, and presently is a significant shareholder and investor in Xero Mobile.  Our confirmation is based upon a certificate by the President of the Company (attached) and certain records which have been provided to us.  We have not otherwise conducted a separate investigation of the facts represented to us.

Attached to the letter was a June 30, 2006 "Certificate" signed by Roger Davis as President of Xero, representing that:

(a)     Carl Freer is the beneficial owner of 4,254,743 of the outstanding shares of Xero Mobile, which shares he holds in his name.  Blowfishworks LLC is beneficial owner of 8,642,311 of the

outstanding shares of Xero Mobile. Additionally, Mr. Freer is the beneficial owner of 1,000,000 shares held of record by Blowfishworks LLC;

(b) The above listed shareholdings represent approximately 31.2% of the outstanding shares of Xero Mobile exclusive of outstanding options and warrants to acquire equity interests in Xero Mobile; and

(c) Carl Freer was the initial shareholder of Xero Mobile or its predecessor.

83. Freer owns and controls Blowfish.

84. In June 2006, Xero performed a reverse merger with a public shell company.

85. On or about March 6, 2006, Davies and Warnock entered into an Assignment of Intellectual Property agreement with Xero, Freer and Eriksson ("IP Assignment"). Pursuant to the IP Assignment, on the Closing Date (the date on which Xero was to have paid $26,000,000 to Davies and Warnock, but failed to do so), Davies and Warnock would assign the intellectual property they owned to Xero. The IP Assignment is incorporated herein by reference.

86. Freer and Eriksson personally guaranteed, jointly and severally, the obligations of Xero under the IP Assignment. If the transactions contemplated by the IP Assignment were not consummated on or before May 31, 2006, Freer and Eriksson would remain liable as guarantors under the 2005 notes.

87. At the time that Freer and Eriksson entered into the above-described agreement with Davies and Warnock, they had no intention to comply with their guarantee obligations. Plaintiffs were fraudulently induced to enter into such agreement.

88. Freer and Eriksson have breached the IP Assignment by failing to meet their obligations as guarantors to, inter alia, pay $26,000,000 (plus interest) to Davies and Warnock.

- 19 -

89.     Thus, Davies and Warnock continue to maintain their beneficial interest in the intellectual property set forth in the IP Assignment and are owed $26,000,000 plus interest by Freer and Eriksson.

**III.    Media Power**

90.     Media Power was founded by Freer and his partner Ljungman.

91.     Ljungman was sentenced in Sweden to prison for tax fraud.  On or about September 30, 2008, Ljungman donated $5,000 to Hilary Clinton's political action committee, Hillpac.  In doing so, he provided a New York address and stated that he was employed by Media Power, but he failed to disclose that he was a not a U.S. citizen.  Pursuant to 2 U.S.C. § 441e, it is illegal for a foreign national to make political contributions.

92.     Media Power USA, Inc. was originally established on December 31, 2006 as a California Limited Liability Company.  Media Power USA LLC was founded by Freer and Ljungman, with Jenkins as Chief Executive Officer.  On October 27, 2007, the company converted to a California Corporation.  On or about June 8, 2008, Media Power USA Inc, a California corporation, merged with Media Power, a Delaware corporation.

93.     Media Power's owners included not only Freer and Ljungman individually, but also related persons and entities under their ownership and control, including without limitation, Dragon Phoenix and 16 companies incorporated in United Arab Emirates or the Isle of Man on or about August 26, 2008. Ljungman, through eCommerce, incorporated 16 companies by using the services of Sovereign Corporate Services.  Dragon Phoenix's website continues to list eCommerce as one of its "partners." http://www.dragonphoenix.hk/partners.php.

94.     In or about late 2007, Freer (along with his son) became involved with Alien King Inc. ("Alien King"), a company financed in whole or in part with the proceeds of the criminal activities by Freer and others as alleged herein.  Alien King provides pornography in the form of "mobile adult entertainment" and operates websites to facilitate its business, including without limitation, http://www.alienking.com and http://mobile.alienking.com.

- 20 -

1   Freer, directly or indirectly, continues to have an interest in Alien King.  Further, Freer
2   caused a Media Power entity to make a payment to mBlox Inc., which, inter alia, facilitates
3   payment to adult content providers.

4       95.    In or around January 2008, Freer made a public statement disseminated by
5   wire that a new Gizmondo product would be developed and sold.  He went on to represent
6   that Tiger would formally own the new Gizmondo and that certain "deals" were in place to
7   facilitate this plan.

8       96.    As creditors of, inter alia, Tiger and Freer, Plaintiffs would be the beneficiary
9   of such a plan.  However, Freer's statements were false and misleading at the time they
10  were made.

11      97.     Freer made such statements in order to (a) attract new investors and/or
12  lenders for the fraudulent scheme for himself and Media Power, and (b) deter Plaintiffs as
13  creditors from pursuing legal action to collect on their debts.

14      98.    On or about February 14, 2008, Media Power purchased a 100% membership
15  interest in eCommerce, LLC ("eCommerce") for $1.00 and assumption of debt.
16  eCommerce's sole member was Ljungman, a Media Power shareholder.

17      99.    By no later than Spring 2008, the Joint Liquidators conspired and agreed
18  with, inter alia, Freer and Media Power to assist the fraudulent scheme and engage in a
19  pattern of racketeering activity.  On or about April 7, 2008, Paul M. Davis, one of
20  Gizmondo-Liquidation's Joint Liquidators, wrote a letter to "whom it may concern,"
21  writing that:

22      The Joint Liquidators are pleased to advise that following extensive enquiries and
23      negotiations they have entered into an agreement with one of the Ex Director's [sic]
        of the Company, Mr. Carl Freer.

24
25      Much time and effort has been spent on finding a resolution in relation to Mr. Carl
        Freer and the IPR Assets of Gizmondo Europe Limited — in liquidation.

26
27      The continued co-operation afforded us by Mr. Freer will enabled [sic] the
        Liquidators to recover a substantial sum for the general body of creditors,

28

furthermore, Mr. Freer's continued assistance will reduce the overall indebtedness of the company.

We have considered the commerciality and viability of selling the IPR Assets to Mr. Carl Freer and feel that in all the circumstances we have achieved the best possible outcome on behalf of the creditors.

Much work has been done by Mr. Freer and the Liquidators in finding ways to uncover value and repair the defunct operations of the company.  According to Mr. Freer "the shareholders of Tiger Telematics will now be able to prosper on the re-introduction of the Gizmondo into the market".

The terms of the agreement remain confidential; however, we can advise that a substantial payment has already been made for the purchase by Mr. Carl Freer of the company's IPR Assets.

We wish Mr. Carl Freer every success with his plans to re establish the Gizmondo in the Augmented Reality environment which will bring the power of Television, the accuracy and accountability of Direct Mail and the interactivity of the Gizmondo to a global audience.

100.    On or about May 20, 2008, Media Power and the Joint Liquidators furthered the fraudulent scheme and conspiracy by entering into a guarantee and indemnity agreement ("GI Agreement") with Gizmondo-Liquidation, whereby Media Power agreed to provide payment security to Gizmondo-Liquidation for the major shareholder of Media Power, i.e., Freer.   On March 31, 2008, Media Power made an advance payment of $750,000 and as of November 3, 2008, Media Power paid a total of $2,379,596 under the GI Agreement.   None of those funds were paid to Plaintiffs as creditors of Gizmondo, Tiger, Freer and Eriksson.

101.    Media Power entered into the GI Agreement for the purpose of personally benefiting Freer, and shows Freer's self-serving purpose for which he uses his corporate entities and the use of such companies as his personal piggybank.

102.    In 2007 and 2008, Media Power had no clients, no income and no product or services.  On or about October 2, 2008, Media Power announced that it was partnering with IT Factory, a Danish company, through its eCommerce subsidiary.  Media Power's CEO,

- 22 -

1  Jenkins, stated that "[o]ur new relationship with IT Factory represents a great opportunity

2  for us to find new and expanded markets for our mobile technology."   eCommerce's

3  relationship with IT Factory was the only source of revenue for Media Power.

4       103.   IT Factory is a central figure in one of the largest frauds in Denmark's

5  history.   It perpetuated a four-year long fraud that involved more than $170 million in

6  fraudulent revenues from nonexistent leasing contracts.

7       104.   IT Factory was run by Stein Bagger ("Bagger"), who turned himself into the

8  Los Angeles Police Department on or about December 6, 2008, was extradited to Denmark

9  and later pled guilty to fraud in Denmark.   On or about June 11, 2009, Bagger was

10  sentenced to seven years in a Danish prison for fraud.   Bagger was also a close business

11  associate of Ljungman, who is in prison facing fraud charges related to the IT Factory case.

12       105.   Some or all of the funds Media Power and eCommerce received from IT

13  Factory are the proceeds of criminal conduct.

14       106.   In addition, Media Power and its subsidiaries and affiliates, including Freer,

15  Irwin, Ljungman, Dragon Phoenix, Corlito Software Limited, IT Factory, Bagger, and

16  others acting in concert with them unlawfully laundered money that was the proceeds of

17  criminal conduct including without limitation, acts reflected on invoices sent by mail or

18  wire dated on or about August 27, 2007, November 30, 2007, December 1, 2007, December

19  3, 2007, December 7, 2007, December 15, 2007, December 21, 2007, January 30, 2008,

20  February 2, 2008, February 12, 2008, March 15, 2008, March 25, 2008, May 18, 2008, May

21  24, 2008, June 5, 2008, June 20, 2008, June 25, 2008, July 5, 2008, July 25, 2008, and

22  August 25, 2008.  Such conduct violates 18 U.S.C. § 1956.

23       107.   Income received by Media Power from the IT Factory fraud was allegedly

24  used by Media Power to develop Augmented Reality technology ("AR").   The results of the

25  technology development allegedly resulted in the filing of patent applications.   This same

26  technology is allegedly the basis for the current business of GetFugu.

27       108.   IT Factory filed for bankruptcy in Denmark in December 2008.

28

109.   After IT Factory filed for bankruptcy, liquidators were appointed ("Danish Liquidators").  The Danish Liquidators conducted an investigation and concluded that the funds paid by IT Factory to eCommerce and Media Power were the proceeds of criminal acts.  As such, the technology allegedly developed by Media Power using the proceeds of such criminal conduct could be the subject of claims by the Danish Liquidators.

110.   On or about November 27, 2008, the solicitors for the Joint Liquidators notified Irwin, then Media Power's Chief Financial Officer, that Freer was in default under their November 15, 2007 Deed of Settlement and that they had demanded that Freer pay the Joint Liquidators $6 million.  The Joint Liquidators demanded payment by December 4, 2008 of $6 million by Media Power pursuant to the May 20, 2008 GI Agreement.

111.   In a press release issued on or about December 2, 2008, Media Power, through its CEO, Jenkins, admitted the association and business relationship with IT Factory.

112.   In December 2008, the Joint Liquidators and their counsel were notified that, as a result of the IT Factory fraud, Media Power was no longer a viable entity.

113.   Freer, Irwin, Jenkins, and others acting in concert with them conspired and schemed to close Media Power and strip it of its assets for their own personal benefit, at the same time making misrepresentations to third-parties as to the future of Media Power.  By way of example, on or about December 10, 2008, Media Power sent a letter addressed to its customers.  The letter stated that Media Power was "updating and remodeling" its business strategy and projecting total income of almost $1 billion.

114.   Both Media Power and eCommerce had offices in New York, where Freer, Jenkins, Ljungman and others worked. They also had an office in Atlanta, Georgia, where they hired employees to work on augmented reality projects and local Atlanta police officers to provide security.  Employees received not only late payments, but checks which bounced, and to receive their last checks were told that they had to sign a document whereby they agreed not to criticize Freer, Jenkins or Media Power. The head employee refused, passed out the checks and told the employees to run to the bank to cash them. To

- 24 -

1  this day, the leasing company, which spent approximately $40,000 in construction costs

2  specifically for Media Power has not been paid in full.  Nor have the approximately 10 to

3  12 Atlanta police officials.

4       115.  On or about January 23, 2009, Douglas Holtz of Frishauf Holtz Goodman &

5  Chick P.C. represented that the following alleged patent applications (collectively referred

6  to as "the Eight Patent Applications") were filed by his firm:

| NON-PROVISIONAL U.S. SERIAL NO. | FILING DATE | TITLE | NAMED INVENTORS |
|---|---|---|---|
| 12/172,803 | 07/14/08 | AUGMENTED REALITY METHOD AND SYSTEM USING LOGO RECOGNITION | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins<br>Jeff Chastine |
| 12/172,27 | 07/14/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LETTERS, NUMBERS, AND/OR MATH SYMBOLS RECOGNITION | Carl Freer<br>Michael Ljungman<br>Rich Jenkins<br>Jeff Chastine |
| 12/172,843 | 07/14/08 | AUGMENTED REALITY METHOD AND SYSTEM USING LOGO RECOGNITION, WIRELESS APPLICATION PROTOCOL BROWSING AND VOICE OVER INTERNET PROTOCOL TECHNOLOGY | Carl Freer<br>Mikael Ljungman |
| 12/172,857 | 07/14/08 | LOGO RECOGNITION FOR MOBILE AUGMENTED REALITY ENVIRONMENT | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/175,519 | 07/18/08 | AUGMENTED REALITY COLLABORATIVE MESSAGING SYSTEM | Carl Freer<br>Mikael Ljungman<br>Rich Jenkins |
| 12/184,793 | 08/01/08 | AUGMENTED REALITY PLATFORM AND METHOD USING LOGO RECOGNITION | Carl Freer<br>Hong Wu<br>Jeremy Brooks<br>Jason Zhang<br>Panagiotis Oikonomopoulos<br>Maribeth Gandy<br>Jeff Chastine<br>Ivan Kozhuharov<br>Atanas Georgiev |

| Provisional U.S. Serial No. | Filing | Title | |
|---|---|---|---|

| | | Date |
|---|---|---|
| 61/094,367 | 09/04/08 | METHOD AND PLATFORM FOR GESTURAL TRANSFER OF DIGITAL CONTENT FOR MOBILE DEVICES |
| 61/104,530 | 10/10/08 | METHOD AND PLATFORM FOR VOICE AND LOCATION BASED SERVICES FOR MOBILE ADVERTISING |

116.    Freer is a co-inventor on all of the alleged non-provisional applications. According to the January 23 letter, Ljungman is a co-inventor on four non-provisional applications.  The felon Ljungman used his credit card to pay legal fees purported incurred in filing the applications with the USPTO.

117.    The Eight Patent Applications reflect the alleged technology developed using the proceeds of the IT Factory/eCommerce criminal conduct.

118.    Only three of these alleged Eight Patent Applications have been published by the USPTO.  On or about December 3, 2009, the USPTO published the following Freer applications listed above: (a) Application No. 12/175,519, Publication No. 20090300122; (b) Application No. 12/172,803, Publication No. 20090300100; and (c) Application No. 12/184,793, Publication No. 20090298517.  As of December 30, 2009, the USPTO has not taken any substantive action in connection with the applications.  Nor have the three applications been assigned by Freer to GetFugu or anyone else.

119.    On information and belief, at least some of the Eight Patent Applications have been abandoned.  Further, an applicant has one year to timely convert provisional applications into non-provisional applications.  37 C.F.R. § 1.53 ("A request to convert a provisional application to a nonprovisional application must also be filed prior to the earliest of: (i) Abandonment of the provisional application filed under paragraph (c) of this section; or (ii) Expiration of twelve months after the filing date of the provisional application filed under paragraph (c) of this section."); Manual of Patent Examination Procedure § 601.01(c)(II).

- 26 -

1  120.   On information and belief, the applicant did not file the provisional

2  applications by September 4, 2009 or October 10, 2009.

3  121.   Even though the Eight Patent Applications were described in Media Power's

4  brochures, they somehow became the property of MARA Group Limited ("MARA"), an

5  alleged company wholly owned by Freer.  Thus, Freer managed to become the personal

6  beneficiary of Media Power's alleged intellectual property assets that were financed by the

7  IT Factory $100 million fraud.

8  122.   Media Power shut down most of its activities in early 2009, and its website

9  disappeared.

10  **IV.    Madero/GetFugu**

11  123.   With Media Power's failure as a result in its involvement in and discovery of

12  the IT Factory fraud, Freer, Eriksson, Jenkins, Irwin and other conspirators  needed a

13  different corporate vehicle to continue their corrupt endeavors.  They found that vehicle in

14  Madero, later re-named GetFugu.

15  124.   On or about August 29, 2008, Media Power entered into a Stock Purchase

16  Agreement with Madero, a publicly traded Nevada corporation on the over-the-counter

17  bulletin board under the symbol MDRQ.  The purchase price was disclosed as $264,000,

18  and Media Power received four million shares of common stock.  Madero was a shell

19  corporation, with its sole Director being a manager/waiter of a restaurant located in Los

20  Mochis, Sinola, Mexico.   After closing, Jenkins, Media Power's CEO, was named

21  President, Chief Executive Officer, Chief Financial Officer and Secretary of Madero.

22  125.   Effective January 30, 2009, three individuals were appointed to serve as

23  members of the Board of Directors of Madero:  Stern, Irwin, and LaPresle; Stern was

24  named Chairman of the Board of Directors.  The same day, Jenkins resigned as the CEO,

25  President, Chief Financial Officer, and Secretary of Madero and was replaced in those

26  positions by Irwin (Media Power's Finance Director).  Jenkins remained a member of the

27  Board.

28

126.   On or about February 1, 2009, a unanimous written consent of the Directors of Media Power gave Media Power's 4,000,000 shares of Madero to certain persons, including without limitation, Jenkins (416,667 shares), Irwin (240,000 shares), Freer (1,700,000 shares), and Steran (416,667 shares).  Many, if not all, of the persons receiving shares were asked to sign a "Donation Agreement" that required the shareholders to not disparage Freer.  The document was drafted or reviewed by an attorney, Alan Sussman.

127.   On or about February 5, 2009, Odin Thorpe of CVA issued a valuation report addressed to Jason Irwin, CEO of Madero, "with the understanding that Madero, Inc. has proposed to acquire these eight patent applications from Mr. Freer."  CVA valued the Eight Patent Applications relating to a technology called augmented reality at $35 million to $52 million.

128.   CVA's valuation report was false and misleading, negligent and/or grossly negligent for several reasons, including without limitation, the following:

(a)   The specific patent applications were never specifically identified;

(b)   There is no suggestion that CVA reviewed the applications, confirmed that they had been filed with the USPTO, or ascertained the status of the applications before the USPTO or the assignee of such applications;

(c)   CVA has no expertise in the complex mobile content, emerging technology fields required to make such assessments;

(d)   CVA boldly (but unrealistically) assumed that the USPTO would issue patents on the applications;

(e)   CVA's entire valuation is entirely based on management's revenue predictions and CVA made no attempt to confirm, test or validate the wildly inflated revenue predictions;

(f)   The valuation did not take into account the fact that GetFugu's alleged technology is based on open source, non-proprietary software;

- 28 -

(g)    None of the Eight Patent Applications had been published by the USPTO (and only three applications would be subsequently published, on December 3, 2009); and

(h)    CVA's valuation did not consider whether any of the Eight Patent Applications would be patentable under U.S. law, e.g., novelty, utility, enablement, written description and best mode.

129.    CVA's valuation reports are thus negligent, grossly negligent and/or made misrepresentations of material facts or omitted to state material facts that render their reports misleading.  CVA knew that Madero, GetFugu and third parties would be relying on its valuation reports, including without limitation, for the purpose of valuing the alleged Eight Patent Applications, the amount of consideration to be paid for such applications, and for the purpose of raising funds from investors.  CVA further knew that consideration in the form of Madero or GetFugu stock would dilute the interest of existing shareholders.  Despite this knowledge, CVA issued its valuation report.

130.    Schloth, purportedly acting on behalf of Madero/GetFugu, contacted and worked with CVA in 2009 to obtain the valuation.  During this time, he communicated with CVA by mail or wire.  On or about January 26, 2009, Schloth wrote an email to CVA's Thorpe stating that:

> Media Power put about $9m of development effort into the patents and the product to try to commercialize under a licensing arrangement with the current patent owner (see the paid in capital on the financials).  Media Power failed to complete on its deliverables and hence now the deal is null and void with the current patent owner Carl Freer getting the rights to what was further with the product and patents. Here's the catch we would like to see how we can include the development effort into the value you come up with (I've attached the 12/31/07 audit of Media Power and 9_30_08 financials). Let me know what else might help a higher valuation because believe it or not that what Madero is looking for so that investors down the road see the contribution that was made.  Does that make sense.

CVA then expressly or impliedly agreed and conspired with Irwin, Schloth, Freer or other currently unknown persons to issue the fraudulent and inflated valuation report.

131.   On or about February 25, 2009, Freer personally entered into a "Head of Terms" with Gizmondo-Liquidation's U.K. Joint Liquidators.   The Joint Liquidators entered into this agreement knowing that Freer and Media Power was involved with  the IT Factory fraud, that Media Power had unpaid creditors and employees and was insolvent.

132.   The terms and conditions of the Head of Agreement included, inter alia, the following:

    (a)   Payment of $500,000 to the Joint Liquidators;

    (b)   Upon payment of the $500,000, the Joint Liquidators would issue a press release that they were "supportive" of Freer and "his new venture" and that creditors of Gizmondo and "certain shareholders" of Tiger "would share in the success of the new venture."

    (c)   A presumption that all intellectual property rights in Freer's name had been transferred to GetFugu;

    (d)   Shares in GetFugu would be transferred to the Joint Liquidators; and

    (e)   If Freer breached the agreement, the balance outstanding under the November 2007 Deed of Settlement would become due and payable by Freer and by Media Power.

133.   The agreement was negotiated and executed in Los Angeles, California.  By entering into this Head of Agreement and acting in compliance with it, the Joint Liquidators were and are complicit with the illegal actions of Freer and other Defendants to violate U.S. law and breach their fiduciary duties.

134.   Effective March 25, 2009, Madero amended its Articles of Incorporation to change its name to GetFugu, Inc.

135.   Media Power had owned 48% of GetFugu until February 1, 2009, when it transferred its interest to certain persons, including Freer, Irwin and Steran.  Freer received approximately 1,200,000 of Media Power's 4,000,000 shares.   Ljungman, directly or indirectly, and the 16 U.A.E. and Isle of Man shell companies, as alleged above, also were provided with GetFugu stock.

- 30 -

1    136.   Effective as of April 2, 2009, Irwin resigned as a member of the Board of

2    Directors and as President, CEO, Chief Financial Officer and Secretary of GetFugu, and

3    Stolar, was elected to serve as the President and CEO.   Effective as of April 4,

4    Stoppenhagen was elected to serve as the Interim Chief Financial Officer and Secretary of

5    GetFugu.

6    137.   On or about April 6, 2009, CVA disseminated by wire or mail a second

7    valuation report addressed to Stolar at GetFugu "with the understanding that GetFugu, Inc.

8    has proposed to acquire these eight patent applications from Mr. Freer."  The April 6 report

9    was virtually identical to the February 5, 2009 report to Madero.  CVA again fraudulently

10   valued the Eight Patent Applications at a range of $35 million to $52 million.  This second

11   report suffers from the same flaws that the first had.  CVA's second valuation report is thus

12   negligent, grossly negligent and/or made misrepresentations of material facts or omitted to

13   state material facts that render their reports misleading.  CVA knew that GetFugu and third

14   parties would be relying on its valuation report, including without limitation, for the

15   purpose of valuing the alleged Eight Patent Applications, the amount of consideration to be

16   paid for such applications, and for the purpose of raising funds from investors.  CVA

17   further knew that consideration given in the form of GetFugu stock would dilute the interest

18   of existing shareholders.  Despite this knowledge, CVA issued its second valuation report.

19   Schloth was again involved with CVA in obtaining the valuation and communicated with

20   CVA by mail or wire.  CVA expressly agreed and conspired with Irwin, Stolar, Schloth,

21   Freer or other currently unknown persons to issue the fraudulent and inflated valuation

22   report.

23   138.   In April 2009, GetFugu raised $502,500 in a private placement of the

24   company's securities.  GetFugu used CVA's valuation to induce persons to invest in

25   Madero.

26   139.   On or about April 9, 2009, GetFugu allegedly entered into an Agreement for

27   the Assignment of Patent Rights with MARA to acquire the Eight Patent Applications for

28   25 million shares of GetFugu, which were purportedly valued at the time of the transaction

at $60 million.  The agreement was signed by Freer for MARA and by Stolar for GetFugu.  While the agreement recites that GetFugu is a Nevada corporation, there is no indication that MARA had or has a separate corporate existence.  GetFugu used the fraudulent CVA valuations of the Eight Patent Applications to justify and support the number of shares provided to Freer, through MARA.

140.   On or about April 9, 2009, GetFugu distributed a press release, which represented to the public that GetFugu purchased the IP Portfolio from MARA. The press release contains untrue material misrepresents and omits information needed to render the statements therein to be true.   The press release failed to disclose that the alleged assignment from MARA (owned by Freer) to Madero/GetFugu (in which Freer is the largest shareholder) was not an arms-length transaction or that the consideration paid to MARA was based on the fraudulent, grossly negligent, and/or negligent CVA valuation reports.

141.   While the assignment agreement with MARA was filed with the SEC, no list of the alleged Eight Patent Applications was filed.

142.   The electronic records of the USPTO assignment database reveals that MARA, Madero or GetFugu are not the assignees of any U.S. patent or patent application.

143.   The Eight Patent Applications either do not exist or have been abandoned, there is no evidence that provisional applications were converted into non-provisional applications.  Only three applications have been published and the USPTO has not taken any substantive action on the applications.  Further, the three published applications do not fulfill the requirements for patentability under the U.S. patent statute, e.g., novelty, utility, enablement, written description and best mode.  As such, the Eight Patent Applications have no value.  The ownership and existence of intellectual property assets is material information.  GetFugu and the Defendant who are its owners, directors, agents, employees and majority shareholders have made misrepresentations and failed to disclose the material issue of ownership and existence of GetFugu's alleged intellectual property assets.

143a.  In addition to Freer, persons who benefitted from the transaction include the following:

| | |
|---|---|
| Thames Ltd. | Concept Consulting Mgt Ltd |
| Jensen Entertainment | Jeremy Bonavia |
| Paul Hamblett | Financial & General Securities Ltd |
| Sidebell Ltd | Carole-Anne Richards |
| Paul van der Boogard | Gerhard Strate |
| AM Sutton | John & Aimee Sutton |
| Richwalk Properties | Nikki Broadhurst |
| Tim Broadhurst | Michael Osborne |
| Barry Hutchinson | EFG Geneva/ACH |
| VP Bank Luxembourg | Robert & Asha Sutton |
| KM Executive Fund | Clare Kerry |
| Jensen Investments Ltd | Portcullis Pension Fund |
| Anthony Xuereb | Mike Taylor |
| Emily Wilson | EFG Bank Stockholm |
| John E.A. and Nicola Deacon | |

144.  GetFugu's April 9, 2009, press release, disseminated using the mail or wire, stating that "GetFugu strengthened its core technology base" as a result of the alleged assignment by MARA is false and misleading.

145.  On April 16, 2009 GetFugu Inc. released a press statement, disseminated using the mail or wire, in which its then Chairman of the Board, Steran, was quoted as saying that "GetFugu has built the next generation mobile search tool."  It continued with the company's CEO, Stolar, stating that "GetFugu has developed the most unique mobile technology that I have seen to date."   Both statements are wholly misleading. Notwithstanding this fact, GetFugu's share price rose.

146.  In addition, while GetFugu's public statements, disseminated by mail or wire, hype its "revolutionary new mobile technology" (see, e.g., September 11, 2009 press release), GetFugu in fact uses open source technology that is available to anyone, including without limitation, Boost and OpenCV libraries, standard C++ STL (standard templates) and public domain algorithms published by Dr. Lowe in  British Columbia.  As such, GetFugu's purported technology cannot be protected by either patents or as trade secrets. Thus, GetFugu's purported technology has little, in any, real value.  CVA's valuation

- 33 -

1  certainly did not reveal the use of this open source software or take that fact into
2  consideration in grossly inflating the alleged value of the Eight Patent Applications.

3       147.   Further, the company's officers and directors knew or should have known that
4  GetFugu's public statements as to proprietary technology, disseminated by mail or wire,
5  were false and misleading, but either caused or permitted such statements to be made.

6  148.   Effective April 20, 2009, Jenkins resigned as a director of GetFugu, and on May 5,
7  Peters was appointed a director.

8       149.   Solomon was appointed to GetFugu's Board of Directors on May 18, 2009,
9  and has served as its Chairman since July.

10      150.   GetFugu provided shares in the company to Freer, members of his family and
11 associated persons without any disclosure of the reason that the officers and directors did
12 so.

13      151.   On October 16, 2009, Freer created a limited liability company controlled by
14 three individuals including his current wife, Ericka Freer.  All shares of GetFugu common
15 stock owned by Freer were transferred to this limited liability company.  (SEC Form 10-Q,
16 filed Nov. 23, 2009).  Such transfer was a fraudulent transfer pursuant to Cal. Civ. Code §
17 3439 et seq. and the common law.

18      152.   GetFugu operates a website, www.getfugu.com.  The website was registered
19 by Kozhuharov.

20      153.   GetFugu's website included graphics with trademarked names and/or logos of
21 third-party companies, including without limitation, American Express, Cisco, Coca-Cola,
22 Dallas Cowboys, Disney, eBay, ESPN, Ford Motor, Goldman Sachs, Google, HBO, Los
23 Angeles Lakers, McDonald's, Microsoft, NBC, Nike, Paramount, Pepsi, Pfizer, and many
24 others.  On information and belief, GetFugu has not obtained authorization or a license to
25 use the names and trademarks of some or all of these companies.  Thus, GetFugu, its
26 officers, directors and/or majority shareholders have subjected GetFugu to numerous
27 potential claims of trademark infringement under Section 32 of the Lanham Act, 15 U.S.C.
28 § 1114, and the common law.  Upon a finding of trademark infringement, the Court may

1  award the trademark registrant either actual damages, or statutory damages of up to

2  $200,000 or, in the case of willful infringement, up to $2,000,000. 15 U.S.C. § 1117(c).

3       154.   In addition, GetFugu's website also renders the company potentially liable to

4  third-parties for violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).   In

5  connection with its goods or services, GetFugu may be using one or more words, terms,

6  names, symbols, or devices, alone or in combination, as well as false designations of origin,

7  false or misleading descriptions or representations of fact (disseminated by mail or wire),

8  which are (a)   likely to cause confusion, or to cause mistake, or to deceive as to the

9  affiliation, connection, or association of GetFugu with the third-parties shown on

10 GetFugu's website, or as to the origin, sponsorship, or approval of its goods, services, or

11 commercial activities by another person, and/or (b) in commercial advertising or promotion

12 (including without limitation its website), GetFugu misrepresents the nature, characteristics,

13 qualities, or geographic origin of its goods, services, or commercial activities.  GetFugu's

14 violations of the Lanham Act could be found to be willful.

15      155.   In September 2009, GetFugu entered into a financial agreement with

16 Spongetech Delivery Systems, Inc. After receipt of $1,750,000 on September 24, GetFugu

17 allegedly terminated the agreement, told Spongetech that it would not accept any further

18 funds and that it would return the amounts received to date, plus accrued interest, "as soon

19 as it is able."  GetFugu announced that it terminated the agreement "due to allegations of

20 wrongdoing against SpongeTech."  GetFugu's September 24 letter stated that:

21
        We have reason to believe that you [Spongetech] have been engaging in short
22      selling of Company stock in anticipation of your proposed investment in the
        Company in violation of federal securities laws.
23
        SpongeTech has been publicly accused of forgery and identity theft in
24      connection with attorney opinion letters allegedly forged by SpongeTech.

25      156.   GetFugu's SEC Form 8-K disclosed that it:

26
        concluded that GetFugu can no longer be associated with SpongeTech or
27      Vanity, and our continued public association with SpongeTech and its
        potentially illegal activities is jeopardizing GetFugu and its continued
28

- 35 -

viability. We therefore have no choice but to immediately terminate any further negotiations regarding an investment in the Company or any other business transaction.

157.   On September 30, 2009, Spongetech sued GetFugu in U.S. District Court for the Southern District of New York, alleging fraud, conversion, breach of contract, breach of fiduciary duty and obligation to deal in good faith, and seeking damages and other relief. GetFugu and its officers, directors and employees failed to conduct adequate due diligence before entering into the agreement with Spongetech, resulting in wasteful litigation expenses.   On November 6, 2009, GetFugu entered into a Settlement Agreement with SpongeTech, including a continuing business relationship with SpongeTech.   GetFugu, however, did not give any indication that GetFugu had investigated and concluded that SpongeTech had not engaged in any illegal activities.

158.   On or about September 25, 2009, Stolar, GetFugu's CEO, disclosed a letter addressed to GetFugu's shareholders that included the statement, inter alia, that:   "It has been an exciting month for GetFugu. We have met or exceeded all targets to date, **have more than adequate funding to continue operations into the foreseeable future**" (emphasis added).   However, the day before, on September 24, Stolar sent a letter to Spongetech representing that GetFugu did not have adequate funds to return the $1,750,000.   Moreover, since the September 25 letter, GetFugu has closed the doors of its San Francisco headquarters and left employees unpaid.   Stolar's letter, disseminated by mail or wire, was false and misleading.

159.   On or about September 4, 2009, Jenkins represented that Freer was not an officer or director of GetFugu.

160.   On September 14, 2009, GetFugu and Freer filed a lawsuit against Davies and Warnock in the Superior Court of California, Los Angeles County, captioned GetFugu, Inc., et al. v. Simon Davies, et al., Case No. BC421759.   GetFugu and Freer filed three amended complaints to identify Doe defendants.   The complaint asserts a variety of claims and seeks compensatory and punitive damages in excess of $600,000,000.   The allegations

of the complaint lack any legal or factual basis and are frivolous.   The filing and continuation of this action is a waste of GetFugu's corporate assets and is nothing more than an obvious attempt to intimidate Plaintiffs from pursuing their claims against Freer and his corrupt associates.   Further, GetFugu and Freer filed the lawsuit without either disclosing it to the Board of Directors or obtaining getting Board approval.  GetFugu has not disclosed the filing of the lawsuit to the investing public in a Form 8-K filing with the SEC.

161.   Effective October 20, 2009, LaPresle and Peters resigned from the Board of Directors.  LaPresle continued to serve as an employee, and Peters as a consultant.

162.   On or about November 2, 2009, Stolar resigned as President (but remained CEO) and Freer was appointed as GetFugu's President and as a member of the Board of Directors.  GetFugu's November 6, 2009 SEC Form 8-K (signed by Freer) disclosed that:

> Mr. Freer has more than 15 years experience as a marketing and technology entrepreneur, successfully raising over $350 million in investment capital, and amassing $2.5 billion in market capitalization for his companies.  Prior to co-founding GetFugu in April 2009, he served as SVP Business Development of Media Power Inc. in 2008.  Mr. Freer founded mobile gaming platform Gizmondo in 2002, and was chairman of the board of directors at its parent company, Tiger Telematics Inc. until October 2005.  He has been recognized as a pioneer in mobile technology and innovative approaches to advertising.

163.   The same Form 8-K also disclosed Freer's criminal history:

> In October 2005, Mr. Freer was sentenced to probation and fined by a court in Germany, for buying four luxury cars with a bad check, though Mr. Freer contended he had canceled the check after believing the cars did not have proper title and immediately informed the authorities.  Upon being informed that only one of the four cars had a title issue, Mr. Freer resubmitted the check.

164.   Also on or about November 2, 2009, Bailey was appointed a member of the Board of Directors.

165.   On or about November 2, 2009, each of GetFugu's Directors entered into a standard form of Board of Directors Service and Indemnification Agreement, which provides, inter alia, that:   "The Company shall at all times during the Term of this

Agreement maintain a standard occurrence based policy of D&O insurance covering the actions of the Board, including those of Director, on behalf of the Company, in an amount to be determined by the Board."

166. The gross mismanagement of GetFugu by its officers and directors is reflected in its most request SEC Form 10-Q, filed November 23, 2009, which disclosed that:

> The Company needs to raise additional capital from external sources in order to sustain its operations while continuing the longer term efforts contemplated under its business plan. The Company expects to continue incurring losses for the foreseeable future and must raise additional capital to pursue its product development initiatives, to penetrate markets for the sale of its products and to continue as a going concern. The Company cannot provide any assurance that it will raise additional capital. If the Company is unable to secure additional capital, it may be required to curtail its research and development initiatives and take additional measures to reduce costs in order to conserve its cash in amounts sufficient to sustain operations and meet it obligations. These measures could cause significant delays in the Company's efforts to commercialize its products, which is critical to the realization of its business plan and the future operations of the Company. These matters raise substantial doubt about the Company's ability to continue as a going concern.

167. The November 23 SEC disclosure, signed by Stolar, is expressly contrary to Stolar's September 25, 2009 letter publicly representing to GetFugu's shareholders that the company has "more than adequate funding to continue operations into the foreseeable future." (Emphasis added).

168. Despite the doubts about GetFugu's ability to survive, the officers and directors have not taken any action to reduce costs. To the contrary, GetFugu's general and administrative expenses totaled more than $21 million for the three months ended September 30, 2009. (SEC Form 10-Q, filed Nov. 23, 2009). GetFugu further disclosed that stock-based compensation associated with unnamed consulting and professional services amounted to $16,755,313 in just the three months ending on September 30, 2009.

169.    Moreover, the officers and directors continue to operate the company for their own personal benefit, rather than the benefit of its shareholders.  The November 23 SEC Form 10-Q disclosed that:

> A meeting of the Board of the Company was held on November 2, 2009.  At this meeting, the Board approved (i) the appointment of five new directors (ii) board compensation of $15,000 per month for the chairman and $10,000 a month for board members, and (iii) granted 2,000,000 options to each of the new directors at the fair value on the grant date of $.37 per share and of which 333,333 options vest in six months and the remainder vests over a period of 3 years.

170.    On or about November 13, 2009, GetFugu allegedly created a new wholly-owned subsidiary, GetFugu Research, Inc., a Delaware corporation, and entered into a merger agreement with IKDATA DE, Inc. ("IKDATA") and its sole stockholder, Kozhuharov, GetFugu's Chief Software Architect.  (SEC Form 10-Q filed Nov. 23, 2009). Under the alleged agreement, GetFugu acquired IKDATA and its intellectual property in exchange for an agreement to issue Kozhuharov five million shares of GetFugu's common stock immediately and an additional five million shares in March 2010.  Kozhuharov also entered in to an employee agreement and a six month non-competition agreement.  (Id.). However, as an officer of GetFugu, any intellectual property conceived or created is a corporate opportunity of GetFugu and not Kozhuharov or IKDATA.  Further, the SEC filing does not disclose what intellectual property GetFugu acquired or whether the officers and directors obtained any independent due diligence and review of the validity and valuation of the purported intellectual property.

171.    GetFugu's officers and directors have failed to publicly disclose that, in a recent presentation to a Fortune 500 company, GetFugu's technology simply did not work. Particularly given the April 16, 2009 statements by Stolar and Steran touting GetFugu's technology, its failure to work is material information that should be disclosed to the investing public.

172.    The enforcement staff of the SEC is conducting an inquiry to determine whether there have been violations of the federal securities laws pertaining to GetFugu.

- 39 -

1    173.   GetFugu has not disclosed this action to its shareholders.

2    174.   The actions, agreements, statements, omissions and ratifications of
3 Defendants including Freer, Champion, Irwin, Jenkins, Kozhuharov, LaPresle, Norton,
4 Solomon, Steran, and Stolar constitute a scheme or artifice to deprive GetFugu and its
5 shareholders of the intangible right of honest services.

6    175.   The actions, agreements, statements, omissions and ratifications of
7 Defendants including Freer, Bailey, Begbies, Champion, CVA, DRP, Davis, Dolder, Ericka
8 Freer, Hudson, Irwin, Jenkins, Kozhuharov, Kurz, LaPresle, Miller, Norton, O'Connor,
9 Peters, Rubin, Schloth, Solomon, Steran, Stolar, Stoppenhagen, and Timpe constitute a
10 conspiracy for a scheme or artifice to deprive GetFugu and its shareholders of the intangible
11 right of honest services.

12    176.   The documents referred to here are incorporated herein by reference.

13    177.   On or about December 14, 2009, GetFugu disseminated, by wire and/or mail,
14 an announcement that it has entered into an agreement to receive up to $10,000,000 in
15 funding through a private placement transaction with a purported institutional investor,
16 Hutton International Investments, Ltd. ("Hutton"), a Bermuda company.  (SEC Form 8K,
17 filed Dec. 14, 2009).[1]  Solomon, Chairman of GetFugu, was quoted in a press release as
18 saying:  "Our ability to obtain a significant capital commitment on favorable terms during a
19 tough economy is a testament to the quality of our product and service offering and the
20 strength of our team[.]"   The release went on to quote Hutton's managing director:
21 "'Implementation of the GetFugu application will be one of the most important mobile
22 search technology initiatives of the coming decade,' commented Wan-Chun Huang,
23 Managing Director of Hutton. 'GetFugu has emerged as one of the Mobile Vision
24 Recognition pioneers and our investment will help them recognize their full potential.'"
25 GetFugu does not disclose, however, that Wan-Chun Huang is currently an undergraduate

---

26 [1]   An article on www.lawdragon.com quotes GetFugu's counsel in this litigation and other
27 matters, John C. Kirkland, as saying he represents GetFugu and Hutton.

28

business student at Boston University (class of 2011) and was, until August 2008, a Nursing Assistant in Taiwan.   (http://people.bu.edu/mikimiki/Resume.doc).   Despite Getfugu's disclosure of doubts about its ability to continue as a going concern without raising additional investment capital (SEC Form 10-Q, Nov. 23, 2009), there is no indication that Hutton has actually invested any money in GetFugu.  The alleged transaction with Hutton is another sham transaction designed to mislead GetFugu's existing shareholders and the investing public.

178.   On November 5, 2009, GetFugu filed a SEC Form 8K in which it disclosed that "we entered into a stipulation with Summit Trading Limited for the issuance of 4 million shares of our common stock, in order to resolve claims for compensation for consulting services."  On or about February 18, 2010, the same Summit Trading Limited, a Bahamian company, filed a SEC Form 13G, indicating that it came to beneficially own 20,277,000 shares of GetFugu common stock (9.2%).  The disclosure was signed by Richard Fixaris ("Fixaris").  Summit Trading is owned or controlled by Charles S. Arnold ("Arnold").   Fixaris and Arnold are well known as penny stock promoters.  Fixaris and Arnold allegedly have a pattern and practice of entering into stock promotion contracts with penny stock companies in return for a substantial amount of stock in the company.  They publish or promote positive stories about fledgling companies and are then in a position to reap a windfall when the positive stories spur investors to drive these stock prices higher. There is currently no public disclose as to the basis for the issuance of approximately 9.2% of GetFugu's shares to Summit Trading.

179.   GetFugu's stock has been repeatedly promoted by Ebeling Heffernan Inc. ("Ebeling Heffernan"). Ebeling Heffernan purports to be

> a public markets Consultancy Company formed by two experienced stock market analysts, each of whom founded and currently operate two venture capital companies in the USA and Hong Kong. EH showcases its client's products and services throughout Asia and invests in innovative businesses, the latest technology, novel pharmaceuticals and new markets.

- 41 -

(http://www.ebeling-heffernan.com/index.html).   One of the principals of the company, Shayne Heffernan ("Heffernan"), was the subject of an investment fraud warning by rhe Australian Securities and Investments Commission in 2003. (http://www.asic.gov.au/asic/asic.nsf/byheadline/03-031+Equity-1+Ltd%3A+investor+warning?openDocument).   The other principal, Paul A. Ebeling ("Ebeling"), pled guilty in 1999 to a series of crimes, including mail and wire fraud, aiding and abetting, conspiracy to destroy vessels; destruction of vessel by owner, and false declarations before a court and the final judgment and commitment to the U.S. Marshal issued June 19, 2002.   *United States v. DeGeorge, et al.*, 99-cr-00038-DSF (C.D. Cal.); *see also* SEC Form 13D for Alpha Spacecom, Inc, filed June 10, 2005.

180.   Ebeling Heffernan has extensively promoted GetFugu's stock to the investing public.  For example:

(a)   On February 10, 2010, Ebeling Heffernan publicly disseminated by wire or mail an article entitled "Getfugu, Inc. Aims at $100 Million in Revenue" pertaining to an alleged contract between GetFugu and Salesconx, a purported network for selling and business professionals, to recruit and deploy 20 sales teams across the country to deliver $5 million each in annual revenue. (http://www.livetradingnews.com/getfugu-inc-aims-at-100-million-in-revenue-gfgu-9038.htm).

(b)   On February 11, 2010, Ebeling Heffernan publicly disseminated by wire or mail a press release touting GetFugu and representing that it had invested in the company.   (http://www.pr-inside.com/ebeling-heffernan-report-on-mobility-aapl-r1717285.htm).

(c)   On or about February 22, 2010, the Ebeling Heffernan "Live Trading News" website disseminated, by wire and/or mail, an article purporting to report on an interview that Shayne Heffernan ("Heffernan") had

with Freer the prior week in Bangkok.  The article painted GetFugu and Freer in a positive light, including glossing over Freer's past conduct, and concluded that:

> Based on our meetings and the information gathered we will be proceeding with funding on Getfugu. We are very bullish on this sector for a number of reasons, Smart phone fever, regardless of the platform, has opened new opportunities for mobile operators and software developers like Getfugu, to gain revenue from applications. The rapid growth in the number of smart phone users is driving demand for mobile data services, in turn generating more revenue from applications.Getfugu is one of the applications with the greatest promise in this sector.

The article also noted that "Without hesitation Carl Freer agreed to end all toxic finance agreements once an agreement with us was put in place."

Despite the suggestions in the articles disseminated to the public by wire or mail, there is no indication that Ebeling Heffernan has invested any money in GetFugu.  These articles were false and misleading and another attempt to try to artificially manipulate the stock price of GetFugu for the purpose of its unlawful "pump and dump" scheme.

181.   There appear to be other business connections between Summit Trading, Arnold, Fixaris, Ebeling Heffernan, Ebeling, Heffernan, GetFugu director Timpe, and its attorney, John Kirkland.  (*See, e.g.*, Hythiam, Inc. SEC Form S-3, Amd. 1, filed Sept. 19, 2008;     http://www.livetradingnews.com/the-hot-list-hytm-gfgu-npwz-amhn-mmrf-aemc-copi-tomz-5948.htm).

182.   On or about February 11, 2010, GetFugu disseminated, by wire and/or mail, an announcement that it has entered into a strategic relationship with Illusive Media, a marketing and advertising firm, where Illusive Media will license on Getfugu's behalf a minimum of eight dedicated keywords to Illusive Media's clients at a negotiated rate of $500,000 per keyword per month; the release quoted Curtis Bowens, purported to be Illusive Media's co-founder.  (*See, e.g.*, http://finance.yahoo.com/news/Getfugu-Inc-Enters-

Agreement-iw-3812302423.html?x=0&.v=1).  Subsequently, Illusive Media disclosed that it had nothing to do with GetFugu and was investigating the circumstances surrounding GetFugu's release.  On or about February 15, 2010, the following announcement appeared on Illusive Media's website:

**illusive**media

**ATTENTION!** Illusive Media is officially issuing a statement regarding a recent press release stating that we, Illusive Media, have entered into a strategic partnership with a company called GetFugu Inc. We are in **no way** connected to GetFugu Inc. nor have we entered into any partnership, negotiation, or affiliation with said company. We are currently investigating the circumstances behind how our name was attached to GetFugu Inc. and the motivation behind the unauthorized press release. We are taking the necessary steps toward resolving this matter as quickly as possible. Curtis Bowens is not an owner or shareholder of Illusive Media, Inc.

More information will be forthcoming as the situation progresses.

GetFugu's public announcement was false and misleading and another attempt to try to artificially manipulate the stock price of the company for the purpose of its unlawful "pump and dump" scheme.

183.  On or about April 22, 2009, the stock price of GetFugu was $3.20 per share.  On March 8, 2010, GetFugu's publicly-traded stock price was $0.090 per share.

184.  In March 2009, GetFugu replaced its accounting firm, Moore & Associates, with MSPC Certified Public Accountants and Advisors, P.C., formerly known as Moore Stephens, P.C.  On April 27, 2009, the Public Company Accounting Oversight Board (PCAOB) issued an inspection report on Moore Stephens, P.C.  (PCAOB Release No. 104-2009-058).[2]  The public portion of the report concluded that the "inspection team identified what it considered to be audit deficiencies", including one instance in which the firm failed to "obtain sufficient competent evidential matter to support its opinion on the issuer's

---

[2]   On or about August 27, 2009, the PCAOB, *inter alia*, revoked the registration of Moore & Associates (PCAOB Release No. 105-2009-006).  The basis for the action was PCAOB's findings that Moore violated section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, PCAOB rules and auditing and quality control standards, and noncooperation with the investigation.

financial statements. [Footnotes omitted.]"  On or about March 3, 2010, a complaint was filed in U.S. District Court for the District of New Jersey alleging that Moore Stephens, P.C. engaged in financial misconduct in connection with the audit of a publicly traded company. *John Bird v. Moore Stephens, P.C.*, Civil Action No. 10-1091(DMC).

185.    In its November 6, 2009 SEC Form 8-K disclosure, signed by Carl Freer, GetFugu pledged to disclose any "[a]ctual or threatened major litigation, or the resolution of such litigation."  However, GetFugu has failed to disclose the pending litigation.

186.   In fact, GetFugu has fraudulently represented to the investing public that no litigation existed.  As part of the purported Hutton transaction discussed above, GetFugu filed with the SEC a copy of the Stock Purchase Agreement.  Paragraph 4.1 (j) represented that:

> <u>Litigation</u>.   To the knowledge of the Company, except as set forth in the SEC Reports or as otherwise publicly disclosed by Company, there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action"), which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities, or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor to the knowledge of the Company any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the SEC involving the Company or any current or former director or officer of the Company. The SEC has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Act.

(SEC Form 8K Ex. 1, Dec. 14, 2009).  Not only had this litigation been filed on November 25, 2009, but the company's officers and directors knew that enforcement staff of the SEC

- 45 -

1  was conducting an inquiry to determine whether there have been violations of the federal

2  securities laws pertaining to GetFugu.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A TO SECOND AMENDED RICO CASE STATEMENT